# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff*, | ) | **Case No. 03-cr-00457-PJM** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KENNETH JAMAL LIGHTY,** | ) | |
| | ) | |
| *Defendant*. | ) | |

## MOTION TO VACATE, SET ASIDE, OR CORRECT  SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255

Julie C. Brain
Julie_Brain@fd.org
Karl Schwartz
Karl_Schwartz@fd.org
Delaware Federal Public Defender Office
Capital Habeas Unit
800 N. King Street
Suite 200
Wilmington, DE 19801
(302) 573-6010

Seth A. Rosenthal (D. Md. Bar No. 10780)
sarosenthal@venable.com
Gilead I. Light
gilight@venable.com
Molly T. Geissenhainer (D. Md. Bar No. 18390)
mtgeissenhainer@venable.com
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
202-344-4000

**APPOINTED COUNSEL FOR DEFENDANT**

**TABLE OF CONTENTS**

PROCEDURAL HISTORY……………………………………………………..………………1

CLAIMS FOR RELIEF…………………………………………..………………...5

I.      THE GOVERNMENT UNCONSTITUTIONALLY EXERCISED ITS
        PEREMPTORY CHALLENGES TO EXCLUDE PROSPECTIVE FEMALE
        JURORS BECAUSE OF THEIR GENDER AND RACE…………………………..5

II.     TRIAL COUNSEL RENDERED CONSTITUTIONALLY
        INEFFECTIVE ASSISTANCE AT THE GUILT PHASE………………………..17

III.    MR. LIGHTY'S RIGHT TO A FAIR AND IMPARTIAL JURY
        WAS VIOLATED IN MULTIPLE RESPECTS…………………………………51

IV.     MR. LIGHTY WAS DEPRIVED OF HIS CONSTITUTIONAL
        RIGHTS BECAUSE THE GOVERNMENT ENGAGED IN
        PROSECUTORIAL MISCONDUCT…………………………………………..65

V.      THE COURT ERRONEOUSLY EXCLUDED RELEVANT
        MITIGATING EVIDENCE AT THE PENALTY PHASE IN
        VIOLATION OF MR. LIGHTY'S CONSTITUTIONAL RIGHTS………………..80

VI.     TRIAL COUNSEL RENDERED CONSTITUTIONALLY
        INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE………………………86

VII.    IMPROPER INSTRUCTIONS TO THE JURY AT THE PENALTY
        PHASE VIOLATED MR. LIGHTY'S CONSTITUTIONAL RIGHTS……..………149

VIII.   ERRORS AND OMISSIONS BY APPELLATE COUNSEL DEPRIVED
        MR. LIGHTY OF HIS CONSTITUTIONAL RIGHTS TO EFFECTIVE
        ASSISTANCE ON DIRECT APPEAL ……………………………………..……157

IX.     MR. LIGHTY'S CONVICTIONS AND SENTENCES MUST BE
        VACATED BECAUSE OF THE CUMULATIVE EFFECT OF
        THE PREJUDICIAL ERRORS MADE IN THIS CASE…………………..……161

PRAYER FOR RELIEF…………………………………………………………...162

VERIFICATION…………………………………………………………………...164

## PROCEDURAL HISTORY

1.        On October 8, 2003, Petitioner, Kenneth Lighty, and co-defendants James Flood, and Lorenzo Wilson were indicted on charges of kidnapping resulting in the death of Eric Hayes, and aiding and abetting the same, 18 U.S.C. §§ 1201(a) and 2, conspiracy to kidnap, and aiding and abetting the same, *id.* §§ 1201(c) and 2, and three counts of using a firearm in furtherance of a crime of violence, and aiding and abetting the same, *id.* §§ 924(c) and 2.

2.        On December 28, 2004, the Government filed notice of intent to seek the death penalty with respect to Mr. Lighty only.  The Government alleged the four statutory proportionality factors enumerated under 18 U.S.C. § 3591(a)(2)(A)-(D), one statutory aggravating factor enumerated under 18 U.S.C. § 3592(c), namely "death during the commission of another crime," and four non-statutory aggravating factors.  The non-statutory aggravating factors were: (1) victim impact evidence, (2) lack of remorse, (3) commission of other serious acts of violence, including murder (alleged to be a January 30, 2002 "drive-by shooting resulting in the death of Antoine Newbill," and "a robbery and assault that occurred on May 8, 2001"), and (4) commission of the capital offense while the defendant was subject to conditions pertaining to other charges and adjudications.

3.        Mr. Lighty's trial commenced on September 29, 2005, before this Court.  Mr. Lighty was represented by Jeffrey B. O'Toole, Esq. and Danya A. Dayson, Esq.  The Government was represented by Assistant United States Attorneys Deborah A. Johnston, Esq. and Sandra Wilkinson, Esq., of the United States Attorney's Office for the District of Maryland.

4.        Mr. Lighty was tried together with co-defendant, James Flood.  The trial of Lorenzo Wilson, had been severed at the request of the Government.  Wilson was tried several

1

months earlier and found guilty of conspiracy to kidnap and not guilty on the remaining counts. He was sentenced to life imprisonment.

5. On October 25, 2005, the jury in Mr. Lighty and Mr. Flood's case returned its verdicts, convicting both men of all charges.

6. On November 1, 2005, Mr. Lighty's penalty phase commenced. The defense submitted two mitigating factors, that another defendant or defendants, equally culpable in the crime, will not be punished by death, 18 U.S.C. § 3592(a)(4), and other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence. *Id.* at 3592(a)(8).

7. On November 10, 2005, the jury returned its verdict, sentencing Mr. Lighty to death. The jury found all of the proportionality factors, and all of the statutory and non-statutory aggravating factors. Various members of the jury found that the following mitigating factors had been proven: another defendant or defendants, equally culpable in the crime, will not be punished by death, found by 9 jurors; other factors in the defendant's background, record or character or other circumstances of the offense that mitigate against the imposition of the death sentence, found by 11 jurors; all life has value, found by 11 jurors; the effect of the sentence on Nancy Westfield (Grandmother), found by 11 jurors; poor defense, found by 3 jurors.

8. On February 28, 2006, the Court sentenced Mr. Lighty to death on the kidnapping resulting in death conviction, to life imprisonment on the conspiracy to kidnap conviction, and to three consecutive sentences totaling fifty-five years on the firearms convictions.

9. On March 6, 2006, Mr. Lighty filed a notice of appeal to the United States Court of Appeals for the Fourth Circuit.

10.     On July 13, 2006, Mr. Lighty filed a motion with the Fourth Circuit to substitute attorney Gary DiBianco, Esq., in place of Danya Dayson, Esq.  The Court granted the motion on July 24, 2006, appointing Mr. DiBianco as lead counsel on appeal, and appointing Jeffrey B. O'Toole as co-counsel.

11.     By letter on March 29, 2007, the Government informed Mr. Lighty's counsel of information corroborating Mr. Lighty's defense at trial that a fourth individual, Anthony Mathis, and not Mr. Lighty, kidnapped and shot Eric Hayes.  The information had been provided to District of Columbia police officers and Prince George's County homicide detectives on July 23, 2006.

12.     Based on this new, formerly unavailable evidence, on June 5, 2007, Mr. Lighty filed a motion with the Fourth Circuit requesting that the case be remanded to the district court to allow him to file a motion for a new trial  pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

13.     On June 25, 2007, the Fourth Circuit issued an Order deferring action on Mr. Lighty's request, and directed counsel to inform the Court if he filed a motion for a new trial.

14.     On December 21, 2007, Mr. Lighty filed a motion for a new trial in this Court

15.     On December 28, 2007, counsel for Mr. Lighty filed a letter with the Fourth Circuit indicating that a motion for a new trial had been filed with the district court.  Counsel again requested that the case be remanded to this Court.

16.     On January 10, 2008, the Fourth Circuit denied Mr. Lighty's motion to remand.

17.     On January 12, 2009, Amanda M. Raines, Esq.and Donald P. Salzman, Esq., of the firm of Skadden, Arps, Slate, Meagher & Flom LLP, entered their appearances as co-counsel for Mr. Lighty.

18.     On various dates in 2008 and 2009, this Court heard evidence and argument in support of the motion for a new trial.  On June 1, 2009, the district court denied Mr. Lighty's motion for a new trial.

19.     On August 11, 2010, the Fourth Circuit affirmed Mr. Lighty's convictions and sentences.  *United States v. Lighty,* 616 F.3d 321 (4th Cir. 2010).

20.     On August 25, 2010, Mr. Lighty filed a petition for rehearing and rehearing en banc.

21.     On September 2, 2010, the Fourth Circuit issued its formal mandate pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

22.     On September 8, 2010, the Fourth Circuit denied Mr. Lighty's motion for rehearing and rehearing en banc.

23.     On February 4, 2011, Mr. Lighty filed a petition for writ of certiorari in the United States Supreme Court.

24.     On October 17, 2011, the United States Supreme Court denied Mr. Lighty's Petition for Writ of Certiorari.  *Kenneth Jamal Lighty v. United States,* 132 S. Ct. 451 (2011).

## CLAIMS FOR RELIEF

I.   **THE GOVERNMENT UNCONSTITUTIONALLY EXERCISED ITS PEREMPTORY CHALLENGES TO EXCLUDE PROSPECTIVE FEMALE JURORS BECAUSE OF THEIR GENDER AND RACE.**

Mr. Lighty's convictions and death sentence were obtained in violation of his Fifth, Sixth and Eighth Amendment rights to due process, a fair trial, a fair and impartial jury and to be free from cruel and unusual punishment because the Government exercised its peremptory challenges against female venire members on the basis of their gender and their race. The Equal Protection Clause of the United States Constitution forbids the Government from striking potential jurors on account of their gender based on the stereotypical assumption that female jurors will view the case in a particular way because they are women in general or women of color in particular. The harm caused by a prosecutor's gender- and race-based use of peremptory strikes is not limited to the denial of a fair trial to the defendant. Jurors excluded because of their gender and race are also harmed, and the integrity of the judicial process is tainted. The exclusion of even a single juror from the petit jury on the basis of gender and/or race violates the Equal Protection guarantee of the Fifth Amendment and requires a new trial.

In support of this claim, Mr. Lighty alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.     The Government used its peremptory challenges to exclude all but one woman, and all African-American women, from participation on Mr. Lighty's petit jury. The Government lacked legitimate gender- and race-neutral justifications for striking prospective female jurors from the panel. The Government's use of its peremptory challenges to strike female jurors in this case was part of, and consistent with, a broader pattern and practice of

exercising peremptory strikes against female jurors in capital prosecutions. Because of the Government's discriminatory use of peremptory strikes in this case, Mr. Lighty's petit jury consisted of 11 men, one woman and no African-American women. All six of the alternates were also men.

2.      The Government's unconstitutional use of peremptory strikes to exclude women in general and African American women in particular from Mr. Lighty's jury entitles him to a new trial. At a minimum, the evidence establishes a *prima facie* showing of gender and race discrimination sufficient to entitle him to discovery and an evidentiary hearing.

3.      The Government struck female venire members at a highly disproportionate rate in Mr. Lighty's case. Because the Court used a blind striking procedure, it is impossible to discern from the face of the current record exactly which jurors the Government struck using its peremptory challenges. Mr. Lighty will seek leave of Court to utilize formal discovery procedures to secure this information, and will seek the Court's permission to amend this Motion to incorporate any relevant information that is discovered. However, upon information and belief, of the 12 peremptory strikes that presently can be discerned, the Government used at least 10 of them to exclude women, and at least five of them to exclude African-American women. It is not possible to discern based on the current record whether the Government struck additional African-American female jurors in the qualified pool or not.

4.      In view of the foregoing, of the strikes that presently can be identified, the Government used at least 83.3% of them against women. Given that women made up 51.5% of the pool for potential strikes,[1] there is a vast disparity between the number of women struck and the number of men struck. If the prosecution had struck women at a rate equivalent to their

---

[1] The jury was chosen from a pool of 66 prospective jurors deemed generally qualified for jury service in this case. Of the 66, 34, or 51.5%, were women and 32, or 48.5%, were men.

representation on the panel of qualified jurors, the prosecution would have used approximately six, rather than ten, of their 12 discernible strikes against women.

4.      Coupled with the fact that only *one* of 18 seated and alternate jurors was a woman, and none was an African-American woman, the Government's strike rate, which was grossly disproportionate to the representation of women on the venire, is strongly indicative of purposeful discrimination.  Happenstance is exceedingly unlikely to produce a jury so heavily dominated by men and completely lacking in African-American women.

5.      Of the identifiable strikes the Government used against women, the women excluded were qualified to serve and possessed characteristics that were either neutral or pro-prosecution.

6.      **First Strike.**  The Government's first identifiable strike was against Juror No. 1, a white female.  Juror No. 1, a 60-year-old retiree, was formerly employed as an administrative assistant in several United States District Courts and the FBI.  She testified on voir dire that she was "ambivalent" about the death penalty, with no strong views either way, and that she would be able to follow the Court's instructions on the law.  She further testified that she would be fair and impartial to both sides, make a decision based on the evidence presented in Court and the law, and impose a sentence of death if appropriate, or a sentence of life in prison if appropriate.  Juror No. 1 testified that she would not always vote to impose death or to impose life in prison, but that she would consider the circumstances in each case, including the aggravating and the mitigating circumstances.  Juror No. 1 further stated that signing a death verdict in open court would not affect her ability to impose a death sentence.

7.      **Second Strike.**  The Government's second identifiable strike was against Juror No. 21, a black female.  Juror No. 21, a 42-year-old registered nurse paramedic, was at the time a

7

supervisory nurse at the United States Government Printing Office.  She indicated in response to a written juror questionnaire that she was "somewhat in favor of the death penalty."  During voir dire, she testified emphatically that a case alleging kidnapping resulting in death is the kind of case in which she would always vote for the death penalty.  However, after some clarification from the Court, she stated that she would not always vote for the death penalty but would instead listen to all of the aggravating and mitigating circumstances of the case.  She testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

8.      **Third Strike.**  The Government's third identifiable strike was against Juror No. 40, a black female.  Juror No. 40 was a 35-year-old management analyst with Defense Information Systems Agency.  Although Juror No. 40 was "somewhat opposed to the death penalty," she believed that the death penalty should be imposed if the evidence showed that the suspect willfully took someone's life.  She affirmed that she would consider the circumstances of the case, and that she could impose either the death sentence or life without the possibility of parole given the evidence in the case.  She testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

9.      **Fourth Strike.**  The Government's fourth identifiable strike was against Juror No. 67, a black male.  A lawyer, Juror No. 67 testified that he had previously taken coursework in criminal procedure and worked for a criminal defense attorney.  He self-identified as "somewhat in favor of the death penalty" and explained that he believed that the death penalty is constitutional, could be fairly imposed, and has appropriate use in the criminal justice system.  Juror No. 67 informed the Court that he believed the death penalty to be an appropriate penalty for a repeat offender previously convicted of homicide.  He also repeatedly affirmed that he would consider all circumstances of the case, and that he would be able to impose either the

8

death penalty or life in prison without the possibility of release, under the appropriate circumstances. Juror No. 67 further testified that signing a death verdict in open court would not affect his ability to impose a death sentence.

10.    **Fifth Strike.** The Government's fifth identifiable strike was against Juror No. 77, a white female. Juror No. 77, a 55-year-old retired software specialist, had previously served as a juror in a criminal case in which the defendant was charged with assault with intent to maim. In that case, the jury returned a guilty verdict. Juror No. 77 stated that she was "somewhat in favor of the death penalty," and that the death penalty "is necessary in some cases." She further testified that she could impose either the death penalty or life in prison given the evidence in the case, and that she would listen to all of the evidence of both aggravating and mitigating factors prior to voting on penalty. She also testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

11.    **Sixth Strike.** The Government's sixth identifiable strike was against Juror No. 83, a black female. Although Juror No. 83 stated that she was somewhat opposed to the death penalty, she testified that there under certain circumstances, she would be prepared to vote for the death penalty. She repeatedly affirmed that she would consider the circumstances of the case, and that she could consider the death penalty in a case alleging kidnapping resulting in death. Juror No. 83 also testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

12.    **Seventh Strike.** The Government's seventh identifiable strike was against Juror No. 88, a white female. Juror No. 88 stated that she had no particular feelings about the death penalty. She indicated that she believed it should be used in certain types of cases, such as torture, or the murder of a police officer, and that she would consider imposing the death penalty

9

in a case alleging kidnapping resulting in death.  Juror No. 88 affirmed that she would consider all of the aggravating and mitigating circumstances before choosing to impose death or life in prison without the possibility of release. She also testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

13.     **Eighth Strike.**  The Government's eighth identifiable strike was against Juror No. 90, a black female.  Juror No. 90, a self-employed consultant, stated that she was somewhat opposed to the death penalty, but that some crimes "are so horrendous that the death penalty would probably be appropriate."  Juror No. 90 further testified that she would be able to follow the Court's instructions, and that she would be able to impose either the death penalty or life in prison without the possibility of release depending on the evidence in the case.  She also testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

14.     **Ninth Strike.**  The Government's ninth identifiable strike was against Juror No. 117, a black female.  Juror No. 117 was a 32-year-old full-time math and pre-algebra teacher for Prince George's County Public Schools.  The Government prematurely attempted to remove Juror No. 117 from the venire.  Upon learning her occupation, the Government immediately requested a bench conference and informed the Court that it believed she should have been excused with all other full-time teachers.  The Court denied the Government's request, stating that "The Government seems to be asking to strike her for a hardship she hasn't asked for."  During voir dire, Juror No. 117 then testified that she thought "it may be necessary for a person to get the death penalty depending upon their crime," but that whether to impose the death penalty depended upon the individual and the circumstances of the individual case.  She repeatedly affirmed that she would consider the circumstances of the case when voting on the

10

penalty.  She also testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

15.    **Tenth Strike.**  The Government's tenth identifiable strike was against Juror No. 121, a white female.  Juror No. 121 was a 59-year-old analyst and executive assistant at L-3 GSI. She testified that she had no strong opinions for or against the death penalty.  Juror No. 121 affirmed that she would be able to impose the death penalty or life without the possibility of release, given the evidence in the case.  Further, she affirmed that she would consider all evidence presented, including both the aggravating and mitigating circumstances of the case, before imposing a sentence.  Finally, she testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

16.    **Eleventh Strike.**  The Government's eleventh identifiable strike was against Juror No. 137, a white male.  Juror No. 137 testified that he is "somewhat in favor" of the death penalty.  He thought the death penalty was "a constitutional penalty," the "ultimate sanction that society can impose for a crime," and "a legal and appropriate remedy which has to be carefully considered."  Juror No. 137 affirmed that he would consider the aggravating and mitigating circumstances of the case, and that signing a death verdict in open court would not affect his ability to impose a death sentence.

17.    **Twelfth Strike.**  The Government's twelfth identifiable strike was against Juror No. 145, a white female.  During voir dire, Juror No. 145 testified that she had previously formed an opinion about the case; she did not believe that any particular evidence, such as "CSI-type" scientific or forensic evidence, need be adduced in order for her to make a finding as to guilt or innocence; and she had never formed an opinion either for or against the death penalty.  She agreed that she would be able to impose the death penalty if the evidence established that a death

11

sentence was appropriate under the law.  She agreed equally that she would be able to impose a

sentence of life in prison if the evidence established that such sentence was appropriate under the

law.  She affirmed several times that she would be able to follow the Court's instructions in all

respects.

18.     Many of the male jurors who were seated and whom the Government accepted

expressed views, including views on the death penalty, that were no different than the

identifiable female jurors whom the Government struck using its peremptory challenges.  In fact,

some of the male jurors who were seated and whom the Government accepted expressed views

that appeared more predisposed to a sentence of life without parole than the identifiable female

jurors whom the Government struck.  For instance:

- Juror No. 19 indicated on his questionnaire that the death penalty was imposed too often,

  and that there are too many African-American men in jail awaiting execution unjustly.

  During voir dire, he explained that he had seen news about African-American men being

  released from prison after they were convicted in the '60s and '70s and thought race

  might have played a role there.  Juror No. 19 also stated that the death penalty is

  somewhat necessary depending on the circumstances of the crime, "but it may not be

  necessary in all crimes and all situations."  He confirmed that he could keep an open

  mind as to either the death penalty or life without parole and would consider all the

  circumstances in making his determination.

- Juror No. 28, who previously served on a jury in a murder case in New York, expressed

  no firm views about the death penalty.  He said he would be able to impose life in prison

  or the death penalty depending on the evidence in the case.  At one point, he also said

  that, in a case alleging kidnapping resulting in death, he would always vote for life in

12

prison without the possibility of release regardless of the circumstances, but on follow-up questioning, he maintained that he would consider all of the evidence, including both aggravating and mitigating circumstances, and could vote to impose either the death penalty or life without parole.

- Juror No. 46, a retired police officer from New Jersey, expressed reservations about the death penalty. He stated, *inter alia,* "Now that I found out that this is a matter of the death sentence, I do feel that it's not that I couldn't render an honest opinion. It's just that I no longer feel that the death penalty is the best way to go. I come to find out that so many people now have been exonerated through DNA or other sources, and I'm kind of leaning towards being against the death penalty. A life sentence I have no problem with . . ." At one point, Juror No. 46 also maintained that he would always vote for life in prison without release, regardless of the circumstances. He then confirmed, however, that he could follow the court's instructions, set aside his personal views, assess all of the evidence and impose a death sentence if he were convinced of its propriety beyond a reasonable doubt.

- Juror No. 56 stated, *inter alia*, that he did not have well-formed views on the death penalty but thinks "it's probably only appropriate for the absolute most violent, you know, hate-filled crimes." He said he would follow the court's instructions, would not always vote one way or the other and could impose either a life or death sentence.

- Juror No. 85 felt that the death penalty is "a necessary evil." He stated that he was "somewhat against it," but believes "it's a necessary thing in our society." At one point, he told the Court that he would not be able to impose the death penalty. Ultimately, however, Juror No. 85 confirmed that he could set aside his personal views, could follow

13

the court's instructions, would not always vote for life in prison, would not always vote for life without parole in a case alleging kidnapping resulting in death and would consider both aggravating and mitigating factors.

- Juror No. 86 stated that there are some crimes "gross enough to deserve a death penalty, and so I'm not opposed to it. I'm not really, you know, like Texas, wanting to apply it to everything either, so." He described himself as "somewhere in the middle." Juror No. 86 asserted that he could set aside his own views and follow the court's instructions, could vote to impose either the death penalty or life without release if the evidence established that either was the appropriate sentence, and would consider all of the circumstances, including all aggravating and mitigating factors.

- Juror No. 107 said he could impose either the death penalty or life without parole depending on the circumstances and "would not say an eye for an eye." He maintained that he would consider all of the circumstances in reaching a decision.

- Juror No. 126 answered on his questionnaire that he thought the death penalty was carried out too often. During voir dire, he affirmed that he did not have a bias against imposing the death penalty, expressed no views that were either demonstrably pro- or anti-death penalty, said he could impose either the death penalty or life in prison and would listen to all the evidence, including aggravating and mitigating circumstances.

- Juror No. 155 did not express any views that were demonstrably in favor of either the death penalty or life without parole. He said he would consider all of the circumstances and could impose either sentence.

- Juror No. 157 wrote in his questionnaire that he was "somewhat opposed to the death penalty." He acknowledged, however, that there are circumstances where it may be

14

appropriate. He said he would always vote for death in cases involving "killing and slaughtering people, like a whole family," and he would never vote for death in cases of accident. To him, a case involving kidnapping resulting in death is the kind of case in which what he decided would depend on the circumstances. Juror No. 157 then said, however, that he would probably vote for life in prison without release in this case, without regard to the circumstances. When the court tried to clarify – "So it wouldn't matter to you whether there were aggravating circumstances that were put in by the  - evidence that was put in by the Government, you would still vote for life in prison without release?," Juror No. 157 answered, "I still vote – let him stay in prison for no release." Subsequently, however, he confirmed that he could impose a death sentence if the evidence showed it to be the appropriate sentence, even though he would tend to lean toward a sentence of life in prison without parole.

- Juror No. 158 said he believed the death penalty is justified in certain cases, and depends on the circumstances. He maintained that he would always vote for the death penalty in cases like the September 11 crimes or the Oklahoma City bombing and would be able to vote for the death penalty in this case if the evidence were to establish that it was the appropriate sentence; however, he asserted that that he had reservations about imposing a death sentence: "I guess my explanation is, you know, it's easy to say, you know, I could impose the death penalty in certain cases and, you know, following the law, but to sit in a room and look across the room and look someone else in the eye and say that you individually deserve to die, I've never been in that circumstance. My honest answer is I'm not sure I could do it." In follow up questioning, Juror No. 158 said he could

15

evaluate the case on the merits, follow the court's instructions, and impose the death penalty if the circumstances warranted it.

19.     The Government's exercise of peremptory challenges to exclude all but one female juror and all African American female jurors from the petit jury in Mr. Lighty's case establishes a violation of Mr. Lighty's constitutional rights.

20.     Upon information and belief, the Government's gender-based exercise of peremptory challenges in Mr. Lighty's case is part of a pattern and practice of unlawful, gender-based peremptory challenges that the prosecutors in Mr. Lighty's case also followed in the capital case they prosecuted prior to Mr. Lighty's.

21.      In December 1999, a federal grand jury in the District of Maryland indicted Willis Mark Haynes and Dustin John Higgs on charges of first-degree murder, kidnapping and using a firearm during and in relation to a crime of violence.  The Government filed a notice of intent to seek the death penalty as to both defendants, who were tried separately.  The same prosecutors who tried Mr. Lighty tried the cases against Haynes and Higgs.  *United States of America v. Willis Mark Haynes*, PJM-98-0520 (D. Md.); *United States of America v. Dustin John Higgs*, PJM-98-0520 (D. Md.).

22.     The Haynes trial took place in May, 2000.  Upon information and belief, a jury that was roughly split between men and women convicted Haynes of three counts of first-degree murder, three counts of kidnapping and three counts of using a firearm during and in relating to a crime of violence.  However, the mixed male-female jury was unable to agree unanimously on the death penalty for Haynes.  Haynes therefore received a sentence of concurrent life terms for the first-degree murder and kidnapping counts, and received a forty-five year consecutive sentence for the firearm counts.

23.     Four months later, in September 2000, the Government tried Higgs.  In contrast to the jury selection in *Haynes,* which produced a mixed jury of men and women, the jury selection in *Higgs* produced an all-male jury.  The *Higgs* jury did not contain even one female juror.

24.     Upon information and belief, the Government purposely exercised its peremptory strikes in *Higgs* to exclude women because the *Haynes* jury, which consisted of a number of women, had not returned a death sentence.

25.     Upon information and belief, the Government in *Higgs* used at least 15 of 20 possible peremptory strikes.  Of those 15 known peremptory strikes, the Government used 11, or 73.3%, to exclude women.   This percentage was vastly disproportionate to the percentage of female jurors in the pool of qualified, prospective jurors.

26.     Whereas the mixed male-female jury in *Haynes* returned a life sentence, the all-male jury in *Higgs* recommended that Higgs receive nine death sentences, one for each of the six murder and three kidnapping-resulting-in-death counts.

27.     Upon information and belief, the Government sought to select an all-male or male-dominated jury in Mr. Lighty's case based upon its experiences in *Haynes* and *Higgs*.  It used its peremptory challenges in Mr. Lighty's case in a discriminatory manner to preclude women, and African-American women in particular, from serving on Mr. Lighty's petit jury.

28.     Trial and appellate counsel provided ineffective assistance of counsel, in violation of Mr. Lighty's Fifth, Sixth and Eighth Amendment rights, by unreasonably failing to challenge the Government's discriminatory use of peremptory challenges.  *See* Claims II and VIII.

## II.     TRIAL COUNSEL RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE AT THE GUILT PHASE

Mr. Lighty's convictions and sentence of death were obtained in violation of his federal constitutional rights to counsel, the effective assistance thereof, a fair and impartial jury, the

17

presumption of innocence, present a defense, confrontation, compulsory process, due process, freedom from cruel and unusual punishment and a fair, reliable, accurate determination of his guilt as guaranteed by the Fifth, Sixth and Eighth Amendments because his trial counsel's representation during the guilt phase of his trial was deficient.  Counsel's multiple errors and omissions resulted in overwhelming prejudice to Mr. Lighty.  Separately, and cumulatively, those deficiencies in the investigation, preparation and presentation of Mr. Lighty's defense require reversal of Mr. Lighty's convictions.   In addition, those deficiencies require reversal of Mr. Lighty's death sentence, as they prejudiced Mr. Lighty's presentation not only at the guilt phase, but at the penalty phase as well.

In support of this claim, Mr. Lighty alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.      **Failure to investigate and present evidence that Tony Mathis, and not Mr. Lighty, killed Mr. Hayes**.  Trial counsel unreasonably and prejudicially failed to investigate and present all available evidence that Tony Mathis, and not Mr. Lighty, killed the decedent.  That evidence includes, but is not limited to:

2.      Tamika Hampton, Mathis' girlfriend and the mother of his children, would have testified to material information, including: She knew Mathis very well, having met him in middle school.  Ms. Hampton also knew James Flood very well, and met him first when they were in sixth grade.  Flood is approximately 5'6" or 5'7" tall and weighs about 160lbs.  Mathis was 5'11" or 6'.  Flood and Mathis knew each other very, very well.  They had known each other since elementary school and were very close.  They were childhood friends that rode bikes and played together, and they were close from then onwards.   Ms. Hampton would always see them

18

together.  Flood's little clique growing up was himself, Mathis and a man named Howard Bradshaw.  Howard Bradshaw was incarcerated in approximately 1993, so since that time Mathis and Flood hung out together.  Mathis was in and out of jail a lot, but when he was out she used to see him in the street and at the barber shop with Flood.  Ms. Hampton did not know Mr. Lighty or Lorenzo Wilson, and never knew either of them to hang out with Flood and Mathis.  Yogi was an acquaintance of Flood and Mathis; Ms. Hampton would see them talking to him.

3.     Mathis made his money selling drugs; he had never had a job.  He sold weed, crack and PCP up and down Iverson Street, Keating Street and in the back streets in that area.  Sometimes his friend Khalif gave him drugs to sell to help him out, like when he first got out of jail.  He was released from jail in November, 2000, after doing a long stretch of six or seven years.  Ms. Hampton became pregnant by him in February of 2001.  He was arrested again some time thereafter, after Ms. Hampton turned him in for robbing a jewelry store, but somebody bonded him out.  He had taken jewelry from a vendor at the mall in the early morning, just as the mall was opening, and brought it all to Ms. Hampton's apartment.

4.     Mathis did not live with Ms. Hampton; he was messing with a girl who lived in the same building as her, and he stayed with her or his mother.  Ms. Hampton saw him with a gun in 2001, during a period of time that he was staying more at his mother's house on 28th Avenue.  It was a small black clip-type gun that looked similar to the gun used in the Hayes shooting.  She saw him with it in the time period leading up to the birth of her daughter on December 21, 2001 and into early 2002.  She saw him with it all the time, and saw it on his bed and on his dresser at his mother's house.  Later on, she saw him with a different gun, with a chrome finish, tucked into his waistband.  When someone in the neighborhood had a gun, they would pass it around amongst their friends.  Ms. Hampton had also seen Flood with a gun, under

19

the seats in his car.  That was when they were teenagers.

5.      In late 2001, early 2002, Mathis had several jackets that he wore.  He wore a blue hoody, a leather jacket, and he also had a thick camouflage hoody that he wore without a coat.

6.      Mathis told Ms. Hampton that he had killed people.  He said he had killed n[]s on the street and that he had killed n[]s for other n[]s and they owed him.  He said that he had demons as a result of the things he had done and could not sleep at night.  He told her that he was responsible for killing a man whose body was found in a trash can.  He told her to be careful and not to tell everyone who she was, because of the risk that someone would retaliate for his crimes by harming her or his children.  Because of that risk, he would not take the children out with him.  Because of all the wrong he had done in the street, he couldn't live like a regular person.

7.      Mathis also told Ms. Hampton that, if it wasn't for him, a lot of people selling drugs in the area would not make as much money as they made.  He felt that the streets owed him something because of all the work he put in, meaning the drugs he'd sold and the people he'd killed.  Putting in work means doing what you have to do to survive, for yourself and your friends, such as robbing people, or killing someone who is beefing with your friend so that the friend doesn't have to worry and be afraid any more.  Mathis told Ms. Hampton that he is a shooter, that's how he kills people. He told her not to mess with him, or else they would find her body in the woods like the girl in Waldorf.  He used to do things to try to make her afraid, such as grabbing her and trying to put plastic bags over her head.  He threatened to kill her several times.

8.      In the summer of 2001, Ms. Hampton saw Mathis with blood all over his shirt. He was sitting on the curb by the mall.  His nose was broken and he was scuffed up a little bit. He lied and told police and Ms. Hampton that he had been hit by a Chevy Tahoe truck

9.      When Mathis and his friends were teenagers, they used to rob anyone who came through the neighborhood that did not belong there.  They took peoples' Eddie Bauer coats, like the one that was taken from Mr. Hayes during the murder, and sold them for $100 a piece.  Flood was not one to do robberies on his own, but he would get Mathis to do it and go with him.  Mathis was like Mikey:  people used to say, oh, Tony will do it, he doesn't care.  Ms. Hampton had a friend who she called Big Crystal.  Mathis robbed either Crystal's baby's father or the baby's father's sister, and so they would no longer speak to Ms. Hampton.

10.      On one occasion, Mathis went to a nightclub called Legend with Flood.  Mathis drove his station wagon there.  He was so high on drugs that he lost his car.  He said he woke up on the bus with no jacket on and didn't know what happened.  Another time Mathis and Flood planned to go to Six Flags but they never even got into the park.  They were smoking PCP and Mathis had a bad reaction and thought Flood was trying to kill him.  He ended up in the hospital.

11.      Counsel sought to call Ms. Hampton as a witness on one discrete and narrow issue.  That testimony was excluded by the Court.  Reasonably competent counsel would have sought to present the entirety of the material information in Ms. Hampton's possession, and the Court would have permitted her to so testify.

12.      Counsel further failed to investigate and present available evidence that Mathis' best friend Flood had been carjacked shortly before the Hayes murder; that the carjacking was committed by Francisco "Sisco" Brittingham and/or some of his people; that Sisco was both a cousin of Mr. Hayes and Mr. Hayes' drug supplier, in that he supplied Hayes with PCP and other drugs to sell out on Eighth Street; that the abduction and murder of Hayes was in retaliation for the carjacking of Flood by Sisco; and that Sisco and his associates immediately thought they knew who the culprits were when they heard that Hayes had been abducted.

21

13. Counsel further failed to investigate and present available evidence that Anthony Mathis admitted to several people that he, and not Mr. Lighty, shot and killed Eric Hayes. Reasonably effective defense investigation of individuals who were known to defense counsel, and likely to have relevant information relating to murder of Mr. Hayes, would have revealed that Mr. Mathis confessed his role in the incident to a number of people.

14. Mr. Mathis had conversations about the incident both inside and outside of prison, and his accounts of his role were consistent in each telling. Mr. Mathis was a close friend of both James Flood and Eugene Scott (aka Yogi). He admitted to friends and acquaintances that he shot Mr. Hayes several times in the head.

15. The witnesses to whom Mathis confessed his role were available to testify at trial. Defense counsel had no strategic basis for failing to investigate and call these witnesses. In failing to conduct any investigation of these witnesses, defense counsel failed to act as the reasonably competent advocates guaranteed by the Constitution.

16. Counsel further failed to investigate and present available evidence that Mathis was released from jail in October of 2001, the same month that Mr. Lighty was released. The Government presented evidence at trial that one of Hayes's abductors, the driver of the blue Lincoln, asked Hayes to sell him PCP because he had just got out of jail and needed to get high. The Government further presented an extraordinarily prejudicial set of records of Mr. Lighty's previous arrest and incarceration on a robbery charge, to which counsel's failure to object independently constituted ineffective assistance, *see* Claim II, incorporated by reference as if fully set forth herein. The basis for the admission of those records was that they included a notation that Mr. Lighty was released from jail on October 21, 2001, and thus could have been the individual who said he had "just got out" in January, 2002. Reasonably competent counsel

22

would have discovered and presented evidence that Mathis, too, had been released from jail in or October, 2001. In early October Mathis was arrested in Prince George's County, Maryland, on a charge of Theft upon which he was arraigned on October 5, 2001. Not long after that date, someone paid Mathis' bail and he was released from custody, around exactly the same time that Mr. Lighty was released on his unrelated charge. Counsel's failure to present this evidence was unreasonable and prejudicial.

17. **Failure to Call Anthony Leftwich to Rebut Testimony of Ebony Miller.** A key government witness against Mr. Lighty was Ebony Miller, a woman with whom he occasionally had sexual relations. Ms. Miller testified that Mr. Lighty called her the night that Mr. Hayes was killed and told her that he had just shot and killed somebody because someone tried to steal his man's car. She said that Mr. Lighty asked her to drive from her home in Virginia to Temple Hills, Maryland to pick him up. She testified that she did so, and Mr. Lighty again told her that he had killed someone for trying to steal his man's car and said that he had picked the man up near Alabama Avenue, put the person in the trunk and driven him to where his friends were. He told her that the man denied stealing the car. He said he put the man back in the trunk and took him to Keating Street where he shot him. Ms. Miller testified that Mr. Lighty instructed her to drive to Keating Street and showed her where he shot the man. She claimed that she saw blood on the ground there, and that Mr. Lighty then had her drive to where he dumped the body. There was no body there, only police tape. According to Ms. Miller, Mr. Lighty made a comment about how fast the police had worked.

18. Ms. Miller swore to the jury that she told her cousin, Anthony Leftwich, who lived with her, exactly what she had told them. At first she claimed that she had not talked to Anthony, but when confronted with the fact that she had testified about their supposed

23

conversation before the grand jury, she reverted to her initial story and insisted that she had told Anthony what happened.

19.     Ms. Miller's claim was untrue.  Anthony Leftwich would have testified that no one ever talked to him about what had happened to Mr. Hayes, including Ebony Miller.  He would have further testified that he had no idea who killed Mr. Hayes.  Reasonably competent counsel would have presented Mr. Leftwich's testimony to rebut that of Ebony Miller, and the failure of Mr. Lighty's counsel to do so was unreasonable and prejudicial.

20.     **Failure to Correct the Government's Misrepresentation Regarding Tamika Hampton's Proffered Testimony.**  Defense counsel unreasonably failed to correct the Government's material misrepresentation about the anticipated testimony of defense witness, Tamika Hampton.  Because of defense counsel's unreasonable failure, the trial court accepted the Government's misrepresentation and erroneously and prejudicially excluded Ms. Hampton's important testimony.

21.     The defense sought to present the testimony of Ms. Hampton, the mother of two of Tony Mathis' children, to establish the close relationship that Mathis had with co-defendant, James Flood, and the absence of any relationship with Mr. Lighty.  The defense also sought to call Ms. Hampton to establish that she had seen Mathis with a gun that resembled the weapon allegedly used to kill Mr. Hayes around the time that the shooting occurred.

22.     The Government moved in limine to exclude Ms. Hampton's testimony, repeatedly stating that Ms. Hampton would testify that she only saw Mathis with the gun prior to the birth of her child on December 21, 2001, and thus too distant in time from the January 3, 2002, killing to be relevant and admissible. The Court granted the Government's motion, stating

24

that "I'm not going to permit the testimony about the person who says it looks like the gun I saw weeks before, that's just far too tenuous."

23.     In fact, when Ms. Hampton testified before the grand jury, the Government elicited from her the following:

Q.      During that time period right around the time your daughter was born *into early 2002*, did you ever see Anthony Mathis with a gun?

A.      Yes.

Q.      What kind of gun?

A.      Black gun with a clip type – where you have the clip.  You – you insert it from the bottom.

Q.      And what were the circumstances that you saw him with that gun?

A.      At his mother's house.  You know, when she was living over there on 28th Avenue.  I would be over there; and, you know, the gun was out on the dresser, on his bed, you know.

Q.      Did you see it more than once?

A.      I would see it all the time.

Q.      Was that *both before and after your daughter was born?*

A.      Mm-hmm. Yes.

(emphasis added).

24.     Trial counsel were in possession of a transcript of this grand jury testimony and yet they inexplicably, unreasonably and prejudicially failed to cite it to the Court in opposition to the Government's motion to exclude Ms. Hampton's testimony.

25.     Had it not been improperly excluded on the basis of the Government's misrepresentations, Ms. Hampton's testimony would have substantially bolstered the defense's theory that Tony Mathis was responsible for the murder of Mr. Hayes.  Ms. Hampton, *inter alia*,

25

would have testified that Mr. Mathis possessed a gun similar to the alleged murder weapon at or near the time of the Hayes homicide; would have identified the actual exhibit the Government alleged to be the murder weapon as a look-alike of the gun she saw in Mathis' possession "all the time;" would not have identified Mr. Lighty as an associate of Mathis'; would have established that Mathis was older than Mr. Lighty and associated with an older group of men, including Mr. Flood; and, in combination with Latasha Massey's testimony, would have helped show that Mathis, by virtue of his reputation and history, was the main culprit in the abduction and shooting of Mr. Hayes.

26.     Counsel's failure to correct the Government's misrepresentation and secure the admission of this testimony constituted ineffective assistance.

27.     **Failure to Competently Argue for Exclusion of Evidence of the Afton Street Shooting.**  Defense counsel unreasonably failed to object on proper grounds to the admission of inadmissible, extremely prejudicial evidence of Mr. Lighty's alleged involvement in an entirely different and unrelated crime, the homicide of Antoine Newbill on Afton Street in Temple Hills, Maryland on January 30, 2002.

28.     In moving to exclude evidence of the Afton Street homicide, defense counsel argued that the evidence was inadmissible under Fed. R. Evid. 404(b).  In response, the Government offered a manifestly false justification for the admission of the evidence. Specifically, the Government argued that the evidence would prove Mr. Lighty's identity as Mr. Hayes' assailant because: (i) the gun seized from Mr. Lighty in the District of Columbia the day after the Afton Street homicide was determined to be the gun that killed Mr. Newbill; and (ii) a key witness, Charles Whitley, would testify that Mr. Lighty himself linked that gun to the Hayes homicide by telling Mr. Whitley that the gun had "two bodies" on it.  In fact, however, Mr.

Whitley, during his grand jury testimony, expressly *denied* that Mr. Lighty had made this remark, telling the grand jury instead that Mr. Lighty's co-defendant, Lorenzo Wilson, had made it. Upon information and belief, Mr. Lighty's defense counsel was in possession of Mr. Whitley's grand jury transcript when the Government proffered its false representation of Mr. Whitley's testimony in order to secure admission of the evidence of the Afton Street homicide.

29.    Defense counsel unreasonably failed to alert the Court to the Government's false representation. Because of counsel's failure, the Court admitted evidence of the Afton Street homicide against Mr. Lighty. Indeed, the Court specifically based its ruling on the Government's unrefuted claim that a witness would testify that Mr. Lighty admitted the same gun was used in both the Afton Street and Hayes homicides. Had defense counsel appreciated the falsity of the Government's claim and objected to the admission of the evidence on the grounds that Mr. Lighty did not, in fact, link the gun seized from him to the two homicides, the evidence would have been excluded.

30.    At trial, defense counsel unreasonably continued in their failure to exclude the Afton Street homicide evidence on the grounds that Mr. Whitley's testimony would not, in fact, demonstrate that Mr. Lighty linked the gun seized from him to the Afton Street and Hayes homicides. During Mr. Whitley's testimony, at a bench conference preceding any testimony about the Afton Street homicide, the parties discussed a limiting instruction that the Court would give regarding the evidence. Without acknowledging that it had earlier made a false representation about Mr. Whitley's anticipated testimony in order to justify admission of the evidence, the Government abruptly stated that Mr. Whitley would *not* testify that Mr. Lighty told Mr. Whitley that the gun had two bodies on it, and it was only Mr. Wilson who made that remark. In other words, the Government acknowledged that the linchpin justification for

27

admitting the Afton Street homicide evidence was unfounded.  However, failing to appreciate the significance of the Government's acknowledgment, defense counsel did not renew its objection to admission of the Afton Street homicide evidence and, instead, allowed the evidence to come in despite its inadmissibility and extraordinarily prejudicial nature.

31.    Defense counsel's failure to expose the falsity of the justification for the admission of the Afton Street evidence – both pre-trial and during trial – constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

32.    Correspondingly, defense counsel furnished constitutionally ineffective representation by failing to make the basic argument that the admission of the Afton Street homicide evidence was not "necessary" under Fed. R. Evid. 404(b).  The gun the Government claimed to be the murder weapon was seized from Mr. Lighty when he was arrested in the District of Columbia on January 31, 2002.  That was the only evidence needed to link Mr. Lighty to the gun.  Evidence that the gun found on Mr. Lighty was used in the Afton Street homicide furnished the jury with no additional evidence whatsoever of Mr. Lighty's involvement in the Hayes homicide, an entirely different crime.

33.    By unreasonably failing to advance this argument in support of their attempt to exclude evidence of the Afton Street homicide, defense counsel compounded their ineffectiveness and exacerbated the violation of Mr. Lighty's constitutional right to the effective assistance of counsel.

34.    Finally, defense counsel unreasonably failed to object to the admission of the Afton Street homicide evidence on constitutional grounds, arguing only that it was inadmissible under Fed. R. Evid. 404(b).  The evidence was, in fact, inadmissible on constitutional grounds.  Its admission violated Mr. Lighty's rights to due process, to a fair trial and to be free from cruel

28

and unusual punishment as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution. Defense counsel's failure to object to the admission of the Afton Street homicide evidence on these grounds compounded their ineffectiveness in failing to exclude such evidence and exacerbated the violation of Mr. Lighty's constitutional right to the effective assistance of counsel.

35.    **Failure to Investigate and Present Available Evidence to Mitigate the Overwhelming Prejudice Resulting from the Erroneous Admission of Evidence of the Afton Street Homicide.** Having failed to secure the exclusion of the highly prejudicial Afton Street evidence, trial counsel compounded the harm to Mr. Lighty by failing to investigate and present evidence that would have mitigated the crime and Mr. Lighty's alleged involvement in it. The homicide took place in the 2200 block of Afton Street, in Temple Hills, Maryland, on January 31, 2002. The victim was Antoine Newbill. Mr. Newbill had been in the company of two friends, Tommie Hart and Antonio Johnson (aka "Boo Boo"), when shots fired from a moving car hit and killed him. Mr. Lighty was alleged to have been driving the car. The incident was described by the prosecutor in her opening statement at the penalty phase as a "drive-by shooting" in which Mr. Lighty "[found] somebody else to shoot."

36.    Government informant Charles Whitley provided the only evidence of Mr. Lighty's participation in the Afton Street incident. He testified that Mr. Lighty admitted to him that he drove with three friends to Afton Street, whereupon the friends began shooting at Mr. Johnson. The shots missed Mr. Johnson, hit Mr. Newbill and Mr. Hart, and grazed a woman who was sitting in a car. Mr. Newbill was killed, Mr. Hart was injured, and the woman suffered a bruise on her leg. According to Mr. Whitley, Mr. Lighty was angry with Mr. Johnson over

29

something Mr. Whitley's girlfriend had said to Mr. Lighty about Mr. Johnson.[2]  Mr. Whitley also testified that Mr. Lighty told him that two days before the Afton Street incident, he had confronted Mr. Johnson about the matter.  According to Mr. Whitley, Mr. Lighty said that he was accompanied by Lorenzo Wilson and that Mr. Johnson was standing with some friends.  Mr. Whitley testified that Mr. Lighty told him that both he and Mr. Johnson's friends pulled out guns, after which Mr. Lighty and Mr. Wilson left the scene.

37.      Detective Sean Chaney testified to having viewed the crime scene the night of the incident.  Based on the ballistics evidence recovered at the scene, Detective Chaney concluded that three guns were fired during the incident.

38.      Because of the trial testimony regarding the Afton Street shooting, Mr. Lighty was depicted to the jury as a man who participated in a second killing involving seemingly innocent victims over nothing more than a verbal slight.

39.      In her penalty phase closing, the prosecutor argued that Mr. Lighty's commission of this additional "murder" allowed the jury to "understand this man" and understand what makes him uniquely deserving of the death penalty.

40.      The defense never responded to the Government's evidence or argument regarding Mr. Lighty's participation in the Afton Street incident.  It was a fact that was simply accepted, as was the Government's characterization of Mr. Lighty's involvement.

41.      Substantial evidence available to the defense, both revealed in the discovery and obtainable through reasonable investigation, would have significantly mitigated the nature of the

---

[2] At Mr. Wilson's trial, Mr. Whitley testified that Mr. Wilson told him that something else had triggered the incident:  Mr. Johnson's refusal to pay back Mr. Wilson for a gun that Mr. Wilson had given him.

crime and Mr. Lighty's role in it.  In failing to obtain and present this evidence, defense counsel failed to perform as the reasonably competent advocates guaranteed by the Constitution.

42.     The aggravating factor of committing another murder has been described as a "super aggravator."  *See, e.g.,* Sandra Schultz Newman, *Capital Sentencing: the Effect of Adding Aggravators to Death Penalty Statutes in Pennsylvania,* 65 U. Pitt. L.Rev. 457, 499-501 (2004) ("when found, where, taking into account the 95% confidence interval, the sentencing body sentences the defendant to death at least 60% of the time.").  It is extremely prejudicial because it suggests to the jury that the murder for which the defendant was just convicted was neither situational nor aberrational.  It encourages the jurors to infer that the defendant is likely to kill again.  Consequently, defense counsel has no greater responsibility than to present evidence to mitigate evidence of an additional murder, if such evidence is available.  It was amply available here.

43.     There was credible evidence available to defense counsel that the dispute that allegedly culminated in the Afton Street shooting did not involve Mr. Lighty, but rather was between Antonio Johnson and Lorenzo Wilson.  A reasonably competent investigation would have revealed that Lorenzo Wilson was the individual who had a serious conflict with Mr. Johnson, and Lorenzo Wilson was the principal in the argument with Mr. Johnson two days before the Afton Street incident.  Mr. Wilson had sold a .22 caliber rifle to Mr. Johnson and never received payment for the rifle.  He was unable to get the rifle back because police seized it from Mr. Johnson when they arrested him with it on Afton Street two and one-half months earlier.  All of this information was available to defense counsel.  Several witnesses, whose statements were disclosed to the defense before trial, could have provided direct evidence of Mr. Johnson's failure to pay for the gun he purchased from Mr. Wilson, Wilson's anger over it, and

his confrontation with Mr. Johnson.  A review of the pre-trial hearing in the Wilson case, which took place several months before Mr. Lighty's trial, reveals that Mr. Wilson admitted to police his involvement in the illegal sales of firearms, having personally sold ten to fifteen.

44.    There was credible evidence available to defense counsel that the claim that Mr. Lighty escalated the initial dispute with Mr. Johnson by pulling out a gun during an argument was not true.  Although Mr. Whitley testified that Mr. Lighty said he pulled out a gun during the earlier argument with Antonio Johnson, an eyewitness to the argument, Marlon Hines, would have credibly testified that he did not see Mr. Lighty with a gun.  Mr. Hines was Mr. Newbill's closest friend and a friend of Mr. Johnson as well.  He had no motive to help Mr. Lighty.

45.    Mr. Hines had testified several months earlier at the trial of co-defendant Lorenzo Wilson.  Mr. Hines stated that he was a passenger in a car being driven by Mr. Newbill when they came upon the argument.  Mr. Hines observed Mr. Lighty, Wilson, Johnson and a fourth person involved in the argument.  He had a good opportunity to observe what was happening.  It was broad daylight, Mr. Newbill had slowed the car down, and they had turned the radio down to hear better.  Mr. Hines found nothing unusual about the argument, because "that's how people talk sometime when they want to get their point across, just try to talk over the top of each other, louder and louder." Mr. Hines never suggested that Mr. Lighty had a gun.

46.    Mr. Hines also testified at Mr. Lighty's trial, after Mr. Whitley testified.  Not surprisingly, after eliciting from Mr. Whitley that Mr. Lighty had pulled out a gun, the Government did not ask Mr. Hines if Mr. Lighty had been armed.  Defense counsel's failure to do so, however, was inexplicable.  In fact, defense counsel asked Mr. Hines no questions at all.

47.    The discovery provided before trial further revealed that Mr. Johnson violently escalated the dispute.  After the argument, Mr. Johnson went looking for Wilson, Mr. Lighty and

32

their friends. According to Mr. Whitley's March 28, 2002 statement, the evening after the argument someone drove a car "up around Marlow and started shooting[,] so everyone was thinking it was Boo Boo and his friends." "Marlow" refers to Marlow Heights, Mr. Lighty's neighborhood. Detective Chaney, who interrogated Mr. Whitley, prepared hand written notes indicating that the car in question was a "Burgundy Expedition," which "shot up 28th (Kenny and Lorenzo's area)," and that it was "[a]ssumed to be Boo Boo." In fact, Boo Boo was no stranger to guns. He had been arrested less than three months earlier in the 2200 block of Afton Street for possession of a firearm.

48.     Defense counsel had further reason to suspect that Johnson was involved in shooting at Wilson, Mr. Lighty and their friends. In Detective Chaney's notes, received by defense counsel before trial, Detective Chaney confirms that he told Mr. Lighty that "[he] thought Tony & his friends would have tried to kill Lighty after the altercation." The jury never heard this, as defense counsel failed to ask Detective Chaney about it.

49.     Defense counsel never followed up on any of this information, conducting no investigation into Mr. Johnson and his cohorts' attempts to kill Mr. Lighty.

50.     Had defense counsel conducted a reasonably competent investigation, they would have learned from eyewitnesses that Mr. Johnson, "Tommie" (on information and belief, Tommie Hart), and "Larry" drove to Marlow Heights that night in a Burgundy Expedition. All were affiliated with a gang from the Afton Street neighborhood. They were looking for Mr. Wilson, Mr. Lighty and their friends, and their intent was to kill them. Mr. Lighty and several of his friends were standing in front of a house in Marlow Heights. Mr. Johnson and his two confederates drove up and began shooting at Mr. Lighty. Mr. Lighty and his friends ran away. Mr. Lighty's friends, who were eyewitnesses to this incident, were, and are, available to testify to

33

what they saw, establishing that Mr. Lighty had reason to believe that Mr. Hart and Mr. Johnson would continue in their efforts to kill them, until those efforts were successful. Trial counsel never contacted them.

51. Additionally, had trial performed competently, they would have shown the jury that , contrary to the Government's case at trial, at least *four* guns, not three, were involved in the Afton Street incident, and at least one of them was fired at Mr. Lighty's car.

52. Ballistics reports disclosed to defense counsel before trial revealed that Detective Chaney's testimony that there were only three guns were fired in the incident - which conveniently corroborated the Government's theory that only the men *with* Mr. Lighty fired shots during the incident - could not be correct. Detective Chaney testified that he recovered ballistics evidence from three different caliber firearms, thus indicating that only three firearms were discharged during the incident. He was referring to ballistics evidence from a .25 automatic, a 9mm Luger, and a .380 automatic. Chaney never mentioned that a fired bullet, and a fired bullet jacket with a corresponding lead core, had been recovered from *inside the car* that Mr. Lighty had allegedly been driving. Those projectiles, both of a .38 caliber type, did not come from any of the three guns that Detective Chaney testified made up the universe of firearms in this incident. The projectiles had been fired at the car by someone outside of the car.

53. Additionally, Detective Chaney failed to mention in his testimony that Terry R. Eaton, Firearm and Tool Mark Examiner for the Prince George's County Police Department, had concluded that at least five different firearms had been involved in the incident, because Eaton included in his assessment two .22 caliber fired cartridge casings found near the scene. Chaney dismissed those casings as probably coming from some other incident, without any basis for doing so. Eaton's conclusions contradicted Chaney's testimony that only three firearms had

34

been involved in the incident, and suggested the likelihood that at least two people were firing at the car allegedly driven by Mr. Lighty.

54.     Although the ballistics reports thus documented evidence suggesting that people outside of the car were shooting at the car, defense counsel presented none of this evidence to the jury.

55.     The February 13, 2002 statement of Tommie Hart was also disclosed to defense counsel.  Mr. Hart told police that Marlon Hines told him that "Berto" was one of the individuals who fired at the car.  Defense counsel never sought to interview Berto or Mr. Hines.  Nor did defense counsel ask Mr. Hines at trial about Berto firing at the car.  In fact, defense counsel asked no questions of Mr. Hines.

56.     Thus, there was a legitimate issue, never presented to the jury, as to who initiated the gunfire during the Afton Street incident.  Marlow Heights is within one square mile of the 2200 block of Afton Street.  From the west, Afton is one of the few streets from which the main thoroughfare of 23rd Parkway can be accessed.  It is surely possible that people on the street instigated the shooting incident, especially if they saw Mr. Lighty in the car, considering the fact that they had demonstrated days earlier their willingness to shoot at him.

57.     Police reports disclosed to the defense also revealed that when the police arrived on the scene at Afton Street, Mr. Johnson was nowhere to be found.  Tommie Hart, who had been standing next to Mr. Johnson, had been injured and thus was unable to flee.  Mr. Hart lied to police when first interviewed.  He stated that he did not know the man who had been standing with him and Mr. Newbill.  Of course, he knew Mr. Johnson very well.  This information, too, was never presented to the jury.  As with Mr. Hines, defense counsel asked him no questions at all.

35

58.     During their investigation of the Afton Street shooting, Prince George's County Police spoke with witnesses who knew of the violent propensities of the men in the Afton Street gang and their willingness to engage in assault and murder against their rivals.  One such witness, a police detective from the Metropolitan Police Department in Washington, D.C., confirmed that the Afton Street gang was feuding with the young men who lived in Marlow Heights.  These witnesses were available to defense counsel, yet defense counsel never sought to find or interview them.

59.     An accurate narrative of the Afton Street shooting included substantial, verifiable evidence that mitigated the offense and suggested that the incident was entirely different than was presented at Mr. Lighty's trial.  As discussed above, the jury heard only about an unprovoked drive-by shooting at innocent victims, precipitated only by an extremely trivial event.

60.     Defense counsel neither investigated nor presented to the jury any of this evidence.  By responding to the Government's evidence of another murder with utter silence, defense counsel failed to act as the reasonably competent advocates guaranteed by the Constitution.  There was evidence available to defense counsel that would have substantially mitigated the nature of Mr. Lighty's involvement in the Afton Street incident.  At the very least, it would have shown the jury that Mr. Lighty was a marked man with every reason to fear for his life and those of his friends at the hands of the Afton Street crew.

61.     **Failure to Properly Object to Inadmissible Other Crimes Evidence.**  Defense counsel were ineffective for failing to renew their objection to evidence that Mr. Lighty had been released from custody shortly before the abduction of Eric Hayes, after the Government's

36

rationale for the admission of that prejudicial evidence was invalidated by the testimony of Antoine Forrest.

62.     At trial, the Government represented to the Court that its first witness, Antoine Forrest, would testify that the taller of the two assailants, who initially confronted him and Eric Hayes, stated that he had just gotten out of jail.  The Government also represented that the taller man had to be Kenneth Lighty, because none of the other perpetrators had been recently released from custody.  This representation was consistent with the theory presented by the Government at the trial of Mr. Lighty's co-defendant, Lorenzo Wilson.  At that trial the Government suggested that Mr. Wilson, shorter and stockier than Mr. Lighty, was the other assailant.

63.     Defense counsel objected to this evidence as irrelevant and prejudicial; however, the Court found the evidence to be relevant to the question of identity, and ruled that the Government would be allowed to introduce it.  The Court's ruling was, of course, based on the Government's representation that Mr. Lighty was the taller man.

64.     Mr. Forrest's testimony, however, contradicted the Government's representation. He stated that that person who told him he had just been released from custody was the person wearing an army coat, who was shorter and stockier than the other person.  At that point, the fact of Mr. Lighty's release from custody in October of 2001 became completely irrelevant.  Mr. Lighty, the alleged taller person, was clearly not the person who stated that he had just been released from custody.  Yet after Mr. Forrest's testimony, defense counsel unreasonably and prejudicially failed to renew their objection to the evidence of Mr. Lighty's prior custodial status, and the evidence was subsequently introduced.

65.     Defense counsel was also ineffective for failing to object to the admission of the entire court file pertaining to Mr. Lighty's robbery conviction.  The file contained highly

prejudicial evidence of other crimes and bad acts having no relation whatsoever to the date of Mr. Lighty's release. Habeas counsel makes this claim upon information and belief that the entire file was introduced into evidence. Counsel's request for access to the exhibit that was actually introduced is pending. Counsel will seek leave of Court for leave to amend this claim, if necessary, after review of the exhibit.

66. The highly prejudicial information contained in the file included:

a. The case which resulted in Mr. Lighty's incarceration and subsequent release on bond involved armed robbery and first degree assault charges;

b. Mr. Lighty was accused of kicking the victim in the head and body, causing injuries to the victim's face and head, and causing bruises and lacerations which required 20-30 stitches. During the robbery the victim's money, keys, and credit card were taken;

c. Mr. Lighty initially denied his involvement in the crime;

d. Thereafter he pled guilty to robbery;

e. He had outstanding bench warrants;

f. While serving his sentence for the robbery conviction, Mr. Lighty had another pending case in Washington, D.C., in which he was charged with carrying a pistol without a license;

g. After being released from total confinement Mr. Lighty violated the terms of his home detention and was re-incarcerated;

h. After being released from total confinement Mr. Lighty violated his probation.

67. Defense counsel failed to perform as the reasonably effective advocates guaranteed by the Constitution when they first failed to renew their objection to the evidence of

Mr. Lighty's release, and thereafter allowed the entire court file on his robbery conviction to be introduced into evidence.

68.   **Inadequate Cross-Examination of Antoine Forrest.**  Defense counsel unreasonably failed to conduct an adequate cross-examination of a key Government witness, Antoine Forrest.  Their inadequate cross-examination prejudiced Mr. Lighty.

69.   Mr. Forrest, a friend of Mr. Hayes, testified that he was at the scene of Mr. Hayes' abduction and saw Mr. Hayes being held down against the hood of a car.  Defense counsel questioned Mr. Forrest for only a couple of minutes, and failed to elicit from him key facts that would have substantially bolstered the defense.

70.   The key information defense counsel failed to elicit on cross-examination included, but is not limited to:

- The fact that Mr. Forrest was facing charges and possible imprisonment in North Carolina, and the consequent interest he may have had in helping law enforcement.

- The fact that, in his initial statement to police, Mr. Forrest said that the driver of the car that carried away Mr. Hayes had a goatee and a mustache, when the Government alleged that the driver was Lorenzo Wilson, who had no facial hair.

- The fact Mr. Forrest told a defense investigator that "the guy who went to Hawaii" (*i.e.,* Mr. Wilson) was not at the scene of the abduction.

- The fact that Mr. Forrest told Prince George's County Police on July 4, 2002, that the passenger of the car that carried away Mr. Hayes, whom the Government alleged was Mr. Lighty, pointed a revolver at him, when the gun the Government identified as the murder weapon a semi-automatic pistol.

- The fact that Mr. Forrest was using PCP just before the abduction of Hayes.

- The fact that Mr. Forrest, at one point, identified a car other than a blue Lincoln Continental as the car that was involved in the abduction of Hayes.

- The fact that Mr. Forrest informed Prince George's County Police on January 4, 2002, that he could identify the driver and passenger of the car that carried away Mr. Hayes if he ever saw them again, but he did not identify photographs of Mr. Lighty and did not identify Mr. Lighty at the trial.

- The fact that Mr. Forrest came in close contact with the individuals who abducted Mr. Hayes, and had multiple opportunities to observe them from very close distances during the abduction, even as close as arm's length, and though he could testify as to the abductors' clothing, build, skin color and appearance as a result of his proximity to them, he still could not identify Mr. Lighty, either in photos while being questioned by police or at the trial.

- The fact that Mr. Forrest told a defense investigator that he knew of Mr. Lighty and that Mr. Lighty was not present at the scene of the abduction.

71.     Defense counsel's failure to pursue, much less elicit, such information from Mr. Forrest, the only eyewitness to the abduction of Mr. Hayes, deprived Mr. Lighty of a critical opportunity to expose significant evidentiary gaps and inconsistencies in the Government's case. Defense counsel's failure constituted ineffective representation of counsel and violated Mr. Lighty's constitutional rights.

72.     **Failure to Object to the Government's Discriminatory Use of Peremptory Strikes.**  Trial counsel unreasonably failed to challenge the Government's use of peremptory strikes to exclude women from Mr. Lighty's jury.  *See* Claim I, incorporated by reference as if fully set forth herein.  There was no conceivable tactic or strategy for failing to raise this claim

40

and to permit a nearly all-male jury to sit in this case.  The disproportionately male jury that the Government's unopposed, gender-based strikes produced caused prejudice to Mr. Lighty by introducing structural error into the trial.  Trial counsel's failure to challenge the Government's use of peremptory strikes to exclude women from Mr. Lighty's jury constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

73.    **Failure to Object to Flood Opening.**  Defense counsel unreasonably failed to object to prejudicial statements made during the opening argument of counsel for his co-defendant, James Flood.  In just the third sentence of his opening, counsel for Mr. Flood argued that Mr. Lighty killed Mr. Hayes with the help of Mr. Wilson and that Mr. Flood was in trouble only because they had used his car and his phone.  Mr. Flood's counsel proceeded to preview evidence that, as he told the jury, would prove that Mr. Lighty was guilty of murder.  For instance, counsel for Mr. Flood improperly and prejudicially argued that:

- "The overwhelming evidence is going to show you is that two people committed this crime:  Kenneth Lighty, who is seated at that defense table, and Lorenzo Wilson, who is not."

- "[Government witness Antoine Forrest will] tell you that the passenger who got out first was six feet tall, was dark-complected, that he had on a black Eddie Bauer jacket.  The person he is describing as the passenger of that car is Kenneth Lighty."

- "[Government witness Michael Davis is] going to describe for you the death of Eric Hayes at the hands of two people.  He'll describe to you seeing two people involved in that.  And I'll submit to you what he's going to be talking about is Kenneth Lighty and Lorenzo Wilson."

- "[T]he evidence against both Kenneth Lighty and Lorenzo Wilson is overwhelming."

41

74.     Because of these assertions, Mr. Flood's opening statement was inflammatory, improper and prejudicial.  Yet Mr. Lighty's counsel did not object to any of it.

75.     Following opening statements, defense counsel renewed an earlier motion to sever.  In response, both the Court and the Government acknowledged that Mr. Flood's opening statement was objectionable.  The Court stated:

> There is no basis for Mr. Flood's attorneys to argue to this jury that Mr. Lighty is guilty… Their argument is to either prove that the Government has not shown, to try and demonstrate that the Government has not proved Mr. Flood guilty or that he's innocent. But to spend a lot of time arguing it's them, it's them, it's them, that's not even a proper argument, quite frankly.  And as I say, it was objectionable and I would have stopped it right then and there."

Counsel for the Government added, "I would only indicate to the Court that Mr. McKenna did make statements that were objectionable by Mr. Lighty's attorney."

76.     Due to defense counsel's unreasonable failure to object to Mr. Flood's opening statement, the jury heard that Mr. Lighty was guilty not only from the Government, but from Mr. Lighty's co-defendant as well.  There were, in effect, two opening statements made against Mr. Lighty.

77.     Defense counsel exacerbated the prejudice resulting from Mr. Flood's opening by failing to insist that the Court issue a limiting instruction not to consider as evidence the assertions made by attorneys during opening statement.  Though the Court discussed giving this instruction, it did not do so promptly following opening statements, and defense counsel did not request one.

78.     Defense counsel's unreasonable failure to object to Mr. Flood's improper opening statement, as well as their unreasonable failure to insist on a limiting instruction to contain the damage it wrought, constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

79.     **Failure to Cross-Examine Charles Whitley Regarding Benefits Afforded to Him in Return for Cooperation in this Case.**  Arguably the most important witness for the Government in this case was Charles Whitley.  Whitley's testimony was crucial to the Government's case at both guilt and penalty phases of the trial.  He testified to Mr. Lighty's alleged admissions to participation in the kidnapping and killing of Eric Hayes, the incident for which Mr. Lighty was on trial, and to Mr. Lighty's alleged admissions to participation in the killing of Antoine Newbill, an unrelated incident erroneously admitted at the guilt phase under Fed. R. Evid. 404(b).

80.     Several months before Mr. Lighty's trial, Whitley testified at the separate trial of Mr. Lighty's co-defendant, Lorenzo Wilson.  Whitley was called by the Government and examined by the same prosecutor who examined him in Mr. Lighty's trial.  The prosecutor elicited from Mr. Whitley that after he was arrested on firearms, assault and burglary charges, police initially warned him that "[i]t was like about 45, 50 years you be facing," and thereafter promised him that if he would "[j]ust give us a little information about the murders and all this would be solved right here."

81.     At Mr. Lighty's trial, the same prosecutor, in the course of examining, Whitley implied before the jury that nothing had been offered in exchange for the information he gave to law enforcement.  The prosecutor asked, "Did I ever offer you anything for your testimony here today, Mr. Whitley?" to which Whitley replied " No."

82.     Reasonably competent counsel would have cross-examined Whitley using his statements at the Wilson trial to dispel the misimpression left by the Government's direct.  The failure of Mr. Lighty's counsel to pursue this line of cross-examination constituted ineffective assistance of counsel.

83.     **Failure to Discover Charles Whitley's History of Cooperation with Law Enforcement.**  Trial counsel rendered ineffective assistance by failing to investigate and discover the nature and full extent of Whitley's history of cooperation with law enforcement officials in order to secure benefits for himself.  Whitley's cooperation in the case against Mr. Lighty and his co-defendants was only one instance of his cooperation with law enforcement. On June 20, 2003, the lead investigator in the case, Detective Sean Chaney, represented to the District Court of Maryland for Prince George's County that Whitley had "previously provided detailed information regarding other crimes of violence and narcotics trafficking . . ."  Upon information and belief, Whitley's history of cooperation included having been an informant in another homicide which also occurred in Prince George's County.  That homicide took place on or about October 19, 2001, less than two months before the homicide in the instant case, and was also investigated by Prince George's County Police.  Michael Scott and Aaron Robinson were arrested and charged in connection with the homicide, and both men were ultimately convicted in Prince George's Circuit Court.  Counsel's failure to discover and present evidence of Whitley's extensive history of cooperation violated Mr. Lighty's constitutional rights.

84.     **Failure to Call a Witness to the Crime.**  Defense counsel unreasonably failed to call Robert Smith as a witness.  Mr. Smith lived adjacent to the location where Mr. Hayes' body was found on Hillcrest Parkway in Temple Hills, MD.  Mr. Smith had given testimony at the trial of Mr. Lighty's co-defendant, Lorenzo Wilson, that materially contradicted important testimony given by Michael Davis, the only eyewitness at Mr. Lighty's trial who testified about events that occurred on Hillcrest Parkway.

85.     Mr. Davis testified at Mr. Lighty's trial that two people got out of a car at the end of the road and that a third person was pulled from the car and then shot while on his knees.  By

contrast, Mr. Smith had testified at the Wilson trial that, while parked in a car nearby, he saw only one person get out of the car before he heard shots fired, and did not see the victim on his knees.

86.     Defense counsel's failure to call Mr. Smith was unreasonable and prejudicial. Mr. Smith's account cast doubt upon certain key, incriminating observations that Mr. Davis said he made, and supported the defense theory that, when Mr. Hayes was pulled from the car, he did not get onto his knees and was already deceased, having been shot earlier on Keating Street.

87.     Defense counsel's unreasonable failure to call Mr. Smith constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

88.     **Failure to Timely Disclose Expert Evidence.**  Defense counsel's unreasonable failure to timely and fully disclose expert ballistics evidence led to the prejudicial exclusion of such evidence during the testimony of defense ballistics expert, William Welch.

89.     Mr. Welch was prepared to testify that the lead alloy bullet that had been fired through the back of Mr. Hayes' head could not have fit into a bullet casing that, in turn, could fit into the .38 caliber semiautomatic pistol that the Government found in Mr. Lighty's possession and alleged to be the murder weapon.

90.     As part of his pre-trial investigation, Mr. Welch performed tests regarding the possibility of putting this lead alloy bullet, Government Exhibit A-11, into a casing that would fit into the magazine of a .38 caliber semiautomatic pistol.  The tests Mr. Welch performed demonstrated that it was impossible for a bullet like A-11 to be made to fit in the magazine of a .38 caliber semiautomatic pistol.

91.     Mr. Welch's testimony would have established conclusively that, consistent with the defense theory of the case, the bullet that entered Mr. Hayes' head behind his ear could not

have been fired from the gun seized from Mr. Lighty and must have been fired from another weapon. This testimony would have seriously undermined the Government's theory that Mr. Lighty was the lone shooter and that each of the three bullets recovered from Mr. Hayes' head came from the gun seized from Mr. Lighty. At the same time, Mr. Welch's testimony would have buttressed the defense theory that Tony Mathis shot Mr. Hayes on Keating Street and that Mr. Hayes was already dead by the time he arrived at Hillcrest Parkway where his body was found.

92.     Prior to trial, defense counsel unreasonably failed to furnish the Government with the requisite notice of the tests that Mr. Welch had performed on Government Exhibit A-11. As a result of defense counsel's failure, the trial court excluded Mr. Welch's testimony about the incompatibility of Government Exhibit A-11 and a cartridge that would fit the magazine of a .38 semiautomatic pistol. In other words, because of defense counsel's failure, the jury was deprived of material evidence that both helped to disprove the Government's theory and proved that of the defense.

93.     Defense counsel's failure to timely notify the Government of Mr. Welch's testimony about Government Exhibit A-11 constituted ineffective assistance of counsel and deprived Mr. Lighty of his constitutional rights.

94.     **Inadequate Cross Examination of Charles Whitley.** Defense counsel unreasonably failed to properly cross examine key Government witness, Charles Whitley.

95.     The Government called Mr. Whitley to testify during its case in chief. Mr. Whitley's testimony was critical to the Government's case against Mr. Lighty. Mr. Whitley testified, *inter alia*, that Mr. Lighty confessed to kidnapping and shooting Mr. Hayes and further admitted involvement in the Afton Street homicide.

46

96.    In various pre-trial statements, Mr. Whitley offered conflicting accounts of the events he claimed to have witnessed. Aspects of Mr. Whitley's pre-trial statements were also at odds with other testimony the Government presented. Yet additional aspects betrayed Mr. Whitley's considerable motive to fabricate.

97.    In their cross-examination of Mr. Whitley, defense counsel unreasonably failed to utilize Mr. Whitley's pre-trial statements. A reasonably competent cross-examiner would have fully exposed Mr. Whitley's prior inconsistent statements, would have demonstrated that Mr. Whitley's testimony was inconsistent with other evidence adduced by the Government, and would have more fully illuminated Mr. Whitley's motive to lie. A reasonably competent cross-examination, therefore, would have rendered Mr. Whitley's flawed testimony incredible.

98.    Defense counsel unreasonably failed to expose on cross-examination of Mr. Whitley, *inter alia*, the following:

- In a handwritten statement given to Prince George's County Police on March 28, 2002, Mr. Whitley stated that "Kenny told me he was the only one who got out the car" and that "Kenny told the dude to get out and take off your shoes and coat off" before he purportedly shot Hayes. These statements were at odds with the account of the shooting provided by the only eyewitness to testify at trial, Michael Davis, who testified that two people, not one, got out of the car, and who did not see the victim take off his coat and shoes before he was shot. The discrepancy between the account of the shooting that Mr. Lighty purportedly gave Mr. Whitley and the account that Mr. Davis supplied was a significant fact that, if it had been exposed at trial, would have materially affected the jury's view of Mr. Whitley's credibility.

47

- In his testimony at the trial of Lorenzo Wilson, Mr. Whitley stated that, during 2001 and early 2002, he was smoking marijuana every day and used PCP "probably about like three, four times out a week." Defense counsel unreasonably failed to establish that Mr. Whitley used memory- and perception-impairing drugs during the time he purportedly heard Mr. Lighty's confessions.

- In his testimony at the trial of Lorenzo Wilson, Mr. Whitley stated that law enforcement officials had told him that his testimony against Mr. Lighty would help him with the criminal charges he was facing at the time. Mr. Whitley recounted at Mr. Wilson's trial that officers told him, "… you are a convicted felon with a handgun, so that's five years and plus all the charges you looking at. It was like about 45, 50 years you be facing. Just give us a little information about the murders and all this would be solved right here." Mr. Whitley also testified that investigators told him that they were interested in Mr. Lighty and Mr. Flood, and promised that "they wasn't going to charge me for having an assault rifle, and then they said they was going to get the charges thrown out for me," which was significant in light of Mr. Whitley's criminal history. Defense counsel did not seek to elicit the same, salient testimony from Mr. Whitley, despite the fact that it directly exposed his motive to lie to appease the Government.

99.     Defense counsel's failure to expose the myriad weaknesses in Mr. Whitley's flawed testimony was consequential, as Mr. Whitley dramatically recounted how Mr. Lighty confessed to involvement in both the Hayes and Afton Street homicides. Insofar as the Government had no eyewitness evidence establishing that Mr. Lighty was the one who shot and killed Mr. Hayes, Mr. Whitley's testimony was central to the prosecution. In fact, it was Mr. Whitley's initial statement to the police that broke the case.

48

100. Defense counsel should have fully exposed Mr. Whitley – who has since recanted his trial testimony – for what he was: an unreliable, self-interested witness who desperately sought to curry favor with law enforcement for his own benefit and, as a result, offered various accounts that are both inconsistent with each other and inconsistent with other evidence in the case. Defense counsel's failure to thoroughly and properly cross examine Mr. Whitley deprived Mr. Lighty of his constitutional right to the effective assistance of counsel.

101. **Failure to Protect Mr. Lighty's Right to a Fair and Impartial Jury.** The Court erroneously struck Jurors 305, 72, and 136 for cause. *See* Claim III, incorporated by reference as if fully set forth herein. Trial counsel unreasonably and prejudicially failed to object to these strikes. Defense counsel further failed to perform as the reasonably competent advocates guaranteed by the Constitution when they failed to exercise a peremptory challenge as to Juror No. 9, a juror he had earlier challenged for cause. Counsel's failure resulted in the seating of a juror who would automatically vote for a sentence of death, and a death sentence was indeed imposed.

102. Counsel additionally failed to raise two separate meritorious grounds in support of their motion to strike for cause Juror No. 114. Had either of these objections been made, Juror No. 114 would have been precluded from jury service.

103. Juror No. 114 stated the following:

a. A person implicated in, and guilty of, another homicide (in addition to the one on trial) should always receive the death penalty;

b. People who come from the area of Southeast Washington, D.C. have no value for life or law.

49

104.    These views, separately and cumulatively, substantially impaired or prevented Juror No. 114 from fairly considering an appropriate sentence in this case.

105.    The Government's penalty phase evidence was that Mr. Lighty had committed another murder, a fact the defense did not contest.  Because the jury was going to be presented with this uncontradicted evidence, Juror No. 114's penalty phase vote was certain to be an automatic vote for death.  Her firm position that the fact of another murder mandates a death sentence precluded her from jury service because it would have prevented her from fairly considering evidence in mitigation and the imposition of a life sentence.

106.    Mr. Lighty lived in the vicinity of Southeast Washington, D.C., as did a number of the witnesses in the case.  A portion of the incident in the instant case took place there as well. The juror's disparaging remarks and hostile impressions of people from that area rendered her unfit to serve as a fair and impartial juror in this case.  The Court asked the juror whether her attitudes about the people from Southeast Washington, D.C. was a "disqualifier."  The question called for the juror to make a conclusion, a conclusion that was this Court's to make, not the juror's.  The Court should have explored the nature and degree of the juror's hostility toward the people of Southeast Washington, D.C., and how those feelings would affect her assessment of Mr. Lighty and the other witnesses in the case.  Nevertheless her equivocal and conclusory answer, "No I don't think it is [disqualifier]," did not establish her fairness or impartiality.

107.    Defense counsel did not challenge Juror No. 114 on the basis of her fixed belief that a defendant with another murder should always be sentenced to death; nor did defense counsel challenge her based on her assertion that the people of Southeast Washington, D.C. have no value for life or the law. In failing to challenge the juror's fitness on these bases, defense

counsel did not act as the reasonably competent advocate guaranteed by the United States Constitution.

108.    These omissions violated Mr. Lighty's constitutional right to the effective assistance of counsel.

109.    Trial counsel had no reasonable strategic basis for any of the errors and omissions identified above.  Separately, and cumulatively, those errors and omissions prejudiced Mr. Lighty and it is more than reasonably likely that the jury would not have found Mr. Lighty guilty or returned a death sentence if counsel had performed as the reasonably competent counsel guaranteed by the Constitution.  Mr. Lighty's convictions and death sentence therefore must be vacated.

## III.    MR. LIGHTY'S RIGHT TO A FAIR AND IMPARTIAL JURY WAS VIOLATED IN MULTIPLE RESPECTS

Mr. Lighty's convictions and sentence of death were obtained in violation of his constitutional rights to counsel and the effective assistance thereof, to the presumption of innocence, to present a defense, to due process, to a fundamentally fair trial before a fair and impartial tribunal, to a fair and impartial determination of guilt and penalty and to freedom from cruel and unusual punishment as guaranteed by the Fifth, Sixth and Eighth Amendments, because his right to a fair and impartial jury was violated in multiple respects.  Separately, and cumulatively, these errors require reversal of Mr. Lighty's convictions and sentence of death.

In support of this claim, Mr. Lighty alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.    **Erroneous Denials of Challenges for Cause.**  The Sixth Amendment guarantees a defendant the right to a fair and impartial jury.  When a prospective juror's views would

prevent or substantially impair the performance of the juror's duties, the juror must be removed for cause. The trial court erroneously declined to exclude for cause 10 potential jurors.

**Juror No. 9**

2. The Court committed constitutional error in denying defense counsel's challenge for cause as to Juror No. 9. Juror No. 9's answers during voir dire left no doubt that in the event of a guilty verdict he would always vote for a sentence of death.

3. During voir dire Juror No. 9 admitted to the following viewpoints which substantially impaired or prevented him from performing his duties as a juror in accordance with his instructions and his oath:

    a. He would always impose the death penalty for a defendant convicted of murder, who had also committed another murder;

    b. He would not consider evidence in mitigation for a defendant with another murder;

    c. Unless a killing is committed in self-defense, the defendant should always receive the death penalty;

    d. A defendant convicted of kidnapping resulting in death should always receive the death penalty.

4. When this Court probed Juror No. 9's position, it became clear that his opinion was strongly held, in that it was based on his belief that people who are convicted of murder "should suffer the same consequences" as their victims.

5. The Court and the Government attempted to rehabilitate the juror, and the juror retreated from some of his absolutist positions on the death penalty. However, at every

52

opportunity in which he was permitted to expound on his views of the death penalty, Juror No. 9 was emphatic that he would always vote to impose it.

6. Defense counsel recognized that seating Juror No. 9 would guarantee a vote for death. In raising a challenge for cause, he argued that the juror "believed in an eye for an eye and a tooth for a tooth," and that he "would automatically vote for the death penalty."

7. This Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and was constitutional error.

**Juror No. 21**

8. The Court erred when it denied a defense challenge for cause as to Juror No. 21. Juror No. 21 repeatedly and unequivocally stated that in a case involving a kidnapping resulting in death she would always vote to impose death, regardless of mitigating or aggravating circumstances.

9. Thereafter, in response to repeated questioning by the Court, Juror No. 21 agreed to consider aggravating and mitigating circumstances before reaching a penalty decision. This assurance, however, was contradicted and nullified by her subsequent assertion that, but for cases of self-defense or sexual abuse, she "couldn't think of any [murders]" which did not merit the death penalty.

10. Juror No. 2's fixed attitude about the death penalty prevented or substantially impaired her from sitting as a fair and impartial juror, and thus precluded her from jury service. Defense counsel properly challenged her for cause. This Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and thus violated Mr. Lighty's constitutional rights.

**Juror No. 44**

53

11.     The Court erred in denying defense counsel's challenge for cause as to Juror No. 44. The juror stated that in a case alleging kidnapping resulting in death he would impose the death penalty 90% of the time. He repeated this assertion several times during voir dire.

12.     The Court correctly advised all counsel that if Juror No. 44 did not "move off that, we got a problem." The Court recognized that a juror who would impose death in such a high percentage of cases was more fixed in his opinion as to punishment than open to both possible punishments, and that such a view would prevent or substantially impair the juror from deciding a sentence fairly.

13.     The juror never "moved off" his position. In fact, ultimately he expanded the reach of the 90% figure, stating that it was not just 90% of kidnappings resulting in death that merited the death penalty, but 90% of all murders.

14.      This Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and thus constituted constitutional error.

**Juror No. 114**

15.     The Court erred in denying defense counsel's challenge for cause as to Juror No. 114. Juror No. 114 stated that a person who "purposely" or with "premeditation" takes a life should always receive the death penalty.

16.     The juror's position that a purposeful or premeditated murder mandates a death sentence precluded her from jury service in this case, as it prevented her from fairly considering evidence in mitigation and the imposition of a life sentence.

17.     The prosecutor and this Court attempted to rehabilitate this juror, seeking her assurance that she would keep an open mind as to penalty. Any such assurance was ephemeral,

54

however, as demonstrated by the juror's comment, following the rehabilitation, that she would vote automatically for death if "[t]hey purposely went out and killed this person."

18.     The Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and constituted constitutional error.

**Juror No. 120**

19.     The Court erred in denying defense counsel's challenge for cause as to Juror No. 120.

20.     When asked whether she was strongly in favor of the death penalty, Juror No. 120 stated that if someone causes death, he "should be punished" and receive "justice."

21.     Juror No. 120 asserted that she would always vote for death in the case of a "brutal murder."  The Government's theory was the instant case involved a "brutal murder" – a kidnapping followed by an execution-style killing.

22      Juror No. 120 maintained that if a person is found guilty of homicide, he should "almost always receive the death penalty" except if there were "extenuating circumstances" related to the crime.

23.     Juror No. 120 felt that the death penalty was imposed "too seldom" and that it costs taxpayers a lot of money to keep someone in jail.  She explained that her view was informed by her observation that a case like the D.C. area sniper case took the Government too much "time and expense … for something that was so blatantly wrong."

24.     Juror No. 120's clear predisposition to imposing the death penalty prevented or substantially impaired her ability to decide fairly on the sentence in this case and thus precluded her from jury service.  Defense counsel properly challenged her for cause on those grounds.  This

Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and thus violated Mr. Lighty's constitutional rights.

**Juror No. 124**

25. The Court erred in denying defense counsel's challenge for cause as to Juror No. 124.

26. Juror No. 124 explained that, in her view, a sentence of life in prison for a murderer does not furnish the family of the victim with sufficient justice; as a result, she believed that "if they take a life, a life should be given up." She asserted that this was a "very" strong belief. In her questionnaire prior to voir dire she similarly wrote that she supported the death penalty because she believed in "a life for a life."

27. Juror No. 124 maintained that she would automatically impose the death penalty in cases where someone committed a murder "for no reason." The Government portrayed the murder in this case as a senseless crime and presented no cogent theory of Mr. Lighty's motive.

28. Juror No. 124's fixed attitude about imposing the death penalty prevented or substantially impaired her ability to decide fairly on the sentence in this case and thus precluded her from jury service. Defense counsel properly challenged her for cause on those grounds. This Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and thus violated Mr. Lighty's constitutional rights.

**Juror No. 178**

29. The Court erred in denying defense counsel's challenge for cause as to Juror No. 178.

30. Juror No. 178 was a career prosecutor in the Public Integrity Section of the Criminal Division of the U.S. Department of Justice, the same agency that prosecuted this case.

He was a "good friend" of the United States Attorney and socialized with him outside of work. Juror No. 178 also had interacted with one of the trial prosecutors telephonically on matters and had been involved in an interview in which one of Mr. Lighty's attorneys served as defense counsel.

31.    While stating that he could follow the Court's instructions and would not vote automatically for the death penalty, Juror No. 178 explained as follows:

a.    He felt comfortable that the appellate process winnowed out improper death sentences imposed by judges and juries and understood that, although he knew he would weigh the evidence and render a decision in this case, his decision would be reviewed on appeal.

b.    Department of Justice prosecutors – like himself – would not initiate prosecution unless they believed that the evidence established guilt beyond a reasonable doubt.

c.    He believed that the United States Attorney, with whom he was good personal friends, would only pursue cases, including a death penalty case like the instant case, that the United States Attorney believed were appropriate.

32.    Juror No. 178's fixed predisposition to crediting both the prosecutorial decisions of Department of Justice prosecutors generally and those of his personal friend, the United States Attorney in particular, as well as his belief that the appellate process would cure any errors in the imposition of a death sentence, prevented or substantially impaired his ability to decide fairly on the sentence in this case and thus precluded him from jury service.  Defense counsel properly challenged him for cause.  This Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and thus violated Mr. Lighty's constitutional rights.

**Juror No. 210**

57

33.     The Court erred in denying defense counsel's challenge for cause as to Juror No. 210.

34.     Juror No. 210 repeatedly stated in writing and during voir dire that she would return a death sentence if the defendant were guilty of murder and that, in effect, it would be the defendant's responsibility to prove that he should be sentenced to life without parole if he were found guilty of murder.  For instance:

a.     Juror No. 210 asserted a "very strong" belief that if the defendant is proven guilty beyond a reasonable doubt and "the victim did not have an opportunity to choose whether he should live or die," then the defendant "should die and save our taxpayer money trying to support him."

b.     Juror No. 210 maintained that if a defendant were "really guilty," she would vote for the death penalty and the defendant would "really have to convince" her otherwise.

c.     Juror No. 210 stated that if a defendant were convicted of kidnapping resulting in death, she always would vote for the death penalty, would "have a hard time not voting for a death penalty," and would find life without release "low on the list" because "it's a waste of taxpayer money."

d.     Even when this Court tried to rehabilitate Juror No. 210 by asking whether she would consider all of the evidence before voting to return a death sentence, Juror No. 120 said that she does not "believe in keeping someone alive who is thoroughly guilty."

e.     On her questionnaire, Juror No. 210 wrote that she would automatically vote for the death penalty if the defendant were also involved in another murder.

f.      The only specific reservation Juror No. 210 expressed about imposing the death penalty was in a situation where she thought the defendant might be innocent.

35.     While Juror No. 210 at times agreed that she would follow the Court's instructions and consider all of the circumstances before returning a death sentence, her written and oral answers to the Court's questions demonstrated that she had fixed views on the propriety of the death penalty that prevented or substantially impaired her ability to decide fairly on the sentence in this case and thus precluded her from jury service. Defense counsel properly challenged her for cause on those grounds. This Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and thus violated Mr. Lighty's constitutional rights.

**Juror No. 254**

36.     The Court erred in denying defense counsel's challenge for cause as to Juror No. 254.

37.     In his questionnaire and voir dire answers, Juror No. 254 indicated a prejudice against African-Americans, said that he favored whites over African-Americans, and observed that most crime in Prince George's County was committed by African-Americans. Mr. Lighty is African-American. The lead detective in this case, among other law enforcement personnel, was white.

38.     Juror No. 254's prejudice against African-Americans prevented or substantially impaired his ability to decide fairly on the sentence in this case and thus precluded him from jury service. Defense counsel properly challenged Juror No. 254 for cause. This Court's denial of the cause challenge necessitated the use of a defense peremptory challenge, and thus violated Mr. Lighty's constitutional rights.

39.     **Erroneous Excusal of Qualified Jurors.**  The Sixth Amendment guarantees a defendant the right to a fair and impartial jury.  To exclude a juror for cause, the Court must find that the juror's views would prevent or substantially impair the performance of the juror's duties. If, as here, jurors are excluded based upon views that would not impact their jury service, then a subsequently imposed death sentence cannot stand.

40.     The trial court erroneously excluded three potential jurors after they expressed some ambivalence about the death penalty.

**Juror No. 72**

41.     The Court erred in striking for cause Juror No. 72.

42.     Juror No. 72 stated that she was opposed to the death penalty, but indicated that she would follow the Court's instructions as to finding and weighing aggravating circumstances. She further stated that she could not vote for a death sentence if the law did not "instruct" her on how to vote for life or death based on her findings.  In other words, if given no guidance as to how her factual findings should inform her vote, i.e., if given unbridled discretion, Juror No. 72 would have to always vote for a life sentence.

43.     Of course, the law does not give a juror unbridled discretion.  The law provides guidance to the juror based on the weighing of aggravation and mitigation.  Had this Court so instructed the juror, her perceived impediment to jury service would have been removed. Her views neither prevented nor substantially impaired her from performing her duties as a juror. Instead of instructing the juror that the sentence she would impose would be a function of her findings on aggravation and mitigation, this Court simply removed the juror.

44.     The removal of Juror No. 72 violated Mr. Lighty's constitutional rights.

**Juror No. 134**

60

45.     The Court erred when it granted, over objection, the Government's motion to strike Juror No. 134 for cause.

46.     The Government moved to strike Juror No. 134 on the grounds that she appeared "bewildered," did not appear to understand the Court's questions and indicated that she might not be able to impose the death penalty.  This Court granted the Government's motion, over a defense objection, finding that Juror No. 134 could not conclusively say that she would impose the death penalty.

47.     In fact, Juror No. 134 repeatedly stated that, while she had some reservations about the death penalty, she could follow the Court's instructions, keep an open mind and make an independent decision to impose a death sentence if the evidence warranted it.  When it appeared as though she said she could never vote for the death penalty, she acknowledged that she was nervous and confused, and reaffirmed that she could vote for the death penalty under the appropriate circumstances.

48.     Juror No. 134's reservations about saying definitively that she would impose the death penalty – that "it has to be a real bad crime totally," that "life imprisonment would probably be an easier part for me to decide on, but the death penalty would be hard in a sense at the time" – are precisely what the law contemplates.  It is presumed that a defendant convicted of a capital crime should not receive the death penalty until the Government proves beyond a reasonable doubt that the death penalty is justified.  A predisposition to imposing a sentence of life without parole is not a valid ground for a cause strike any more than a predisposition to presuming a defendant innocent until proven guilty.

49.     Defense counsel properly objected to striking Juror No. 134.  This Court's granting of the Government's motion to strike Juror No. 134 violated Mr. Lighty's constitutional rights.

**Juror No. 136**

50.     The Court erred by striking Juror No. 136 for cause.

51.     In his questionnaire and voir dire responses, Juror No. 136 indicated that he had significant reservations about imposing the death penalty.  However, he stated in his questionnaire that he was only "somewhat" opposed to the death penalty, and clarified during voir dire that he believed he could impose the death penalty in situations where the defendant committed a crime that was "totally abhorrent to society as a whole."  Juror No. 136 gave Timothy McVeigh's crime involving the bombing of the federal building in Oklahoma City as an example.

52.     While expressing reservations about the death penalty, Juror No. 136 said that he could set aside his personal views and follow the court's instructions.

53.     Juror No. 136 further stated that he would lean naturally toward a sentence of life without parole and would consider the propriety of that sentence before considering the death penalty.  When asked whether he would automatically return a life without parole sentence in case involving kidnapping resulting in death, he stated that it would take "an extraordinary set of circumstances really to ever consider the death penalty."  He again gave the McVeigh case an example of "extraordinary circumstances."

54.      Juror No. 136's views about the death penalty are a fair, if abbreviated, distillation of the law on capital punishment.  A jury that finds a defendant guilty of a capital crime must impose a sentence of life without parole unless the Government proves the existence

of a statutory aggravating circumstance beyond a reasonable doubt, establishes that the aggravating circumstances outweigh the mitigating circumstances, and finally demonstrates the propriety of the death penalty. In other words, consistent with Juror No. 136's views, the default punishment for a capital crime is life without parole. The Constitution, in fact, reserves the death penalty for "extraordinary" cases.

55.     The removal of Juror No. 136 violated Mr. Lighty's constitutional rights.

**Juror No. 305**

56.     The Court erred when it struck for cause Juror No. 305.

57.     Juror No. 305 reasonably and thoughtfully stated that because the death penalty is the most serious penalty that can be imposed, deciding whether or not to sentence a person to death would weigh heavily on him. While he supported the death penalty, he expressed understandable doubt as to how he would react if actually confronted with the life or death decision. Although he described a life sentence to be his default position, he indicated that he would be open to both possible sentences if he served as a juror.

58.     The following representations of this juror revealed his willingness to consider a sentence of death, and demonstrated that his views neither prevented nor substantially impaired his ability to perform his duties as a juror in accordance with his instructions and his oath:

   a.     He supported the death penalty;

   b.     He could vote for the death penalty for a kidnapping resulting in death;

   c.     He could consider imposition of the death penalty in Mr. Lighty's case;

   d.     If he were "pretty convinced" that it was the right sentence he would vote for the death penalty;

       e.     After hearing all of the evidence he could be convinced that the death penalty was the best course of action.

59.     The prosecutor had no legitimate basis for her objection to the seating of this juror. Her stated rationale was that the juror "would be predisposed to sentence someone to life without the possibility of release." Just as the law presumes innocence, however, in the penalty phase of a capital case a presumption exists that life is the appropriate sentence. Far from being disqualified from jury service, then, a person "predisposed" to a life sentence is a person the Constitution recognizes as eminently qualified for jury service.

60.     Nevertheless, in response to the prosecutor's objection, the Court made further inquiry of the juror. Inviting the juror to doubt his own ability to consider a sentence of death, the Court advised him that "on this issue some people may not be able to [consider a death sentence]." Following the Court's lead the juror indicated that he might be such a person and was immediately excused.

61.     The juror's recognition of the presumption of innocence and his expression of honest doubt as to how he would react when confronted with the life or death question, arising in the context of his repeated assurances that he would be open to consideration of both penalties, was not a basis to strike him for cause. The juror's removal was constitutional error.

62.     **Jurors' Failure to Disclose Information on Voir Dire.** Mr. Lighty was further denied his right to a fair and impartial jury by the seating of two jurors who made material misrepresentations during voir dire that directly related to their qualifications for jury service. The misrepresentations demonstrated that the jurors were incapable of sitting as fair and impartial jurors in Mr. Lighty's case, and warrant the granting of a new trial. Alternatively, Mr.

64

Lighty must be granted a hearing at which the two jurors can be examined to determine if honest answers to the questions they answered falsely reveal potential sources of partiality or bias.

63.     Juror No. 155 worked for 31 years at the Government Printing Office.  That office also employed three of the witnesses who testified for the defense at the trial, Rev. Leon Lipscombe, Mr. Lighty's grandmother, Nancy Westfield, and Mr. Lighty's step-grandfather, Richard Westfield.  Although Juror 155 declared on his questionnaire that he did not know any of the witnesses, in truth he had for years played in the same intramural basketball league as Richard Westfield.  The men played on different teams for the Government Printing Office, once a week on Sundays for three months of the year.

64.     Juror No. 19, stated on his questionnaire that he had never having been accused of, arrested for or charged with any kind of crime, whether or not it resulted in a conviction. This was untrue.  On January 4, 2002, Juror 19 was convicted of a misdemeanor offense, under Case Number 059GT0116550600, in the District Court of Fairfax County, Virginia.  Upon information and belief, the underlying conduct involved reckless driving.

66.     The violations of Mr. Lighty's constitutional rights to a fair and impartial jury require that his convictions and sentences be vacated.

## IV.     MR. LIGHTY WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS BECAUSE THE GOVERNMENT ENGAGED IN PROSECUTORIAL MISCONDUCT.

Mr. Lighty's convictions and sentences were obtained in violation of his federal constitutional rights to due process, counsel, the effective assistance of counsel, a fair and reliable determination of guilt and penalty, a fair and impartial jury, the presumption of innocence, present a defense, confrontation and freedom from cruel and unusual punishment, as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, because the prosecutors engaged in various instances of impermissible and prejudicial

misconduct before and during the guilt and penalty phases of Mr. Lighty's trial.  Separately and cumulatively, the Government's misconduct requires the reversal of Mr. Lighty's convictions and sentences.

In support of this claim, Mr. Lighty alleges the following facts, in addition to those that will be presented after a full investigation, discovery, access to the Court's subpoena power, expansion of the record, and an evidentiary hearing:

1.      **Non-Disclosure of Charles Whitley's History of Cooperation with Law Enforcement.**  Arguably the most important witness for the Government in this case was Charles Whitley.  Whitley's testimony was crucial to the Government's case at both the guilt and penalty phases of the trial.  He testified to Mr. Lighty's alleged admissions to participation in the kidnapping and killing of Eric Hayes, the incident for which Mr. Lighty was on trial, and to Mr. Lighty's alleged admissions to participation in the killing of Antoine Newbill on Afton Street, an unrelated incident erroneously admitted at the guilt phase under Fed. R. Evid. 404(b).

2.      The Government violated the commands of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States,* 405 U.S. 150 (1972), by failing to disclose to defense counsel the nature and full history of the cooperation Whitley provided to law enforcement officials in order to secure benefits for himself.

3.      Whitley's cooperation in the case against Mr. Lighty and his co-defendants was only one instance of his cooperation with law enforcement.  On June 20, 2003, the lead investigator in the case, Detective Sean Chaney, represented to the District Court of Maryland for Prince George's County that Whitley had "previously provided detailed information regarding other crimes of violence and narcotics trafficking . . ."

66

4.      Upon information and belief, Whitley's history of cooperation included having been an informant in another homicide that also occurred in Prince George's County.  That homicide took place on or about October 19, 2001, less than two months before the homicide in the instant case, and was also investigated by Prince George's County Police.  Michael Scott and Aaron Robinson were arrested and charged in connection with the homicide, and both men were ultimately convicted in Prince George's County Circuit Court.

5.      The Government was constitutionally obliged to provide defense counsel with the particulars of Whitley's history of cooperation, including the cases in which he cooperated, the defendants against whom he cooperated, the law enforcement officials with whom he worked, the quality and accuracy of the information he provided and the consideration that was given to him in exchange for his cooperation.  The Government disclosed none of this information to the defense.

6.      **Improper Presentation of Conflicting Theories of Motive for Afton Street Homicide through Charles Whitley.**  The Government further committed misconduct by presenting, through Charles Whitley, a completely different motive for the Afton Street shooting at Mr. Lighty's trial than it had at the trial of co-defendant Lorenzo Wilson.  During the Wilson trial, when the Government was seeking to prove that Wilson participated in the Afton Street homicide, the Government elicited from Whitley that the motive for the shooting was Wilson's "falling out" with Antonio Johnson, the alleged target of the shooting.  According to Whitley at that trial, Johnson was supposed to have delivered a gun to Wilson but he never did so.  Wilson suspected that Johnson had sold the gun or given it to one of his friends, and he wanted money from Johnson for the weapon.

7.       In contrast, at Mr. Lighty's trial, when they sought to prove that Mr. Lighty had participated in the Afton Street shooting, the Government presented Mr. Lighty, rather than Wilson, as the person who was angry with Mr. Johnson.  At Mr. Lighty's trial, Whitley testified that it was a disagreement between Antonio Johnson and Mr. Lighty that precipitated the incident, after Whitley's girlfriend told Mr. Lighty about some things she had heard Antonio Johnson say about him.

8.       The same prosecutor who examined Whitley at Mr. Wilson's trial examined him at Mr. Lighty's trial.  By presenting against Mr. Lighty a theory of the genesis of the Afton Street homicide that conflicted with the theory presented at Mr. Wilson's trial, the Government violated Mr. Lighty's constitutional rights.

9.       **Uncorrected Misrepresentation Regarding Benefits Provided to Charles Whitley in Return for Cooperation.**  Several months before Mr. Lighty's trial, Whitley testified at the separate trial of Mr. Lighty's co-defendant, Lorenzo Wilson.  The prosecutor elicited from Whitley at that trial that, after he was arrested on firearms, assault and burglary charges, police initially warned him that "[i]t was like about 45, 50 years you be facing," and thereafter promised him that if he would "[j]ust give us a little information about the murders and all this would be solved right here."

10.       At Mr. Lighty's trial, the same prosecutor, in the course of examining Whitley, implied before the jury that nothing had been offered to Whitley in exchange for the information he gave to law enforcement.  The prosecutor asked, "Did I ever offer you anything for your testimony here today, Mr. Whitley?" to which Whitley replied "No."

11.       The Government violated Mr. Lighty's constitutional rights, including the right to a trial free from the knowing use of perjured testimony, by failing to alert the Court, the jury and

68

the defense that it had presented evidence at the Wilson trial that Whitley was offered leniency in exchange for his cooperation against Mr. Lighty and by failing to correct the misimpression created by the exchange set forth above.

12. **Non-Disclosure of Evidence Implicating Maurice Gray in Afton Street Shooting.** On February 23, 2002, officers of the Prince George's County Police Department conducted a search of a residence at 10904 Philips Drive, Upper Marlboro, Maryland. That residence was inhabited by an individual named Maurice Gray. The police seized a number of items, including three electronic scales, a black hoodie, a bag of gun cleaning patches, .32 and .38 ammunition, a gun cleaning kit, three cell phones and personal paperwork addressed to Maurice Gray. The search was conducted pursuant to a warrant obtained in connection with the shooting of Antoine Newbill on Afton Street, the homicide that was erroneously introduced against Mr. Lighty at trial as purported Fed. R. Evid. 404(b) evidence. Having obtained a search warrant for Maurice Gray's home, law enforcement officials were necessarily in possession of evidence amounting to probable cause to believe that Maurice Gray was implicated in the Afton Street shooting. Such information is obviously materially exculpatory of Mr. Lighty, who has no connection whatsoever to Maurice Gray. Yet the Government failed to disclose the information to Mr. Lighty's trial counsel. Despite diligent efforts, undersigned counsel have been unable to obtain the affidavit in support of the application for the search warrant of Maurice Gray's residence or any other documents containing the information. Counsel will seek leave of Court in due course to utilize formal discovery procedures to secure the information, and will seek the Court's permission to amend this Motion to incorporate any relevant information that is discovered.

69

13.     **Misrepresenting the Record to Secure the Exclusion of Tamika Hampton's Testimony.**  The Government engaged in prosecutorial misconduct, in violation of Mr. Lighty's constitutional rights, by making a material misrepresentation about the anticipated testimony of defense witness, Tamika Hampton, that led to the Court's erroneous and prejudicial exclusion of Ms. Hampton's testimony.

14.     The defense sought to present the testimony of Ms. Hampton, the mother of two of Tony Mathis' children, to establish the close relationship that Mathis had with Mr. Lighty's co-defendant, James Flood, and the absence of any relationship with Mr. Lighty.  The defense also sought to call Ms. Hampton to establish that she had seen Mathis with a gun that resembled the weapon allegedly used to kill Mr. Hayes around the time that the shooting occurred.

15.     The Government moved *in limine* to exclude Ms. Hampton's testimony, repeatedly stating that Ms. Hampton would testify that she only saw Mathis with the gun prior to the birth of her child on December 21, 2001, and thus too distant in time from the January 3, 2002, killing to be relevant and admissible. The Court granted the Government's motion, stating that "I'm not going to permit the testimony about the person who says it looks like the gun I saw weeks before, that's just far too tenuous."

16.     In fact, when Ms. Hampton testified before the grand jury, the Government elicited from her the following:

Q.     During that time period right around the time your daughter was born ***into early 2002***, did you ever see Anthony Mathis with a gun?

A.     Yes.

Q.     What kind of gun?

A.     Black gun with a clip type – where you have the clip.  You – you insert it from the bottom.

Q.      And what were the circumstances that you saw him with that gun?

A.      At his mother's house.  You know, when she was living over there on 28th Avenue.  I would be over there; and, you know, the gun was out on the dresser, on his bed, you know.

Q.      Did you see it more than once?

A.      I would see it all the time.

Q.      Was that **both before and after your daughter was born?**

A.      Mm-hmm. Yes.

(emphasis added).

17.     Given Ms. Hampton's sworn grand jury testimony, about which the Government was undoubtedly aware, the Government's representation that Ms. Hampton would say she only saw Mathis with the gun prior to the birth of her child was inaccurate and materially so, as it led to the exclusion of her highly relevant testimony.

18.     Had it not been improperly excluded on the basis of the Government's misrepresentations, Ms. Hampton's testimony would have substantially bolstered the defense's theory that Tony Mathis was responsible for the murder of Mr. Hayes.  Ms. Hampton, *inter alia*, would have testified that Mr. Mathis possessed a gun similar to the alleged murder weapon at or near the time of the Hayes homicide; would have identified the actual exhibit the Government alleged to be the murder weapon as a look-alike of the gun she saw in Mathis' possession "all the time;" would not have identified Mr. Lighty as an associate of Mathis'; would have established that Mathis was older than Mr. Lighty and associated with an older group of men, including Mr. Flood; and, in combination with Latasha Massey's testimony, would have helped show that Mathis was the main culprit in the abduction and shooting of Mr. Hayes.

71

19.     Trial counsel provided ineffective assistance of counsel, in violation of Mr. Lighty's constitutional rights, by failing to alert the Court to Ms. Hampton's grand jury testimony, expose the Government's misrepresentations, and secure the admission of Ms. Hampton's trial testimony.

20.     **Misrepresenting the Record to Secure Admission of the Afton Street Homicide Evidence.**  The Government engaged in prosecutorial misconduct, in violation of Mr. Lighty's constitutional rights, by deliberately misrepresenting to the Court the evidentiary basis for the admission of irrelevant and prejudicial evidence of Mr. Lighty's alleged involvement in the Afton Street homicide.

21.     The Government's justification for the admission of the Afton Street homicide evidence was that it would establish that Mr. Lighty murdered Eric Hayes.  Specifically, the Government proffered that it could prove Mr. Lighty's identity as the shooter in the Hayes homicide by directly tying the gun purportedly used in the Afton Street homicide, which was seized from Mr. Lighty, to the Hayes homicide.  The principal evidence the Government proffered to establish this link, and thus to secure admission of the Afton Street homicide evidence, was the testimony it said it anticipated from Charles Whitley.  Mr. Whitley's anticipated testimony, however, did not establish Mr. Lighty's ties to the gun and both homicides.  And the Government must have known it.

22.     Consistent with his statements to the police, Mr. Whitley testified in the grand jury that Lorenzo Wilson – not Mr. Lighty – had told him that the gun seized from Mr. Lighty had "two bodies on it."  The Government explicitly asked Mr. Whitley in the grand jury whether it was Mr. Wilson or Mr. Lighty or both men who made this statement to him.  In response, Mr.

Whitley denied that Mr. Lighty made the statement. According to Mr. Whitley, the statement came only from Mr. Wilson.

23. In seeking to secure admission of the Afton Street homicide evidence, the Government argued that Mr. Lighty made a statement to Mr. Whitley that would conclusively link the gun seized from Mr. Lighty to both the Hayes and Afton Street homicides. The trial court initially admitted the Afton Street homicide evidence on the strength of that representation. Yet the Government knew, based on Mr. Whitley's grand jury testimony, that Mr. Whitley would *not* testify that Mr. Lighty had told him that the gun seized from Mr. Lighty had "two bodies on it." In fact, because of Mr. Whitley's grand jury testimony, the Government was aware that Mr. Whitley had expressly denied that Mr. Lighty had made such a statement, and reconfirmed that only Mr. Wilson had done so.

24. The Government had no basis for seeking admission of the Afton Street homicide evidence on the grounds that Mr. Whitley would testify that Mr. Lighty told him that the alleged murder weapon was used in both the Afton Street and Hayes homicides. Indeed, in the middle of Mr. Whitley's trial testimony – after having already secured admission of the Afton Street homicide evidence and forced the defense to address it in opening statements – the Government acknowledged in passing at a bench conference that Mr. Whitley would not furnish the crucial link between the gun seized from Mr. Lighty and the Afton Street and Hayes homicides.

25. Trial counsel provided ineffective assistance of counsel, in violation of Mr. Lighty's constitutional rights, by failing to object to the admission of the Afton Street homicide evidence on the grounds that the Government could not, in fact, establish through Mr. Whitley that Mr. Lighty linked the gun seized from him to the Afton Street and Hayes homicides. *See* Claim II.

26.     Appellate counsel provided ineffective assistance of counsel, in violation of Mr. Lighty's constitutional rights, by failing to argue on appeal that the Government materially misrepresented the anticipated testimony of Mr. Whitley in order to secure admission of the Afton Street homicide evidence.  *See* Claim VIII.

27.     **Improper and Prejudicial Penalty Phase Closing Argument.**  The Government engaged in prosecutorial misconduct, in violation of Mr. Lighty's constitutional rights, by knowingly advancing improper, impermissible arguments during its penalty phase closing.

28.     On several occasions during both its initial and rebuttal closing arguments, the Government incorrectly and improperly suggested that evidence of Mr. Lighty's privation or trauma could only be considered mitigating if it directly explained or related to the crimes of conviction.  For example:

- "We heard from Miss Monroe.  And, oh, did you talk about the facts of the case with him?  No, I only talked about from his family members, and I heard about, you know, the very sad situation about him losing his folks when he was young and how that affected him.  Well, what did that have to do, Ms. Monroe, what did that have to do with what happened on January 3, 2002?  Well, I'm not saying anything about that.  I'm just going to show you these records. . . What does that have to do with what we're doing here, Miss Monroe?

- "What you'll see is that they have never done anything about these red flags to see if actually that fact or that circumstance had anything to do with the way that Mr. Lighty acted on the day of the crime.  Why? Because they never bothered to have Miss Monroe discuss with him what happened that night, never bothered to have Mr. Cunningham examine him and discuss with him the events of January the 3rd, 2002 so he could assess

whether any of these risk factors actually had any role in the offense. And that, ladies and gentlemen, is the problem with this notion of these events being mitigating."

- "His drug use and academic failure, he did very well in school in the beginning. He did well through grade school, middle school he starts to have problems. It's a fact. We're not here to argue those facts. That is a fact. But what's the connection between that fact and what he did on January 3rd of 2002? What's the connection? Where is the connection? He wasn't a drug addict. Nobody said he was under the influence of drugs when this happened. No one said he was depressed when that happened. There's no connection between these facts of his history up until the time he is 14 and what he does on January 3, 2002. How in the world, then, can it mitigate against the crime in this case?"

- "[Defense counsel] say, look at all these factors of what happened to him before he was 12. And you find that that mitigates a sentence of less than death. There's no linking there. It's not connected. Not one, one witness has come in and said, we saw red flags so we followed it up and this is what we concluded. They just said there's these red flags in his background. Feel sorry for him. That's what the argument comes down to. Feel sorry for him because he had some rough times in this childhood. Not that it had anything to do with why he acted that way on January 3rd, 2002, but to feel sympathy, which the law prohibits you from doing, whether its sympathy for Mr. Lighty or sympathy for the Hayes family."

- "These factors in the background have to somehow mitigate his involvement. There has to be a nexus. And I suggest to you the defense has absolutely not met their burden of proving that in any way these factors mitigate against what his did on January 3rd,

75

2002."

29.     The jury is free to consider any evidence in mitigation that supports a sentence of life imprisonment and militates against a death sentence.  The Government's argument that the jury must not consider events in Mr. Lighty's life unless Mr. Lighty could show that they related to the crime of conviction was erroneous as a matter of law, improper and prejudicial.

30.     During its penalty phase closing, the Government also *knowingly* made the impermissible and prejudicial argument that the victim's family wanted the jury to sentence Mr. Lighty to death.  The Government first stated, "And let there be no doubt what the United States is asking you to do in this case, *on behalf of the Hayes family* and with the law in support, to imposes the only justifiable sentence in this case and that is a sentence of death." (emphasis added).  The Government next told the jury, "…with that evidence to guide you and with the law to guide you, *you will do what the Hayes family asks you to do*, what the Government tells you to do, in connection with the facts and the law of this case, and that is to impose the only sentence, the only sentence that is justified for these facts for the execution of this young man.  And that is the death sentence." (emphasis added).

31.     The above statements were not inadvertent errors.  They were deliberately offered by a seasoned prosecutor who was fully aware that imploring a jury to consider the wishes of the victim's family concerning the death penalty was improper, particularly when such wishes were not in evidence.  In earlier discussions with the Court, the Government acknowledged, "We would never be able to ask them their opinion of the death penalty, why we're all here, do you want the defendant to get the death penalty?  Those questions are clearly improper."  At another point, the Government argued, "We would never be able to ask this question of all the people who testified because I can assure you each one of them would testify that they feel very strongly

that Mr. Lighty should receive the death penalty, and we would never ask that question." On another occasion, the Government stated, "We would not be able to ask and did not ask Mr. and Mrs. Hayes how they feel about the fact that Mr. Lighty be permitted to live. And we haven't been able to ask that." And on yet another occasion, the Government stated, "We were not allowed to introduce evidence of the impact of the proceedings, the impact of the death sentence on the victim's family." Each of these assertions demonstrates the Government's knowledge of the impropriety of introducing evidence and argument about whether the victim's family wants a capital defendant to receive the death penalty.[3]

32.     Upon defense counsel's objection and motion for a mistrial following the Government's inflammatory, unconstitutional assertions about the wishes of Mr. Hayes's family, the Government justified its conduct by saying that the Court had expressly permitted the Government to "argue that the Hayes family supported imposition of death in this case." Yet there was no such permission given, nor could there have been given the Government's repeated acknowledgement that such argument was impermissible.

33.     The Government told the jury not once, but twice, that the victim's family wanted Mr. Lighty to receive the death penalty, notwithstanding its knowledge that such argument was

---

[3] This claim of intentional misconduct is different than the claim addressed on direct appeal, which was whether the Government's two-time statement that the Hayes family wanted the jury to impose the death penalty violated Mr. Lighty's constitutional rights. To resolve this issue, the Court of Appeals did not need to determine whether the Government's conduct was deliberate. *See* Claim VIII (arguing ineffective assistance of appellate counsel for advising the circuit court to apply an incorrect standard of review). Nevertheless, because the Court of Appeals employed the wrong standard of review, the Court of Appeals did make such a determination. It found that the record contained no evidence, "other than Lighty's rank speculation," that government intentionally placed its unconstitutional remarks before the jury. But to the contrary, as set forth above, the record contained voluminous evidence of the Government's knowledge that it was "clearly improper" to say that the victim's family wanted Mr. Lighty to be put to death. The existence of this evidence warrants an evidentiary hearing on the issue of the Government's intent.

improper. The Court's curative instruction could not and did not "un-ring the bell." The Government's intentionally inflammatory, unconstitutional assertions about the victim's family's wishes prejudiced Mr. Lighty and deprived him of a fair penalty phase trial.

34. The Government further deprived Mr. Lighty of a fair penalty phase trial by improperly acting out, during its closing argument, the imagined voice and thoughts of Mr. Hayes during the charged kidnapping. The Government stated, "And you have to think that that is the feeling that Eric Hayes had in that trunk that night. That, what is going to happen to me? Did I tell my mom I loved her before I left? What is going to happen to me? Can I escape? What is going to happen to me, Eric Hayes, in the trunk of that car? Where are they taking me? What are they doing? I didn't do anything wrong? Why are they taking me away? Why are they in Maryland? Why are these men looking at me?"

35. By narrating Mr. Hayes's supposed thoughts and feelings, the Government improperly attempted to inflame the emotions of the jury. The Government had no factual basis for arguing that Mr. Hayes had these thoughts as the crime was being committed. Additionally, by acting out what Mr. Hayes purportedly felt, the Government impermissibly led the jurors to put themselves in the place of Mr. Hayes during the commission of the crime.

36. The Government further deprived Mr. Lighty of a fair penalty phase hearing by commenting on the strain endured by Mr. Hayes's family as a result of sitting through Mr. Lighty's trial. During closing, the Government referred to Mr. Hayes's father and asked, "What is the weight of . . . coming here and sitting in this trial and watching this man, and spending the last three days talking about him biting his nails when his mom died 15, 16, 17 years ago? What is the weight of that?" These remarks constituted improper victim impact argument and violated Mr. Lighty's constitutional rights, including the rights to trial by jury and to present a defense, by

imposing an unfair and impermissible cost on the exercise of those rights. The Government's remarks were especially improper because the Government itself believed they were improper. When Mr. Lighty's counsel attempted to present evidence regarding the impact of the trial on Mr. Lighty's grandmother, Nancy Westfield, the Government vigorously and successfully objected, stating that it would be improper for the Government to elicit such evidence from its own witnesses.

37. The Government also engaged in improper, prejudicial argument when it asserted facts not in evidence pertaining to Mr. Lighty's jail records. Included in the background materials that Lori James-Monroe compiled on Mr. Lighty was a certificate of completion of a course of study in job readiness from the Prince George's County Detention Center. In its rebuttal closing, the Government said: "Where is there anything other than a certificate that is in their life history book, but not in the Department of Correction record. So one wonders where that came from." Yet the Government had introduced no evidence establishing that the "Department of Correction" had no record of the certificate or otherwise casting doubt on the authenticity of the certificate.

**38. Non-Disclosure of Wilson's Admission Regarding the Motive for the Afton Street Shooting.** In March of 2002, a Prince George's County detective interviewed Lorenzo Wilson. Mr. Wilson admitted to having sold a .22 caliber rifle to Anthony "Boo Boo" Johnson. This information was highly exculpatory as to Mr. Lighty regarding the issues of guilt and penalty. The Government's theory regarding Mr. Lighty's involvement in the Afton Street incident was that he was angry with Mr. Johnson over a verbal slight. The Government suggested that this slight led to Mr. Lighty arguing with Mr. Johnson, pulling a gun out on him, and then later driving the car from which shots were fired at Mr. Johnson. There was, however,

a counter theory, supported by statements of civilian witnesses, that it was in fact Lorenzo Wilson who had the dispute with Mr. Johnson, over a .22 caliber rifle he had sold to him. Mr. Johnson never paid for the rifle, and this angered Mr. Wilson, who was in the business of selling illegal firearms. Mr. Wilson's admission to police, a classic declaration against penal interest, had strong indicia of reliability. It would have been powerfully exculpatory evidence as it would have corroborated the fact that Mr. Lighty was, at best, peripherally involved in a dispute with Johnson and not motivated to do him harm. In failing to disclose this information, he Government violated its constitutional obligation under *Brady.*

39. Separately and cumulatively, the multiple instances of misconduct in which the Government engaged violated Mr. Lighty's constitutional rights and require reversal of convictions and sentences.

40. Trial counsel provided ineffective assistance of counsel, in violation of Mr. Lighty's constitutional rights, to the extent they failed to object to any of the Government's improper and prejudicial statements identified in this section. Appellate counsel provided ineffective assistance of counsel, in violation of Mr. Lighty's constitutional rights, to the extent they failed to raise on appeal any of the Government's improper and prejudicial statements identified in this section.

## V. THE COURT ERRONEOUSLY EXCLUDED RELEVANT MITIGATING EVIDENCE AT THE PENALTY PHASE IN VIOLATION OF MR. LIGHTY'S CONSTITUTIONAL RIGHTS

Mr. Lighty's sentence of death was obtained in violation of his federal constitutional rights to counsel, the effective assistance thereof, present a defense, confrontation, compulsory process, due process, freedom from cruel and unusual punishment and a fair, reliable, accurate determination of his sentence as guaranteed by the Fifth, Sixth and Eighth Amendments because

the Court made a series of rulings that precluded the sentencing jury from considering relevant mitigating evidence.

In support of this claim, Mr. Lighty alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.      **The Court Erred in Refusing to Permit Witness Jacqueline Simons to Ask the Jury to Spare his Life.**  Defense counsel presented the testimony of Jacqueline Simons at the penalty phase of Mr. Lighty's trial.  Ms. Simons is the mother of one of Mr. Lighty's friends, Gerald Anderson.  She testified that she loves Mr. Lighty and has a bond with him.  When her son was incarcerated, Mr. Lighty still came to Ms. Simons's house to check on her and make sure that she was okay. She said that Mr. Lighty calls her "Mom" and treated her younger children as if they were his siblings, and that they have an important relationship that is not going to change.

2.      However, the trial court erroneously forbade defense counsel from eliciting from Ms. Simons her plea to the jury to spare Mr. Lighty's life, or her view that his life has value.

3.      The plea of a defendant's loved one to the jury to spare his life is relevant mitigating evidence that the Court is constitutionally required to permit.  While a witness is not allowed to testify to what the jury "ought" to do in her opinion, she must be permitted to ask the jury to spare the defendant's life if she is willing to do so.  Not only is such evidence reflective of the defendant's impact upon those around him and thus of his character, it also prevents the jury from inferring based on the absence of such a plea that the witness does not want the jury to spare him.  The Court's ruling constituted prejudicial error.

4.      **The Court Erred in Refusing to Permit Defense Counsel to Elicit Evidence**

81

**Demonstrating Their Witnesses' Ability to Empathize with the Victim's Family and Still Testify on Mr. Lighty's Behalf.**

5.      **Jacqueline Simons**.  On cross examination of defense witness Jacqueline Simons, the Government elicited the fact that she did not know the family of Mr. Hayes, and that she did not know the mother of Antoine Newbill, the decedent in the Afton Street shooting.  The obvious inference that the Government wished the jury to draw from this question was that Ms. Simons's loving testimony about Mr. Lighty should be discounted because she had no appreciation for the pain that his actions caused the victims' family members.  On redirect, defense counsel sought to elicit evidence that Ms. Simons herself was the family member of an attempted homicide victim, and thus she could indeed empathize with the pain of losing a loved one in this manner.

6.      This testimony would have established that Ms. Simons's husband, and the father of her son, Gerald, was a police officer in Washington, DC.  One night in September, 1995, when he was off duty he visited a convenience store.  As he left the store he was shot in the neck by a would-be robber with a .380 pistol.  Fortunately, he survived.  The perpetrator was caught, prosecuted and convicted.

7.      This evidence would thus have powerfully rebutted the Government's claim that, essentially, Ms. Simons did not know what she was talking about and would not be supporting Mr. Lighty if she did.  It would also have allowed the jury to see that Mr. Lighty's family was not so different from Mr. Hayes's family in the sense of having suffered terrible loss, and to see the senselessness of inflicting still more pain by executing Mr. Lighty.  However, the Court erroneously refused to permit Ms. Simons to so testify, and the jury never heard it..

8.      **Montoria Freeland**.  Montoria Freeland, a paternal cousin of Mr. Lighty's by

82

marriage, was also called as a defense witness at the penalty phase. Her testimony centered on her close relationship with Mr. Lighty when he was a baby and a toddler. She recalled that she used to babysit him when his mother was at work, every day for a period of time, and she loved him dearly. She was also in close contact with the family at the time his mother died, and observed some of the effects of that loss on Mr. Lighty and his grandmother.

9.      On cross examination, the Government emphasized the fact that Ms. Freeland dropped out of Mr. Lighty's life after his early years, and had only very recently taken steps to resume her relationship with him. Plainly, the Government sought to have the jury infer that Ms. Freeland could not have cared very much for Kenny if she simply drifted out of his life when he was still young. Ms. Freeland attempted to explain that it was a series of her own tragic losses of family members to homicide that affected her ability to maintain and later reestablish her relationship with Mr. Lighty, and not a lack of love or care on her part. Evidence regarding the losses she had endured was for this reason additionally relevant in Ms. Freeland's case. However, the Court sua sponte cut the witness off when she began to explain how the series of losses consumed her, and allowed defense counsel to elicit only the bare fact that she had lost Kenny's father, Kenny's paternal uncle, her son's father, and finally her son and his best friend to murder. The Court insisted on a "telescope" approach to the presentation of this testimony and no details of these events were allowed.

10.     Had she been permitted, Ms. Freeland would have recounted that she lost her husband, Ricardo C. Minnis, Sr., to homicide on November 17, 1990. Her husband was 27 years old when he died of multiple gunshot wounds on the 1200 block of I Street, SE, in Washington, D.C. The crime was never solved. Ten years later, on July 6, 2000, Ms. Freeland's oldest son was murdered. Ricardo Minnis, Jr., was 20 years old when he was killed, along with his best

friend, Burl Lawson.  Both victims were shot to death in Washington, D.C., by a man named Daron McMillian.  All three men were in a car driving down 14th Street SE.  Minnis and Lawson were in the front seats and McMillian was in the rear.  McMillian shot both men in the back of the head and jumped out of the car as it crashed into a parked vehicle.  McMillian was arrested and confessed to the two murders along with a third that he committed.

11.      **The Court Erred in Excluding Testimony Regarding the Effect of the Proceedings Upon Nancy Westfield**.  During the testimony of Rev. Lipscombe, counsel sought to elicit from the witness his knowledge of the effect of what was happening to Mr. Lighty upon his grandmother and primary caretaker, Nancy Westfield.  After the Government objected to the question, counsel explained that he wanted to explore "how she's taking this" with the witness, who is her pastor and has known her and her family for 40 years.  Plainly, counsel was not proposing to elicit a litany of complaints about the inconvenience of having to come to court or the hardship involved in hearing testimony about what her grandson was alleged to have done.  Rather, he was attempting to illustrate for the jury Ms. Westfield's deep and abiding love for Mr. Lighty, her appreciation of the enormous gravity of the crimes he had been convicted of and the impact upon her of the terrible prospect of her grandson being put to death.  This testimony was relevant and constitutionally required to be admitted.  Nevertheless the Court ruled that evidence regarding "the effect of the trial" on Ms. Westfield was irrelevant and, if counsel asked his question, the Government would be permitted to bring in members of the decedent's family to talk about the strain that the trial process had put on them.

12.      **The Court Erred in Excluding Evidence that Mr. Lighty Could have a Positive Influence in Prison**.  During the testimony of Randy Lighty Sr., Mr. Lighty's counsel sought to elicit evidence regarding Mr. Lighty's character traits and abilities and how they would

fit in a prison environment and enable him to be a positive influence in such a setting.  Knowing Mr. Lighty, and having spent many years incarcerated in prison himself, Randy Lighty Sr. was positioned to provide important information regarding the types of personality traits and habits that he has observed to be conducive to successfully, peacefully and productively surviving in prison and whether his nephew has them.  Similarly, counsel sought to elicit from Mr. Lighty's cousin, Jubarlo Thompson, who has also spent a substantial amount of time in prison, evidence regarding the traits and characteristics that Mr. Lighty has that would enable him to help others while incarcerated.  Sua sponte, in both instances, the Court ruled that the testimony would not be permitted.

13.     The Court's rulings erroneously deprived Mr. Lighty of evidence in the form of his relatives' observations of him and the environment he could be going into from which the jury could and would have drawn favorable inferences regarding his character and his probable future conduct if sentenced to life in prison.  The rulings therefore violated Mr. Lighty's constitutional rights.  The prejudice resulting from these exclusions must be evaluated cumulatively with the prejudice resulting from each of the other items of mitigating evidence that were excluded.

14.     **The Court Erred in Excluding the Baby Book**.  Mr. Lighty's mother, Denise Lighty, kept a baby book chronicling her son's first days in which she described her drug use while she was pregnant with him.  The baby book contained handwritten statements from Ms. Lighty, including the following:  "Lil' Kenny had to stay in the hospital for 10 days.  The doctor wanted to observe him because I was on that 'boat' all during my pregnancy."  The book records that Mr. Lighty was born on September 14, 1982, and that he did not come home until September 24, 1982.  Denise Lighty also recorded her sadness that Mr. Lighty's father had passed away and

85

was not there to see his son, noting the first anniversary of his funeral and writing that she still keeps crying because she misses him so much.

15.     The baby book was retained by Mr. Lighty's grandmother, Nancy Westfield, but Mr. Lighty's counsel did not learn of its existence until the trial was already underway.  As soon as they discovered the book counsel provided a copy of it to the Government and sought to admit it.  However, the Court excluded the evidence because counsel had not included it on Mr. Lighty's exhibit list and did not timely produce it to the Government pursuant to the Court's presentencing order.  As a result, the jury never heard Mr. Lighty's mother's admission that she used drugs extensively while pregnant with him, an issue that the Government contested.  The prejudice resulting from this exclusion must be evaluated cumulatively with the prejudice resulting from each of the other items of mitigating evidence that were excluded.

16.     The combined effect of the erroneous rulings manifestly had a substantial and injurious effect upon the jury's penalty phase verdict and Mr. Lighty's death sentence must therefore be vacated.   To the extent that appellate counsel failed to adequately raise and litigate this claim for relief on direct appeal, they rendered constitutionally ineffective assistance.  *See* Claim VIII.

## VI.     TRIAL COUNSEL RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE

Mr. Lighty's sentence of death was imposed in violation of his constitutional rights to counsel, the effective assistance thereof, a fair and impartial jury, the presumption of innocence, present a defense, confrontation, compulsory process, due process, freedom from cruel and unusual punishment and a fair, reliable, accurate determination of his sentence as guaranteed by the Fifth, Sixth and Eighth Amendments because his trial counsel's representation during the penalty phase was woefully deficient.  Counsel's multiple errors and omissions resulted in

overwhelming prejudice to Mr. Lighty.  Separately, and cumulatively, those deficiencies in the investigation, preparation and presentation of the mitigation case and defense to the State's aggravating circumstances require reversal of Mr. Lighty's sentence of death.

In support of this claim, Mr. Lighty alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.      Each of the errors and omissions of trial counsel in the guilt phase also contributed to the jury's decision to vote for a sentence of death.  *See* Claim II, incorporated by reference as if fully set forth herein.

2.      **Failure to Adequately Investigate and Present Mitigating Evidence**. Trial counsel unreasonably and prejudicially failed to adequately investigate and present an abundance of readily available mitigating evidence.  It is more than reasonably likely that, had counsel performed as the minimally effective advocates guaranteed by the Constitution and presented this evidence, at least one of Mr. Lighty's jurors, who struggled with their sentencing decision over the course of three days as it was, would have voted for a life verdict.

3.      The Mitigation Case that Was Presented.  The evidence actually presented by trial counsel at the penalty phase was thin, uncompelling and at times affirmatively damaging to Mr. Lighty.  Counsel barely scratched the surface of the adversity Mr. Lighty faced throughout his life and the effects that it had on him.  Trial counsel first called Dr. Mark Cunningham to the stand to talk to the jury in general terms about studies that have identified "risk factors" in a person's background that increase the statistical likelihood that they will engage in violent delinquent or criminal behavior.  As noted, because counsel had unreasonably and prejudicially failed to comply with the notice requirements of Rule 12.2, Dr. Cunningham was prohibited

from even stating whether or not any of the risk factors he described were present or absent for Mr. Lighty. His testimony was thus a litany of issues mentioned in passing and with minimal explanation. The jury was left to discern, on its own and with no expert guidance, whether any of the risk factors were present in Mr. Lighty's background, and was given no information about the effects on his development of any that were present other than the fact that the more factors there were, the greater the statistical likelihood that Mr. Lighty would be a violent criminal. The overall effect of this testimony was the polar opposite of mitigating. Rather than humanizing Mr. Lighty and allowing the jury to empathize with him as a fellow human being, Dr. Cunningham's presentation reduced him to a statistic, a number, and a criminal one at that.

4. Some aspects of Dr. Cunningham's testimony were particularly damaging. For example, he testified that "adults who were ADHD as children are more likely to display conduct problems, alcohol and drug abuse, sociopathy, or an insufficient operation of conscience." He testified that children with ADHD are "[m]ore likely to end up with a significant personality disorder that puts you in the criminal justice system," and recounted statistics showing that 41% of prison inmates have ADHD as compared to 3-5% of the general population. Mr. Lighty's pediatrician then testified that he had been diagnosed with the condition, thus raising the specter that he was a "sociopath" who lacked a conscience.

5. Dr. Cunningham's testimony was immediately followed by that of Mr. Lighty's grandmother, Nancy Westfield. In jarring contrast to Dr. Cunningham's testimony regarding risk factors that may be present in defendants' lives, Ms. Westfield painted a rosy picture of Mr. Lighty's childhood. She described her daughter as a loving, caring mother to Mr. Lighty who was very close to him and loved him very much. She said that Denise was always jolly and happy, and portrayed her as a responsible, hard worker. Ms. Westfield did report Mr. Lighty's

88

father's death before he was born, and described her daughter's tragic death from cancer when Mr. Lighty was three years old. She also recalled his behavior changes in the immediate aftermath of the loss of his mother. But she then portrayed the ensuing years as uneventful and said Mr. Lighty was essentially doing fine until he got to high school and fell in with the wrong crowd. She said that she had a good relationship with Mr. Lighty as he was growing up, that she loved him very much and that she continued to stick by him and urge him to do right and stay in school as he started to slide into trouble.

6.      Trial counsel next presented Randy Lighty Sr., Mr. Lighty's uncle. Randy Lighty Sr. had been locked away in prison for all but 10 months of Mr. Lighty's life, released briefly when Mr. Lighty was 11 years old. Of those 10 months, he was consistently around Mr. Lighty for only three or four months. His testimony established essentially that Mr. Lighty was exposed to criminal behavior for the few months he was around. Randy Lighty, Sr admitted to drug dealing, and to plying his trade when Mr. Lighty was with him. He said he thought it was important to toughen Mr. Lighty up, so he talked to him and tried to teach him to fight. He also took him to prostitutes on several occasions. Randy Sr., too, lionized his sister – Mr. Lighty's mother – as an outstanding citizen and all-round wonderful, decent person.

7.      There then followed a succession of witnesses whose principal purpose was to state that they loved Mr. Lighty and that they intended to remain in contact with him now that he was in prison – despite the fact that several of them had had little or no contact with him since he was a toddler. Randy Lighty Jr., Randy Sr.'s son, testified that he and Mr. Lighty had a good life together growing up, that he recalled good times at family cookouts, and talked extensively about his own criminal record. He also added to the refrain that Mr. Lighty's mother had been a sweet, honest and loving person. Mr. Lighty's paternal aunt, Jacqueline Ruth, noted that he and his

mother had a loving relationship prior to her death and were always together. She, too, pledged to faithfully visit Mr. Lighty in jail and talk on the telephone to him, even though she had not been in contact with him since he was a toddler. Her son, Jubarlo Thompson, said the same, though he had been out of touch with Mr. Lighty for as long as his mother had. Montoria Freeland, a relative by marriage, also lost contact with him when he was tiny. She nevertheless opined that Nancy Westfield was a good mother to him, that she was very heavily involved in his life and that she did the best she could with him. Mr. Lighty's godmother, Donna Kingsbury, also pledged to keep in touch, though she admitted that she had had very little contact with him over the years since his mother died.

8.      The remaining lay witness was Reverend Leon Lipscombe, a former colleague of Nancy Westfield at the Government Printing Office. He testified that he helped her when she was a struggling single mother, which was before Mr. Lighty was born. He said that she once alluded to drugs in her household, and sometimes gave things to her children instead of her attention, but insisted that she did her best with them. He had not seen Mr. Lighty since he was a small child.

9.      The only other witness called by the defense was Lori James-Monroe, a social worker. Ms. Monroe testified about her investigation into Mr. Lighty's social history, and about the "red flags" she found in his background. Her account of his history largely repeated the accounts of the lay witnesses who preceded her, although she did add some unhelpful points such as Mr. Lighty's dropping out of job corps and selling drugs, and she was extensively cross-examined on Mr. Lighty's aggressive behavior in school and his failure to express remorse for the murders to her. She, too, perpetuated the impression that Mr. Lighty's mother, Denise, was a lovely person whom everyone adored, noting that she was considered to be the glue holding the

90

family together and was the only "good" child that Nancy Westfield had.  She also extolled the bond and the relationship between Mr. Lighty and his grandmother, and said that Ms. Westfield tried her best to influence him in a positive way.

10.     Ms. Monroe said that what she called "red flags" were "circumstances in a child's life that *could*, down the road or in the current, cause them some sort of problems."  (emphasis added).  She admitted that she made no assessment of whether any of the "red flags" she found in Mr. Lighty's background actually *did* cause him "some sort of problems," nor did she explain what "sort of problems" someone exposed to such events might be expected to experience.  Her "red flags" corresponded to some of the risk factors that Dr. Cunningham listed as predisposing one to violent delinquent or criminal behavior, and she testified that she indeed found some to be present for Mr. Lighty.

11.     She testified that prenatal difficulties were present, in that his mother was depressed and used PCP and alcohol during her pregnancy with him.  She was forced to acknowledge on cross, however, that she had no evidence that these issues adversely affected Mr. Lighty, and she was just reporting facts.  She testified that there was a family history of substance abuse and criminal behavior, and that was a "red flag."  The use of drugs and alcohol in the home also counted, in her view, as family management problems.  She said that there was no domestic violence in Mr. Lighty's life and hence the red flag of family conflict was not present, but that parental attitudes toward criminal behavior and substance abuse were an issue because nobody put a stop to the aforementioned criminal behavior and substance abuse.  She found that community disorganization was present because "there's something going on in [Mr. Lighty's] neighborhood," and people had told her that crime had been on the increase there.

12.     The family had not moved around a lot, but there had been transitions as people

91

moved in and out of the home.  Ms. Monroe found that exposure to firearms was an issue while Randy Sr. was around, *i.e.*, for 3-4 months when he was 11, and then "whatever exposure he experienced in hanging out in the neighborhoods that he hung out in."  She testified that juvenile delinquency was a red flag, based on Mr. Lighty's juvenile record, as was his academic failure and lack of commitment to school, rebelliousness, delinquent peers and ADHD.  In sum, her testimony conveyed to the jury that Mr. Lighty grew up in a house where criminal behavior and drug use occurred and were tolerated, and that he did poorly in school and then started to hang out with the wrong crowd in the wrong neighborhoods and get in trouble with the law.  In conjunction with Dr. Cunningham's testimony, these facts were offered to prove that Mr. Lighty was predisposed to be a violent criminal.  Since the jury had already found that Mr. Lighty had committed violent criminal offenses, this presentation added little or nothing to the question of what the penalty should be.   No narrative was presented, and no attempt was made to convey to the jury what life was like for Mr. Lighty day to day when he was a child in the Westfield household, or how his life experiences affected him.

13.     Trial counsel's presentation was so thin and unpersuasive because they failed to conduct a constitutionally adequate investigation into potential mitigating circumstances.  As counsel for a client facing the death sentence, trial counsel had an obligation to conduct a thorough, searching inquiry into the possible existence of mitigating circumstances.  At a minimum, they were required to prepare a comprehensive, multi-generational psychosocial history of Mr. Lighty, including obtaining information on his current mental and physical functioning, medical history of both mental and physical illnesses, history of alcohol and drug abuse, dependence and treatment, birth trauma, developmental delays, educational history including achievements, behavior problems, special education needs, cognitive limitations and

learning disabilities, military history, employment and training history, trauma history including physical, emotional, and sexual abuse and neglect, criminal and delinquency history, religious and cultural influences, provision of social services, poverty and other deprivation, and multigenerational family history of mental illness and exposure to trauma; to identify and interview all available witnesses in order to obtain information concerning Mr. Lighty's psychosocial, family and life history throughout all developmental stages, including those who may have information relevant to an assessment of his mental health and functioning; and to gather all records and documents regarding Mr. Lighty's psychosocial and multi-generational family history.

14.     The Mitigation Case That Reasonably Competent Counsel Would Have Presented.  In Mr. Lighty's case, had counsel conducted the requisite investigation, they would have discovered and presented a wealth of rich and compelling mitigating evidence, including, but not limited to:

15.     *Family Origins*.  Kenneth Jamal Lighty was born on September 14, 1982, in Washington, D.C.  He was the first and only child born to Denise Lighty, then 24, and her boyfriend, James Kenneth Thompson, 26.

16.     *Maternal Family*.  Denise Lighty, Mr. Lighty's mother, was born in Washington, D.C, on November 21, 1957.  She was the third child of her parents, George Lighty, Sr., and Nancy Lighty.  Although she took George Sr.'s name, George Sr. and Nancy were never married.  The closest they came was to apply for a marriage license in 1958, but the marriage was never performed.  Denise's two older brothers, George Jr. and Randy, were born in 1954 and 1956, respectively.  After Denise came another brother, Anthony, who was born in 1961.

93

17.     Nancy Lighty was born Nancy Smith on August 24, 1933, during a family visit to Georgia.  She was raised initially in Edgefield, South Carolina by her father, John Henry Smith, and her mother, Annie Bell Dobbs.  Nancy was the youngest of four children.  The firstborn was a daughter, Mattie Smith.  She was followed by John Henry Smith, Jr, then Gertrude Smith.  John Smith worked in a saw mill in Edgefield owned by a man named Prostor Millikin.  When Mr. Millikin moved his sawmill operation to Tabor City, North Carolina, around 1936, the Smiths moved with him.

18.     Proster Millikin and his family lived in a big house and kept a series of much smaller houses that had living and sleeping areas in which the mill workers lived.  The Smiths' house had two bedrooms, and the children all slept in one bed.  John Smith lost an arm while working in Mr. Millikin's saw mill.  The family lore is that there was a young boy playing near the saw who was not supposed to be there.  The boy got stuck in a machine and Mr. Smith lost his arm in the process of saving the boy's life.

19.     Annie Bell and John harshly disciplined their children.  To punish them, Annie Bell typically made them pull a switch from a nearby tree and give it to her to beat them with.  There were also times when Annie Bell would weave multiple willow branches to form a sort of whip to beat the children with.  This happened when she thought that the child had picked too small of a branch off the tree in an attempt to avoid a more painful punishment.

20.     The Smith children in turn were brutal to each other.  Gertrude and Nancy tortured their brother John.  Nancy chased John in circles around the house with a can of kerosene trying to throw some of it onto him.  Gertrude stood on the porch with matches, lighting one and throwing it on John whenever he passed by, trying to light him on fire.  When Gertrude was four or five years old and she pushed her younger sister Nancy into an open fire.

Nancy was one or two years old at the time. She had to go to the hospital to be treated for severe burns on both her arms. Gertrude also pushed Nancy into an old well that had been filled in. It was not extremely deep since it was no longer active, but she was still unable to get out on her own. Annie Bell had to come and pull Nancy out of the well. She then beat Gertrude severely.

21.     Although John Smith had a job, the family was extremely poor. Annie Bell made all of the family's clothes, even their underwear. The only time of the year that the family was able to enjoy fruit was at Christmas time and that was the only gift that the children received. Nancy and her siblings had to walk about three miles every day to get to school. Gertrude in particular had trouble behaving in school. She teased other children and acted out, often dancing on top of desks during class for attention. John Henry was called down to the school frequently because of Gertrude's bad behavior.

22.     John Henry had a bad temper. He would fight anyone over anything, even though he only had one arm. He was also an alcoholic. He spent a great amount of time at a place known in Tabor City as "the Bottom" where there was an abundance of bars and women. Although during the week John Henry was able to stay sober and go to work, the weekends were another story entirely. Every weekend he drank at the local bars and returned home extremely intoxicated and extremely angry. He directed his anger at his wife and daughters. The neighbors took pity on Annie Bell and her daughters because everybody knew how violent John Henry was when he drank. Sometimes Annie Bell took the girls to a neighbor's house in the evening and waited there until John Henry had gotten home and passed out and it was safe to return to the house.

23.     John Henry also made and sold moonshine. One evening, when he was home alone with the children and was impatient for them to go to sleep, he made all the children drink

95

from his jug of moonshine until they passed out.  Nancy was around five years old at the time. The children all got very sick and threw up all over the house.  When Annie Bell came home she was furious with John, Sr., not because he had given the young children moonshine, but because there was vomit all over the house.

24.     John Henry was chronically unfaithful to Annie Bell.  There was one instance where Annie Bell caught John Henry in a car with one of his women.  She reached into the car and grabbed onto his jacket where the sleeve was pinned for his missing arm.  John Henry slipped out of the jacket and ran all the way home, jumping into bed with Nancy and Gertrude when he got there.  Annie Bell showed up shortly afterwards waving his jacket.  When he tried to deny that she'd caught him, she screamed "you mean to tell me there's another one armed mother fucker in North Carolina?"  Annie Bell used to track her husband's whereabouts by the tread of his tires or the tracks from his shoes.  She usually managed to find him.  Once when she found his truck parked outside one of his women's homes, she stuck newspaper in the gas tank and then lit it on fire, blowing up his truck.

25.     John Sr. had many affairs but was seen most often with a woman by the name of Marguerite Johnson.  Marguerite only lived a couple houses down from John Henry and Annie Bell's home in Tabor City.  Annie Bell was enraged by John's constant infidelity. Whenever she caught her husband with Marguerite or any other woman she became violent.  She once hit Marguerite in the head with a jar of freshly canned peaches.  She was arrested at least six different times for her violent outbursts toward John Henry's mistresses.  However, Annie Bell Smith was never charged with any crime.  Her husband's boss, Proster Millikin, had so much influence within the community that he was able to convince the policeman to release her each

time. Proster Millikin was possessive of the Smith family and explained to the police officers that they were "his niggers."

26.     John Sr. had a child with his mistress Marguerite, a boy named Billy Johnson. The children were aware of the fact that this was their brother and often saw him around town and the neighborhood since he only lived a few houses down.

27.     Both Mattie and Gertrude had their first children when they were teenagers. Mattie gave birth to her first child, Annie Ruth Price, in North Carolina in 1940 when she was 16 years old.  She had her second child, Jimmie Price, two years later when she was 18 years old. Gertrude had her first child, Lynn Smith, when she was 15.  When Gertrude got pregnant, Annie Bell moved her daughters to Washington, D.C.  Annie Bell's sister, Bessie Blocker, was living up there at the time and they lived with her until they could find a place of their own.  John Henry and his son followed later when Proster Millikin closed the saw mill.  The family stayed with Aunt Bessie until they found their own home in southeast D.C.

28.     Alcoholism continued in Nancy's generation of the family. Mattie Fisher was a heavy drinker throughout her adult life.  Although she became sober 10 years prior to her death, years of drinking had taken a toll on her body. She died of cirrhosis of the liver on November 16, 2004 at 80 years old.  Mattie was also physically abusive to her children.  She was particularly brutal to her daughter Annie Ruth.  John Henry Jr. served in the military as a bazooka shooter during WWII. His job was to clear out places where the enemy was hiding. During his time in combat he saw two of his comrades killed in explosions right in front of his eyes.  John Henry Jr. eventually began drinking heavily, also.  On weekends he often drank a gallon of gin and did not move from his bed.

29.     Nancy Smith met her future husband, George Lighty Sr.,while her family was living on 11th and I Street in southeast Washington, D.C.  George Lighty was born in South Carolina to Robert Lighty and Nancy Gales Lighty.  He was one of ten siblings, five boys and five girls.  First came Robert, Jr. who was known as Sunny, Willie James, Theophilus who was called Teddy, Ira Lee, Callie Mae, Willisten, Christine, and the fraternal twins Clara Edith and Claudis.  They were all raised in a small town called Lamar, South Carolina.  The Lightys were sharecroppers.  The family grew up in a farming community where the focus was on tending to the farm rather than education.  Most of the kids in the neighborhood went to school but during the harvest or whenever necessary, the boys were pulled out of school to help out.

30.     As they became adults the siblings all scattered, some staying in South Carolina but most traveling north to find work.  Claudis, Clara and Willisten all went to New York City.  George, Christine, Callie, Sunny, Willie James and Teddy all went to Washington, D.C.  Ira Lee ended up settling in Connecticut.

31.     George Lighty began working as a truck driver in Washington, D.C. and for a while he was a special policeman.  His duties involved those of a security guard, but the job was connected to the Metropolitan Police Department.  After leaving that job, Mr. Lighty became a licensed mechanic and started his own business called Lighty Transportation Services.  Mr. Lighty continued to work on and off as a mechanic for the next forty to fifty years.  Nancy also worked.  She worked for a time as a companion and caretaker for an elderly woman.  The woman eventually passed away and then Nancy got a job working in the Government Printing Office starting in 1968.  She worked there continuously until she retired in 1993, at which point she began taking in foster children to make money.

32.     As noted, Nancy and George Lighty Sr. never married.  Their first child, George Lighty, Jr., was born on January 17, 1954, when Nancy was 20 years old.  George Jr. is known to the family as June.  For the first two years of their relationship, Nancy, George Sr., and George Jr. lived with Nancy's mother on 11th and I street in Southeast Washington, DC.  Shortly after George was born, the three moved out of the house and into their own.  After they moved out, Annie Bell decided that she had finally had enough of her husband, John Henry.  She began to pack his things while John watched her.  He called Gertrude and then Nancy and told them that their mother had lost her mind.  When Nancy and Gertrude arrived at their parents' house, Annie Bell said that she had always told her husband that she would leave him when the kids were grown and now that they were, he had to go.  Annie Bell and John Henry never lived together after that.

33.     John Henry continued his drinking.  Around 1962, he came home drunk one night and found his girlfriend in bed with another man.  John Henry picked her up and threw her outside, then turned around, went back inside of the house and went to sleep.  The woman lay outside all night and the next morning she was dead.  John Henry was convicted of manslaughter and was sentenced to 9 years in prison.  In 1967, John Henry passed away from cancer of the throat.

34.     Randy Lighty, Nancy and George Lighty's second child, was born on November 9, 1956.  The third was Denise Lighty, who would become Kenny Lighty's mother.  Nancy was unaware that she was pregnant with Denise until several months into the pregnancy.  She had been misdiagnosed with tuberculosis and was hospitalized at a clinic for two months as a result.  Finally, a more seasoned doctor evaluated her and told her that she was actually pregnant. Her baby was inverted in her womb, which caused the heartbeat to be heard below the belly button

instead of above. This is why the doctors initially told her that she wasn't pregnant. They had been listening for the infant's heartbeat in the wrong place. Nancy gave birth to her first and only daughter Denise "Niecy" Lighty on November 21, 1957.  Nancy's fourth and final child, Anthony Lighty, was born March 19, 1961.

35.     George Lighty Sr. was also an alcoholic.  He often had his siblings over to the house for drinking parties, which caused tension between him and Nancy. In addition to his drinking problem, George Sr. had developed a serious gambling addiction.  There were multiple times when George Sr. gambled away all of his money and the burden of keeping the family fed and a roof over their heads fell entirely upon Nancy.   As George started drinking more, he became increasingly angry, jealous and sometimes violent.  George was very suspicious of Nancy's whereabouts and used to follow her to see where she was going.  He convinced his son, Randy, that his brother Anthony was the product of an affair that Nancy had with another man. When he was drinking he had a tendency to pick fights with her.  Nancy hated the way he spoke to her at those times.  There were at least two incidents where George was physically abusive towards Nancy.  The children were aware of these occurrences.  Nancy eventually had enough of the drinking and the jealousy.  She left George around 1968.  Randy remembers being 12 years old and standing in a telephone booth with Nancy and his sister Niecy while Nancy called her mother to tell her that she had left George Sr.

36.     Even after Nancy left him, George Sr. continued his jealous and suspicious ways. George's business allowed him the flexibility in his schedule to stalk Nancy.  George eventually discovered that Nancy was dating a man named Rudy Williams. Rudy was a married man whom Nancy met while working at the Government Printing Office.  Nancy used to meet Rudy at the

home of her cousin Joyce.  On one occasion when they were together at Joyce's place, George Sr. showed up with his gun and fired shots at Rudy.

37.    George Sr. wanted the children to stay with him after Nancy left him.  George was planning on heading up to New York City where he had family.  Nancy told him to just let the children decide which parent with whom they wanted to live.  Both Anthony and Niecy went with their father at first, though Niecy returned to her mother a short time later.  George Jr. and Randy stayed in Washington, D.C. with their mother.

38.    Anthony experienced no consistent schooling while living with his father in New York. He was often enrolled in school only to be pulled out weeks later when his father decided to move again. Their frequent moves were often determined by George's relationships with women. They were in New York City for about two years.  They then went to Connecticut for about another two years to live with another woman who George was seeing at the time.

39.    George Jr., or June, became a talented basketball player. He played in high school and then for Harford County Community College.  In his second year there he was scouted and received multiple offers from four year colleges and universities, finally settling on Fairleigh Dickinson University in Teaneck, New Jersey.

40.    He only played eight games before a terrible car accident. On January 8, 1976, after a game against Iona in New Rochelle, New York, the bus dropped off the team at Rutherford campus.  From there, George Jr. got a ride home with two teammates and close friends, Ben "Nokey" Johnson and Redonia "Red" Duck. It had been raining that day and the temperatures dipped below freezing in the evening.  Nokey was only 18 years old and an inexperienced driver.  He hit a patch of black ice and lost control of the vehicle.  The car hit a telephone poll and Nokey's chest and legs were crushed under the weight of the car. He died

instantly. Neither George Jr. nor Red had been wearing seatbelts and upon impact both were thrown from the car through the back windshield. Red hit the back of his head on the pavement and had a U-shaped laceration on the back of his neck. George Jr. woke up to see a flap of skin dangling from Red's skull and blood pooling from his head.  George Jr.'s own leg was hanging on by a piece of skin. The bone was sticking out through several layers of clothing that he was wearing due to the cold weather.

41.    George Jr. was in the hospital for a month after the accident.  He was in such bad condition that he wasn't able to attend Nokey's funeral. He was told by his doctors that he might never walk again and his basketball career was certainly over.   Although he never played another game of basketball at Fairleigh Dickinson, he was eventually able to walk and run again. His mental wounds, however, did not heal as readily as his physical ones.

42.    When he was released from the hospital, George Jr. moved back home with his mother.  He received a sum of money from an insurance company as compensation for the accident, and he gave a large part of it to Nancy for a down payment on a house for the family. It was then that Nancy, Niecy and George Jr. moved to the house on Gaither Street in Temple Hills where Kenny would grow up.

43.    Depressed and despairing after his dreams of a professional basketball career had been dashed and severely psychologically traumatized from the accident and the death of his friend, George Jr. began abusing drugs and remained an actively using drug addict for the next 30 years.  He lived in the house on Gaither Street throughout.  George had trouble holding down a job due to his drug habit.  He had a pattern of keeping a job for a few weeks at a time and then using the money he earned to go on a binge.  As soon as he got paid he disappeared for days on end, strung out on drugs.

44.     Kenny's second-oldest uncle, Randy Lighty, was incarcerated on and off from a very early age and he has spent most of his life in prison.  When he was young, Nancy often dropped Randy off at relatives' homes.  He often stayed with his Aunt Mattie and her grandson who was named Gary.  As noted, Mattie was a heavy drinker who used to drink to the point of passing out in her bedroom, leaving Randy in the care of Gary, who was himself a drug addict.  Randy was taken on drug runs by Gary to get his heroin and cocaine.  When Randy was only five years old, Gary injected him with heroin right under his skin, a technique known as skin popping.  Randy was also sent to his Uncle John, but spent most of that time with John's son, Ricky.  Ricky was a "stick up boy" in the neighborhood who robbed liquor stores and took Randy with him.  When Randy was just ten years old, Ricky taught him to how to rob stores without getting caught.

45.     Randy was bullied at school.  There was a group of neighborhood children who were constantly harassing him.  Eventually, Randy started fighting back.  Around the age of nine or ten, Randy started carrying a steak knife with him at all times for protection.  By the time he was twelve years old, he had started carrying a gun.

46.     Randy came into direct contact with the law for the first time when he was ten years old.  The family was living in Southeast D.C. on 6th and Chesapeake.  Randy and his friends used to ride around the neighborhood on their bikes stealing unattended bikes.  He was caught and given probation.  Randy continued to get in trouble throughout his late childhood for minor things like shoplifting, but when he was 12 years old he was arrested for breaking into a house looking for money.  Randy was sent to the Receiving Home, which was D.C.'s juvenile facility at the time.  From that point on, he spent the rest of his teenage years in and out of juvenile facilities.

103

47.      Randy started serious experimenting with drugs when he was 12 years old.  He was doing speedballs, which consist of cocaine and heroin.  He was also using marijuana.  He dropped out of school altogether in the tenth grade.  In 1974, Randy went to prison after being convicted of multiple charges including Assault With Intent to Murder and Armed Robbery.  He was released in 1994, but 10 months later he committed another armed robbery and has been incarcerated ever since.

48.      Kenny's mother, Niecy, followed a path very similar to that of her brothers.  In school she was a below average student, but graduated from Ballou High School in Washington, D.C., in 1976.  In her 8th grade year Niecy failed almost all of her classes.  Her mother was called to the school after she and a girl named Deborah Ezell got into a fight in class that continued in the cafeteria.  In 9th grade Niecy was disciplined for disruptive, uncontrollable behavior in class and for cutting class.  She received a day's suspension after her name was sent to the assistant principal several times for infractions.

49.      Niecy is described by people who knew her as someone that "you didn't want to mess with."  She learned how to fight at an early age and did not run from a physical confrontation.  If any of her friends feared getting jumped, they called Niecy to protect them.

50.      Niecy was first arrested at the age of 16 and tried in juvenile court for Robbery (Snatch) and Assault, along with a co-defendant who was her friend.  They were found not guilty of the charges, but they had in fact snatched the purse of a lady in the street and pushed her down because they wanted money. In May of 1976, Niecy was arrested in Seat Pleasant, Maryland, and charged with Shoplifting.

51.      In 1978, when she was 20, Niecy was arrested and charged with Carrying a Pistol Without a License and Failure to Register a Firearm in Washington, D.C.  She was noted to be

104

unemployed.  The case was ultimately nolle prossed a few months later after having been continued several times for trial.

52.     Shortly before she was arrested, Niecy applied to, and was accepted in, the National Guard.  The report of her pre-enlistment physical examination noted that she had had gonorrhea two to three years previously, at the age of 17 or 18.  She had recently lost weight due to not eating, and had suffered episodes of dizziness and fainting due to not eating, the last having occurred two years previously.  Later that year she was examined again, and it was noted that she was taking iron pills for anemia.  In December of 1979, Niecy received a letter of Reprimand/ Intention to Reduce in Grade from her commanding officer.  He reprimanded her for missing drills, and wrote "Do not ask to make-up this drill in paid status.  You have done that enough.  In addition, you will never be hired again in any capacity for the DCNG."  The officer added:  "I have had people calling me from the national Rifle Association all last week.  They have been asking me about your worth in order that they can hire you for a job.  I have never told so many lies in my life.  I told them that you were dependable, punctual, trustworthy and a hard worker.  All of these things are far from the truth."

53.     Like her brothers, Niecy abused drugs and alcohol as a teenager and young adult. She loved to go out to clubs and party with her friends.  Two of her closest friends were Tam Paris and Charmaine Cain.  Both women were substance abusers also.  Charmaine was addicted to cocaine and heroin for many years, beginning at the age of 16.  She, Tam and Niecy also used to smoke PCP together on a regular basis.  They soaked dried parsley in the liquid form of the drug and smoked it.  Niecy smoked PCP every day.  She also used cocaine, and liked its ability to help her lose weight.  Niecy and her friends were also all dealing drugs.  Two men used to deliver liquid PCP to the house on Gaither Street.  The men dressed as door to door salesman in

suits with briefcases. Inside of the briefcases were glass canisters of PCP. Niecy had a mason jar and she would pour however much she wanted into it. George Jr. then went out and purchased marijuana for Niecy which she would mix with the PCP to create boat to sell. Niecy mixed it very potently which created very loyal customers for her. She sold her "boat" in front of her friend Tam's mother's house on the corner of Wahler Place and Willow Road in Southeast D.C. Niecy usually had George Jr. or Anthony with her for protection so she did not encounter and problems. In addition to Niecy, Tam, and Charmaine all dealing drugs, Tam's mother was as well. Selling drugs was quite lucrative for Niecy. After a day of selling she came home with pockets full of cash. One time she pulled it all out of her pockets, threw it on her bed and just rolled around in it laughing. Niecy and Charmaine were able to afford matching mink coats and Niecy was known for having a stylish wardrobe full of beautiful clothing.

54. Niecy's close friend Charmaine also had a criminal record. In 1977 she was arrested for Armed Robbery in Washington, D.C. While in jail she tried to commit suicide by strangling herself with a shoelace, and was sent to St. Elizabeth's Hospital for a psychiatric evaluation. She had a history of suicide attempts. She told doctors that she had recently testified in the grand jury about a murder that she had knowledge of, and was afraid of being targeted as a snitch. She admitted that she was using cocaine and shooting up heroin. She also admitted that, in addition to the armed robbery with which she was charged, she and a boyfriend had also stuck up a dairy store in Maryland. The boyfriend held a gun on the clerk while Charmaine emptied the cash register. She was out on bond after being arrested in that case when she was arrested on the DC robbery charge, in which she was accused of robbing a cab driver with the same gun that was used in the Maryland robbery. She had been arrested for shoplifting a couple of years earlier. Her boyfriend had recently been released from prison after serving a three-year sentence.

106

55.     Nancy's fourth and final child, Kenny's uncle Anthony, has suffered from severe mental illness since he was a teenager. He tried to take his own life by overdose due to the voices that he was hearing. Since that time he has made additional suicide attempts and has a history of threatening to harm himself. He has been consistently diagnosed as paranoid schizophrenic, and as suffering from polysubstance dependence resulting in chronic illegal drug use. He primarily abuses crack cocaine. He has been psychiatrically hospitalized on numerous occasions, both civilly and for restoration of his competence to stand trial on criminal charges. He has virtually never been able to maintain employment, and has received SSI benefits for years because of his psychiatric disability.

56.     His compliance with his prescribed medication regimen is poor. When unmedicated and in a floridly psychotic state, Anthony's appearance and behavior can be quite frightening. His personal hygiene is poor and he is at times hostile, loud and angry. His behavior in these states is unpredictable. He experiences paranoia and psychomotor agitation and hears voices. At times he talks out loud to himself in public places, and has been seen masturbating outdoors and in group therapy sessions. His speech becomes pressured and he can be hyperverbal.

57.     Anthony's criminal history includes arrests and convictions for possession with the intent to distribute cocaine, failure to appear in court, theft, possession of cocaine, possession of barbiturates, possession of drug paraphernalia, indecent exposure, disorderly conduct, trespass and carrying a handgun. In jail he has been described as threatening to staff, throwing urine, spitting and smearing feces and frequently requiring restraints and pepper spray to control his behavior. At times he has been physically assaultive towards jail staff.

58.     *Paternal family*.  Mr. Lighty's father, James Kenneth Thompson, was known to his friends and family as Kenny.  He was the fourth child born to Mary "Thelma" Ward.  He was born on July 9, 1956, in Washington, D.C.  Thelma Ward had five children altogether.   From oldest to youngest there were: Geraldine, Earl Stanley, Jacqueline, James Kenneth and Oliver. Geraldine was born on October 6, 1947, when Thelma was 20.   Geraldine's father is thought to be "Q" Thompson. All five children were given the last name of Thompson, although he never married Thelma and at least Jacqueline and Kenny were fathered by one James Kenneth Jackson. Jackson was an infrequent figure in both their lives and as they got older they lost track of him entirely.

59.     Thelma was a beautician who initially worked out of her home and eventually had her own shop called Arpege that she operated with Lola Thompson, her sister's mother-in-law. It was located in Northwest Washington, D.C., not far from where the family lived on V Street in LeDroit Park. When her children were young, Thelma had a busy social life. She often went to cabarets and bars with her drinking buddy and closest friend, Bertha Golf. Her grandson Jubarlo recalls never seeing her without a drink in her hand. Thelma's drink of choice was Bacardi Rum and Coke.  Thelma travelled frequently on the weekends, leaving the children to fend for themselves.  She went out of town on almost every other week to places like North Carolina, Louisiana and Atlantic City.

60.     Kenny's older sister, Geraldine, graduated from Dunbar High School then left the neighborhood, getting a job as a secretary for the Pentagon.

61.     Earl Stanley Thompson was Kenny's older brother.  He was known as Stanley and for most of his childhood he was raised by an elderly couple who could not have children of their own. Harry and Dolly Madison lived at 4th and Rhode Island Avenue in Northeast D.C., a

short  drive from where Thelma and her other children were living. Stanley slept at the Madisons' home and they paid for his private schooling.  Stanley went into the military after graduating from private school. He served in the Vietnam War and when he returned he came to live with his mother.  He almost immediately started exhibiting bizarre behavior. One such incident occurred when Stanley slapped his mother in the face.  Another time he punched his fist through the wall in the house. Geraldine was called to help get Stanley under control. She had him committed on two occasions to St. Elizabeth's Hospital, the large government mental hospital in Washington, because he was destroying Thelma's home and possessions.

62.     Often times, Stanley slept underneath the kitchen sink because it reminded him of the bunkers they slept in during the Vietnam War. He never slept in his bed after he came home. Jackie, who was still living at home at the time, hated having friends over because Stanley was preoccupied with showing anyone and everyone the photo albums that their mother kept. Stanley wanted to go through each one of them, pointing out people and rehashing old memories with anyone who would listen in a very socially inappropriate way. Jackie found this embarrassing and perplexing.  Jackie frequently had to retrieve her brother from the streets when he got into trouble. Stanley had been drinking heavily since his return to his mother's home. Each time he drank he became belligerent and aggressive and picked fights with people in the neighborhood or strangers caught in his path. He regularly drank himself to the point of unconsciousness.

63.     Stanley created many enemies from his drunken escapades and, while visiting a friend in another part of the neighborhood, someone shot him from the roof of a building. No family member pressed charges and no one was convicted of the murder.  He was killed in 1976.

64.     Kenny's sister, Jacqueline, was the closest to him in age.  She became pregnant at the age of 16 with her son, Jubarlo Thompson.

65.    Oliver was the last of Thelma's children to be born but he died tragically at a very young age. He fell out of a third story window of their apartment complex when he was an infant and died.

66.    Kenny was diagnosed with a learning disability while at Paul Robeson Middle School. One of his teachers had noticed that he had great difficulty retaining school material.  He was also referred to a school counselor that same year because they found that there had been a series of deaths in the family and Kenny was having some emotional difficulties. He received counseling along with his sister, Jackie, who was just a year ahead of him in school.  Kenny withdrew from Cardozo High School during his junior year in 1974.  During this time his mother had fallen ill with cancer and his sister Jackie had begun caring for her at home.  He started selling drugs on a full-time basis after withdrawing from school. He never returned or held a job.

67.    Shortly before Stanley was murdered, on February 26, 1976, Thelma passed away of ovarian cancer.  Jackie, who had cared for her mother in her last days, was 21.  Her son, Jubarlo, was almost three and Kenny, who was also still living in the home, was 19.  After losing first his brother and then his mother within months of each other, Kenny became very depressed. He slept all day and went days without bathing.

68.    *Kenny and Niecy*.  Kenny sold PCP, heroin and cocaine out of their home and became a prominent drug dealer in the LeDroit Park neighborhood. He dressed very nicely and had several cars, including an Oldsmobile station wagon, Lincoln sedan and his prized green Peugeot sedan. He brought a lot of attention to himself. There were those in the neighborhood who were jealous of the amount of money he was making. Several break-ins occurred in their home. On one occasion Jackie, her then-boyfriend and Jubarlo returned home to find a strange man in their house looking for Kenny's stash of drugs.  The man had a gun and forced Jackie's

110

boyfriend to do push-ups while he searched the house. Jackie felt unsafe in the house and was concerned for the well-being of Jubarlo. Jackie and Kenny often argued about how dangerous his lifestyle had become for their family.  She ultimately tolerated it, however, because she benefited from the cash and material things that Kenny provided for her.

69.     Kenny kept PCP in pickle jars wrapped in tinfoil in the freezer.  At the age of 10, Jubarlo learned how to cut and cook heroin by watching his Uncle Kenny. At the age of 11 years old, Jubarlo experimented with selling PCP by stealing from Kenny's stash. Seeing drugs in the home was the norm. It was not unusual for Jubarlo to open the freezer and find the tinfoil-wrapped PCP next to the popsicles.  Kenny also had a larger freezer in the garage in which he kept still more PCP.

70.     Kenny was arrested in the fall of 1980 for Possession of a Prohibited Weapon-Knife and Indecent Publication but released without charges being filed. Then, in 1981 he was convicted of a misdemeanor count of possession of dangerous drugs. He was fined $200.00 and sentenced to 180 days in jail, suspended, and 180 days probation.

71.     Many women were attracted to Kenny because of his money and flashy clothes. He met Mr. Lighty's mother, Niecy, and they became a couple.  They liked to party hard in local bars and clubs.  People viewed them as a latter day Bonnie and Clyde. They both liked the finer things in life and Niecy was not opposed to Kenny's means to achieve them. They had their arguments, mostly about Kenny's affairs with other women.  Niecy had her own apartment at this time, located at 16th and Park in Northwest D.C., but she spent most of her time over at Kenny and Jackie's home on V Street.  Niecy was the only woman Kenny considered his girlfriend. Kenny trusted her with his money. He kept a safe in his home with jewelry, money

and two firearms. Niecy had the combination to it. Niecy also held drugs for him when they couldn't be stashed at the house.

72.     Kenny built up a large clientele that he sold drugs to within the community. He used several young men that he trusted to deal drugs for him during this time.  There was one man named Darryl Smith who was having trouble with a client, Mr. Poteat. Mr. Poteat had taken drugs from Darryl and had not paid him for them. On January 26, 1982, Darryl came to Mr. Poteat's home at 1915 4th Street in Northwest D.C., where he lived with his mother, Mable Poteat, and confronted him about the debt. They argued, and reached no resolution.  It happened that that particular night Darryl was driving Kenny's green Peugeot sedan. Darryl drove the car to Kenny's house and explained to Kenny what had happened with Poteat.  Kenny decided to return with him to Poteat's home and try his own hand at collecting the debt.  As he and Darryl drew up outside the Poteat home, Mable Poteat, who was drunk, opened the front door with a gun in her hand and fired it at Kenny, hitting him in the neck.

73.     Darryl ran the four blocks back to Kenny's home and told Jackie what happened. Jackie ran to Poteat's home and found her brother laying of the sidewalk in a pool of blood. Mable Poteat had already gone inside and closed the door. Jackie lifted Kenny by his shoulders and Darryl picked up his feet and together they placed him in the backseat of his car. They drove him to Howard University Hospital, but he was declared brain dead on site. He remained unconscious for over a week until Jackie Ruth agreed to take him off life support on February 4, 1982.

74.     Not long after Kenny died, Niecy discovered she was pregnant with his child. She was distraught over Kenny's death, and considered terminating the pregnancy.  Ultimately, she decided to keep the baby, but she changed nothing of her substance-abusing lifestyle. She

112

continued to smoke PCP, use cocaine and drink alcohol throughout her pregnancy, in part to numb the pain of losing her boyfriend. She was nevertheless depressed and unhappy, and sought psychiatric treatment. She stayed in her bedroom alone getting high and crying.

75.    *Little Kenny*.  Kenneth Jamal Lighty was born on September 14, 1982 at D.C. General Hospital at 11:07am. Kenneth, like his father, is known as Kenny, or Little Kenny to distinguish them. He was kept in the hospital for ten days after his birth because of the drugs and alcohol that Niecy had been using throughout her pregnancy.

76.    Even though she had a young child, Niecy did not slow down her partying or her hustling activity. She was back in the clubs with her friends within weeks of giving birth. She continued to sell PCP and marijuana in Northwest D.C., often taking Kenny with her when she went on drug runs to her clients. At times they were accompanied by Kenny Thompson's nephew, Jubarlo. Jubarlo was around 12 or 13 years old when he served as Niecy's lookout while riding on the passenger side with Kenny was strapped in the car seat in the backseat.

77.    In August, 1983, before Kenny turned one year old, Niecy was arrested in Washington, D.C. for Disorderly Conduct and Failure to Pay Bus Fare. The charges were no papered the following day. In February of 1984, when Kenny was 2 ½, Niecy was arrested and charged with Armed Robbery in Washington, D.C. She was accused of robbing a woman named Karen Kelly in her apartment in Southeast D.C. Kelly reported that she let Niecy into the apartment because Niecy knocked on the door and said she wanted to talk. She had met her the day before, when Niecy and a mutual friend named Valentine had come to the apartment, had a few drinks and spent the night. Shortly after she let her in, Niecy pulled out a silver handgun and grabbed Kelly's Celebrity telephone and a radio. She then ransacked Kelly's purse and took $5.00 before leaving out of the front door. Niecy ultimately pled guilty to a lesser charge of

113

Robbery and was sentenced to 8-24 months in jail, suspended, and placed on supervised probation for two years with the condition that she refrain from illegal drug use and undergo treatment for drug dependency.  While that case was pending, in March of 1984, she was again arrested, this time for Possession of Drug Paraphernalia.  That charge was no papered.

78.    Niecy told the probation officer who prepared her presentence report that she was at Kelly's apartment to buy cocaine, and that while she was there a man took $300 from her purse and refused to return it.  She claimed that she returned to the apartment a third time to try to retrieve her money, but the man was not there.  Niecy said she told Kelly that she was going to take the radio, telephone, and $5, and Kelly replied that she did not care what Niecy took, so she took them.  She admitted that she had been using cocaine for the past 3-4 years and had been freebasing it for the last year, and confessed to feelings of guilt about the possible effects of her cocaine use on Kenny when he was in utero.  The probation officer concluded that Niecy had an inability to act in a totally responsible manner, and the reasons for her drug use had yet to be addressed.

79.    Shortly after Kenny was born, Niecy was diagnosed for the first time with cancer of the kidney.  She had surgery to remove the kidney in 1983 and was in remission for a while.  In June of 1985, Niecy was hospitalized for two weeks due to a blood clot in her leg.  By August of 1985, the cancer had returned.  Niecy was hospitalized for a week and it was discovered that the cancer had metastasized extensively.  It soon became clear that the disease was terminal.  She could not keep food down and she immediately began losing weight.  She was in pain and had begun taking Percodan.

80.    In the final months of her life, Niecy lost so much weight that she was literally skeletal in appearance.  She remained in her mother's home on Gaither Street the entire time,

cared for by nurses that visited and tended to her around the clock. As she got weaker and weaker and could no longer walk, her brother George Jr. carried her around the house. She was in near constant pain and eventually could not tolerate being touched. Kenny, who had sat in her lap and on the bed with her when she entered the terminal stage of her illness, was now forbidden from physical contact with his mother. He became little more than an afterthought as the household focused on Niecy and her suffering. Slightly less than four years after Kenny was born, on July 28, 1986, Niecy finally passed away at home in Temple Hills, Maryland.

81. In the months following her daughter's death, Nancy Westfield was overwhelmed by her own grief and retreated into herself. She could barely function and did not return to her job at the Government Printing Office for more than a year. As a result, she was completely unable to be the nurturing parent that Kenny so desperately needed at that traumatic time in his life. He was passed around amongst a variety of maternal and paternal relatives for babysitting, often being cared for by extremely inappropriate caretakers such as his uncle Anthony and his cousin Jubarlo. Neither Nancy nor anyone else in the household talked to him about what was happening with his mother, either before or after she died. He experienced her death as a sudden abandonment, and did not understand until many years later that she had gotten sick and died. Nor were the problems that the trauma inevitably caused for him adequately addressed. Nancy sought counseling for him when Niecy was near death and afterwards, but she was inconsistent in showing up for appointments.

82. After Niecy died, the household at 2002 Gaither Street was comprised of Kenny's uncles George Jr. and sometimes Anthony, his grandmother Nancy and her husband, Richard Westfield. The household was a chaotic, unpredictable, unsafe and frightening place for a child. George Jr. remained an active crack cocaine addict throughout. His drug use was open and

115

tolerated by Nancy, and it caused significant chaos in the home, with dealers and other users coming in an out at all hours.  There was so much foot traffic to the back door of the house that the grass was worn away to bare earth.  George Jr. frequently smoked his drugs in the basement room and the smell of it wafted all over the house.

83.     Anthony was in the home for several periods of time as Kenny was growing up. He was there when Kenny was born until he was around three years old.  He returned for some years when Kenny was eight, until he was 11 or 12, and again off and on during Kenny's teenage years.  Nancy Westfield had to call police to the house on a number of occasions to deal with Anthony when he was in a psychotic state and/or under the influence of drugs. In November of 1990, Anthony came to the house and stole a television set and a number of CDs right in front of Nancy.  Nancy called police and told them that Anthony was using drugs and she wanted to press charges against him.  Anthony was subsequently arrested and charged.  In March of 1991, Anthony stole a CD player from the house and fled.  He had been at the house with some of his friends when Nancy went out to run an errand.  When she returned, the CD player was gone and so was Anthony.  Nancy knew it was him that had taken it, and called police.  In 2004, Anthony himself called police to report that people were trying to break into the house.  When the police got there, they saw two people outside who said that they were there to buy drugs from Anthony. Anthony told the police that the two men were trying to break in because he owed them money from an earlier drug transaction.  The two men were sent on their way.

84.     On July 6, 2005, someone called a crisis hotline to report that Anthony was upset and wanted to commit a murder.  Police were dispatched to the house on Gaither Street, where they were met by Anthony who informed them that he did not need the police and they could

116

leave.  The police discovered that there was an open warrant for Anthony's arrest on a theft charge, and took him into custody.

85.     The relationship between Nancy and her husband was fraught with conflict.  They separated twice in the early 1990's and again in 2002.  Richard was 17 years younger than Nancy.  He struggled throughout the marriage with a gambling addiction, and spent most of his time down at the racetrack, literally gambling there every day.  He was generally a very passive person, who left the running of the household to Nancy, but there was occasional domestic violence in the relationship.  Police were called to the home in November, 1992, because of a domestic dispute between them.  Richard also got into numerous altercations with Anthony, some of which also necessitated that the police be called.

86.     Richard's brother, William Westfield, also lived in the house for periods of time when he was homeless and had nowhere else to go.  During one of those periods, when Kenny was small, police were called twice to the house because of domestic disputes that William was involved in there.

87.     In the summer of 1994, when Kenny was 11, his uncle Randy Lighty returned to the home following his lengthy incarceration for a conviction for armed robbery.  Randy suffered from a crippling heroin and cocaine addiction during this time. Randy also sold drugs and took Kenny with him when he went out to conduct drug deals.  Randy brought guns into the home and counted the money he earned from drug transactions in full view of Kenny.

88.     Randy considered Kenny to be "soft" and was concerned that he might be gay.  Randy took it upon himself to toughen Kenny up.  Boo, who was also back in the house at the time, and Randy took turns physically abusing Kenny by hitting him and and punching him in the chest, insisting that he needed to learn how to take a punch without crying.

117

89.     In addition to the physical abuse, Kenny endured sexual abuse at the hands of his uncles.  At the age of 11, Kenny was taken by Randy to the homes of neighborhood prostitutes and crack whores. Randy instructed the women to perform oral sex on Kenny, and forced Kenny to submit to it. Anthony often brought prostitutes to the home while Nancy was working nights at the Government Printing Office. Anthony's room was next to Kenny's in the home and Anthony called Kenny into his room while he was having sex with women and made him watch. Then, Anthony directed the prostitutes to perform oral sex on Kenny. Randy and Anthony had prostitutes perform sexual acts on Kenny a total of six times between the ages of eleven and twelve years old.

90.     As the years passed after Niecy's death, Nancy become no more nurturing or adequate a parent with Kenny.  She continued to grieve the loss of her daughter and was overwhelmed by the chaos in her home that resulted from her sons' drug use.  She returned to working nights at the Government Printing Office, leaving Kenny in the house with his drug-addicted uncle George Jr. to take care of him.  During the day while she slept, Kenny went to relatives or to daycare and eventually to school.  She provided material things, but was unable to give anything of herself except for harsh discipline with a belt.  Kenny was essentially left to raise himself, with very little adult help or guidance.  By the time that he was a young teenager, Kenny was running the streets and coming home in the early hours.  He began selling drugs. Two of his biggest clients were his uncles, George Jr. and Anthony.

91.     *Fetal Alcohol Spectrum Disorder*.  Armed with the foregoing information, reasonably competent counsel would have retained an expert in fetal alcohol spectrum disorders to evaluate Mr. Lighty and inform the jury of the devastating effects of in utero exposure to alcohol and other substances on the developing fetus.  Had Mr. Lighty's counsel done so, they

118

could have presented compelling testimony to the jury regarding the effects he suffered due to his mother's drinking while she was pregnant with him. That testimony would have included, but is not limited to:

92.    Prenatal alcohol exposure may adversely affect the developing fetus in a multitude of ways, causing permanent neurocognitive and behavioral effects that span a broad range of severity. The umbrella term for medical conditions due to alcohol exposure in utero is Fetal Alcohol Spectrum Disorders ("FASD"). The most severely affected children present with full Fetal Alcohol Syndrome, which is characterized by distinctive facial dysmorphology, growth deficiency and central nervous system dysfunction. Even children who do not develop the full Syndrome, however, have debilitating impairments. As infants they often display irritability, sleep dysfunction, and problems with self-regulation and habituation. They are also much more likely to have symptoms of depression, generalized anxiety disorder and separation anxiety disorder, even as very young children. As they grow older they show increased reactivity, irritability and activity level, impulsivity and deficits in attention. They also typically have neurobehavioral deficits such as impairments in intellectual functioning, language, memory, visual-spatial ability, problem-solving and executive functions such as planning, problem-solving, abstraction and judgment. IQ scores typically fall into the borderline to low-average range. They may have poor socialization and communication skills, poor adaptive skills and are less likely to live independently. When FASD manifests in children in hyperactivity, impulsivity and attention deficits, it is likely to be misdiagnosed as Attention Deficit Hyperactivity Disorder ("ADHD") or a similar condition.

93.    Individuals with FASD also are at greatly increased risk for developing a psychiatric disorder. There is a high incidence of mental health problems amongst those with

119

FASD, including mood disorders such as depression and anxiety. Individuals exposed to alcohol prenatally are also much more likely to develop substance abuse problems themselves in later life, both because of a biological predisposition and as a way to self-medicate for all of the other impairments that their FASD has caused.

94. Beginning in early childhood, Mr. Lighty manifested signs of FASD due to his mother's consumption of alcohol, along with other drugs, while pregnant with him. His academic record shows consistent problems with attention, impulsivity and hyperactivity. In the 1st grade, his teachers noted that he had difficulty working quietly and showed growth in self control only part of the time. By 2nd grade, he was resistant to doing class work and his relationships with his fellow students needed improvement. A particular difficulty with mathematics was already emerging. In 3rd grade his conduct was less than satisfactory throughout the entire school year, and his level of interest and effort was suboptimal most of the time. In 4th grade, Mr. Lighty's difficulties with attention were noted and again his conduct, interest and effort were noted to be problems. In 5th grade, his teacher wrote that he needed "to show much more self-control," and again in 6th grade his behavior was "a major concern." He received a number of failing grades that year. He also received below average scores across the board on the Otis-Lennon School Ability test, and below average scores on a measure of his ability with concepts and number and on a test of listening ability.

95. Mr. Lighty also demonstrated symptoms of Anxiety and Major Depressive Disorder throughout his lifetime, beginning as a child. His anxiety manifested itself in chronic nail-biting when he was a toddler. It came to the attention of his pediatrician around the time that his mother was in the final stages of her illness, but Mr. Lighty's grandmother reported that the practice began months before Denise Lighty was diagnosed as terminal and began to show

signs of physical decline. She also reported that Mr. Lighty was having sleeping problems, and that he seemed nervous, needy and clingy. Counseling was prescribed, but Mr. Lighty's grandmother stopped taking him after two sessions. In 1997, when Mr. Lighty had turned 15, he went to his doctor complaining of fatigue that had been afflicting him for two weeks. He had been sent home from school the previous day because he felt so unwell. The doctor recorded in his chart that Mr. Lighty "does not communicate well," and referred him for mental health treatment.

96. A few months later, Mr. Lighty returned to the doctor with the same complaint. He had been sleeping in class at school and was tired all the time. The doctor noted that he stared at the wall throughout the entire visit and had a completely flat affect. He wrote that Mr. Lighty had a behavior problem, was almost completely withdrawn and apathetic, and referred him for counseling. The following year, Mr. Lighty was referred to a psychiatrist by his primary care physician to be prescribed medication. The records of that visit note that Mr. Lighty had a life-long history of behavior problems in school. He was formally diagnosed with ADHD and prescribed Ritalin.

97. When he was in 10th grade, the school district assessed Mr. Lighty for ADHD. Teacher reports gathered in connection with that evaluation report that Mr. Lighty had difficulty beginning and completing tasks, difficulty maintaining attention, was easily distracted, overactive, lacking in self-control, and was easily influenced by others. The physician who conducted a health assessment as part of the same evaluation noted that Mr. Lighty did not want to talk and seemed depressed and angry. The physician recommended further psychological evaluation. During that same time period, Mr. Lighty was referred for a drug screen to determine whether he was using drugs; the physician who conducted that assessment noted in the

121

record that he suspected that Mr. Lighty was suffering from clinical depression.

98.     *Neuropsychological Deficits*.  Reasonably competent counsel would have retained a neuropsychologist to conduct a thorough and complete neuropsychological evaluation of Mr. Lighty.  Had they done so, Mr. Lighty's counsel would have discovered, and would have presented testimony regarding, significant neuropsychological deficits that Mr. Lighty has. Neuropsychological testing reveals that Mr. Lighty's IQ is in the low average range.  His deficits also include, but are not limited to, learning disabilities and significant impairments in multiple memory functions, impaired ability to think abstractly and a relatively impoverished fund of knowledge.

99.     *The Effects of Chronic Exposure to Childhood Trauma*.  Had competent counsel conducted the constitutionally required investigation and gathered the information outlined above, they would have immediately recognized the need to retain and present the testimony of a mental health expert with particular knowledge and expertise in the psychological and neurobiological effects of chronic exposure to trauma in childhood.  A competent expert in that field would have explained to the jury the significance of Mr. Lighty's experiences and their combined effect upon his development.  This testimony would have included, but not have been limited to:

100.     Growing up in the type of chaotic and abusive environment that Mr. Lighty was subjected to actually shapes the development of a child's brain and his subsequent capacities for regulating his emotions and behaviors. The wiring of the human brain is far from finished at birth; the brain undergoes major neurological growth and development throughout childhood and adolescence before finally reaching maturity in the early 20s.  Chronic exposure to trauma

122

prevents the brain from developing normally, and causes structural and neurochemical changes that have profound functional and behavioral consequences.

101.    Trauma activates, among other brain structures, a deeply-seated region of the brain called the amygdala.  The amygdala is the part of the brain that is principally responsible for emotional reactions and emotional memories, particularly fear and reactions to threat.  When activated, the amygdala triggers massive physical changes in the body that prepare it to take emergency protective action.  The pupils dilate to take in more light.  The heart rate and blood pressure increase in order to make more blood available to the muscles to prepare them for action.  Breathing quickens so that the lungs can oxygenate the increased blood flow.  Known as the "fight/flight" reaction, all of these changes are effected by the amygdala by directing the release of very powerful chemicals, including adrenaline and norepinephrine.

102.    While adaptive and useful when a swift reaction to danger is occasionally called for, this fight/flight hormonal response to terror is not designed to be activated repeatedly, day after day, year after year, as it is when a child is exposed to chronic violence and abuse.  Under such circumstances, the amygdala and associated neural structures involved in the fear response become hypersensitive and hyperreactive to any perceived threat and to any stimulus that evokes memories of past trauma.  Benign stimuli that would not even be noticed by a non-traumatized person may be perceived as overtly threatening by a brain transformed by chronic trauma.  As a result, a full-fledged terror response may be initiated to something that, rationally, is not the least bit dangerous.  This is known as affect dysregulation.  The fear pathway of the brain shaped by repeated exposure to violence becomes hypersensitive to minute social cues - the expressions of eyes, the positioning of hands, curvature of the lips, tone of voice, indications of intoxication - that might suggest that the person with whom they are interacting poses a threat to them.  The

123

child becomes hypervigilant, always on high alert and scanning the environment for such signs. In contrast to traumas such as motor vehicle accidents or natural disasters, child abuse occurs in the context of ordinary everyday life.  For people who have endured this type of trauma, the sights, sounds and smells of ordinary everyday experiences (e.g. a door slamming, nightfall, the clank of dishes in the sink, etc.) are often sufficient to trigger extreme emotional distress because their sensory qualities open pathways to traumatic memories of the past. At those moments, physiologically the person feels as if the traumatic event is happening all over again.

103.    This chronic hypersensitivity and hyperreactivity and the massive adrenaline reactions that follow eventually cause the nervous system of the child to lose, or to never fully develop, the ability to differentiate between threat and safety. The child's neurobiologic system therefore never learns to calm itself down, or to suppress an unnecessary fear reaction in conditions of safety. When a child's brain and body are persistently hyperaroused, other parts of the brain responsible for learning and responding to new stimuli are de-activated. Therefore, a traumatized child cannot, even in safe conditions, feel, know or experience safety.

104.    As it must be in order to serve the purpose for which it was designed, the fear reaction is automatic and instantaneous - the eye sends a signal to the brain that there is a long thin brown object up ahead, the amygdala registers "snake" and a surge of adrenaline and norepinephrine prepares the body to flee.  In the normal brain, after the initial reaction, the frontal cortex will continue to process the sensory information the brain has received, the brain will recognize that the long brown object is a harmless stick, and the body will immediately begin to suppress the fear response and return to a normal state.  In the chronically traumatized brain, however, the initial reaction persists, and it becomes more and more difficult to calm the

124

fear response and incorporate new information. This leads to longer and more intense adrenaline reactions, and a vicious cycle continues.

105. A counterweight to the hyperarousal effects of trauma is the development of the higher cortical, or executive, functions of the brain. As the frontal lobes of the brain develop, a child increases his capacity to control and inhibit the fear response as well as other emotional impulses. Development of these areas of the brain comes about from the thousands of daily interactions and social experiences that the child blessed with competent, nurturing caregivers has over the course of his childhood, through which the child gradually learns to inhibit instinctual responses. For this reason, a child who is both traumatized and neglected, as Mr. Lighty was, is dealt a double blow: not only does he develop a hypersensitive and hyperreactive nervous system that dramatically magnifies his impulses and emotions, but also he is deprived of the care and attention that is necessary for optimal development of the ability to inhibit those impulses.

106. Additionally, it is the frontal lobes of the brain that are the last structures to mature. *See infra.* Thus, the full capacity to modulate emotional responses is not present until the early 20's, even for children who enjoy stable upbringings that are not plagued by trauma. Mr. Lighty, whose upbringing was plagued by trauma, was alleged to have killed Mr. Hayes several months after reaching the age of 19.

107. If left untreated in childhood, the immediate psychological effects of exposure to violence, abuse and neglect – namely, fear, isolation and an inability to trust – frequently translate into lifelong psychological and emotional disorders. It is well known that the psychiatric effects of chronic child maltreatment are wide-ranging and disabling. As noted, affect dysregulation leads a trauma survivor to have wholly disproportionate responses to everyday

125

stresses.  When not overreacting, the child will numb, often attempting to shut himself down emotionally with strategies that activitate numbing such as self-mutilation and substance abuse. Adults who were chronically traumatized as children understandably struggle with low self-esteem, self-hatred, shame, self-blame, an inability to develop trusting relationships, impaired impulse control, aggressive behavior and anhedonia, or an impaired ability to experience pleasure.  They frequently develop anxiety or depressive and substance abuse disorders, and may experience distress in the form of physical symptoms, sometimes without discernable medical explanation.   The earlier in life the trauma begins and the longer it lasts, the more severe the symptoms are likely to be.  When the perpetrator or perpetrators are in a position of responsibility and the victim is dependent on the perpetrator for his needs, as in the case of childhood abuse and neglect, the severity of symptoms also typically increases.

108.   A competent expert in the effects of chronic exposure to trauma on child development would have demonstrated to the jury that there is abundant evidence that Mr. Lighty struggled with symptoms and behaviors as a child and adolescent that were exactly what one would expect in a child who was exposed to trauma, as Mr. Lighty was.  The expert, together with lay witnesses and treating professionals that observed Mr. Lighty, would have provided the jury with critically important information, which includes but is not limited to:

109.   The earliest traumatic experience that Mr. Lighty remembers is the death of his mother when he was almost four years old.  This experience was traumatic in multiple respects. The way in which she died, slowly and gradually wasting away, was frightening to him.  His mother got thinner and thinner and weaker and weaker as she approached death and could no longer stand to be touched by him.  Mr. Lighty suffered nightmares about skeletons and visions of monsters throughout his life as a result.  Because of his young age, Mr. Lighty had no concept

126

of death and was unable to understand on his own what was happening to his mother.  Children of that age cannot conceptualize the fact that people can get sick and die, and that they have no control over it.  He did not understand that his mother was sick, and her death came as a total surprise to him.  One day she was in the house, and the next day she was gone.  Nobody in the family explained to him what was happening and no one talked about it, so he experienced the loss of his mother as an abandonment of him.  He had a sense of her withdrawing from him and then disappearing altogether, and was left questioning what was wrong with him that caused this to happen.  No one soothed him or helped him cope with his emotions and so he internalized his feelings.

110.     Mr. Lighty was severely traumatized and damaged by the early loss of his mother under such terrible circumstances.  His experience of abandonment impaired his ability to view the world as a safe and positive place and to trust that he would be protected and cared for.  It led him to see himself as damaged and unworthy.  Children are not born with innate self-esteem or an instinctual sense of their own value and worth.  Rather, they learn it because their parenting figures tell them that they are special and valuable.  With such figures, whom the young child perceives as all-powerful, focused on the child and his well-being, he learns that he must be pretty important.  Children who grow up with parents who care for them and nurture them grow up feeling good about themselves.  As they get older, they begin to separate from their parents and realize that they are actually just ordinary human beings, but by then they have internalized what they learned growing up and have their own sense of self-worth.  For Mr. Lighty, who experienced abandonment by his mother and a near total absence of nurturing from his subsequent caregivers, that process never happened.

111.     Children also learn how to calm the fear response from their caregivers.  In the

face of a frightening event, if the caregiver immediately protects and reassures the child, he can calm the child down. After multiple such experiences, the child begins to learn how to calm himself down. In the absence of consistent parenting, however, that process does not take place and the child does not earn how to temper the physiological response to fear. They therefore remain hyper- and over-reactive, and are less able to deal with the physiological effects of trauma.

112. Not only did he never receive adequate treatment to ameliorate the effects of the trauma of losing his mother, Mr. Lighty continued to be exposed to more and more traumatic events throughout the remainder of his childhood and adolescence that served to reaffirm his feelings of mistrust and worthlessness and his sense that life is unpredictable and cannot be expect to turn out in a positive way. He was physically abused by his grandmother and his uncles. He was exposed to domestic violence between his grandmother and her husband, and by his uncle Anthony. The household was chaotic and unpredictable as a result of George Jr.'s drug use and Anthony's paranoid schizophrenia and drug use. During the short time that Randy Sr. was in the household, he physically abused Mr. Lighty and subjected him to sexual abuse by taking him to adult female prostitutes at the age of 11 and making him perform sexual acts with them.

113. Mr. Lighty's grandmother raised four children, not one of whom matured into a stable, law-abiding, self-sufficient adult. Consistent with her failure as a mother, and deeply affected by the grief resulting from the death of Niecy and the effective loss of her other children, she could not and did not provide Mr. Lighty with the nurturing he needed to cope with the effects of trauma and mature to self-actualized adulthood.

114.    *Neuropsychological Evidence Regarding Juvenile Brain Development.*
Reasonably competent counsel would have immediately recognized the need to retain and present the testimony of a mental health expert with particular knowledge and expertise in the brain development of adolescents and young adults.  A competent expert in that field would have explained to the jury how Mr. Lighty's young age affected his ability to make competent adult decisions.  This testimony would have included, but not have been limited to:

115.    At the time of the Hayes murder, Mr. Lighty was 19 years old – a late adolescent or young adult.  The development of the frontal lobes of the brain – which play a critical role in the executive functions of the brain, including impulse control, risk assessment, and moral reasoning – is incomplete during adolescence and young adulthood.  As a group, adolescents and young adults are overrepresented statistically in virtually every category of reckless behavior.  Individuals are particularly prone to risky behavior during late adolescence and young adulthood.  Late adolescents and young adults often value impulsivity, fun-seeking and peer approval more than adults do; they are less likely than adults to consider alternative courses of action, understand others' perspectives, or restrain impulses; and they focus more on opportunities for gains and less on protection against losses than adults do.

116.    Anatomical development explains the cognitive differences between adolescents/young adults and mature adults.  Neuropsychological research has shown that adolescents and young adults rely on the amygdala for certain tasks more than adults do.  As noted, the amygdala is the area of the brain associated with primitive impulses of aggression, anger and fear.  Adults generally process similar information through the frontal cortex, which is the area of the brain associated with impulse control and good judgment.

117. Brain activity does not shift to the frontal lobes of the brain until individuals develop into full-grown adults. The frontal lobes, especially the pre-frontal cortex, play a critical role in the executive functions of the brain, such as response inhibition, emotional regulation, planning and organization. The frontal lobes are involved in the planning and implementation of goal-directed behaviors, and specifically in selecting, coordinating and applying the cognitive skills necessary to accomplish goals. Frontal lobe impairment may lead to impairments in foresight, strategic thinking and risk management, and has been associated with greater impulsivity, difficulty in concentration, attention, self-monitoring and decision-making. One of the classic indicia of frontal lobe dysfunction is difficulty making decisions in one's own long-term best interests. The frontal lobes also modulate synaptic transmission to the amygdala. A fully mature frontal lobe has more control over the amygdala, and thus more influence over behavior and emotions, than an immature or underdeveloped frontal lobe.

118. The frontal lobes of the brain are among the last parts of the brain to reach structural maturity. Research has shown that the frontal lobes are structurally immature until the early twenties. As a result, the region of the brain associated with impulse control, risk management and moral reasoning is the last to form, and remains incomplete until late adolescence and beyond.

119. Because the brain does not reach full maturity until adulthood, adolescents and young adults are less mature, more impulsive, less risk averse and less judicious than adults. This is especially true for individuals who have suffered, *e.g.,* brain trauma, a dysfunctional family life, violence or abuse during childhood. An individual's ability to limit impulsivity, plan and consider different viewpoints and the broader context of his decisions progresses over time.

Therefore, an individual who engages in risky behavior, including criminal behavior, as an adolescent or young adult may not engage in the same behavior as an adult.

120.    There is no conceivable strategic or tactical reason for counsel not to have presented expert testimony demonstrating that the brain development of a 19 year old, particularly a 19 year old with Mr. Lighty's traumatic exposure and FASD, is incomplete.

121.    As a young adult, Mr. Lighty was extremely guarded, trusting of no one, fearful, overreactive and suffering from Post Traumatic Stress Disorder and Major Depressive Disorder superimposed upon Chronic Dysthymic Disorder.  He felt alienated and estranged from his peers.  His mood was unstable, as was his own sense of himself and his self-worth. He was self-medicating with chronic use of marijuana and PCP, and also drinking alcohol.  At the age of 19, his brain had yet to fully develop, and he was still suffering the effects of the central nervous system dysfunction caused by FASD.  The combination of these impairments decimated his capacity for competent adult decision-making.  However, due to trial counsel's ineffective investigation and presentation, Mr. Lighty's jury heard none of this and instead was left with a completely inaccurate, misleading and highly prejudicial perception of who Mr. Lighty was and why he ended up where he did.

122.    **Failure to Provide Proper Notice under Fed. R. Crim. P. 12.2 of the Testimony of Dr. Mark Cunningham Pertaining to Mr. Lighty.**  Defense counsel unreasonably failed to provide timely notice to the Government of the expert testimony of Dr. Mark Cunningham pursuant to Federal Rule of Criminal Procedure 12.2.  Defense counsel's unreasonable failure to properly notice Dr. Cunningham's testimony led to the exclusion of his testimony pertaining to Mr. Lighty.  The exclusion of this evidence unfairly and unnecessarily prejudiced Mr. Lighty at trial.

123.    Defense counsel retained Dr. Cunningham, a clinical and forensic psychologist, for two related purposes:  first, to testify as a teaching witness regarding the nexus between adverse developmental experiences and disrupted developmental trajectory on the one hand and adverse developmental outcomes, including criminal activity and criminal violence, on the other; and second, to apply this research to Mr. Lighty based on his review of Mr. Lighty's social history, Mr. Lighty's school, medical, criminal and other records, the reports of a social historian who investigated Mr. Lighty's life history and a psychologist who examined Mr. Lighty, and consultations with the social historian and the examining psychologist.

124.    As to the first part of his testimony, Dr. Cunningham was retained to testify about United States Department of Justice ("DOJ") studies concluding that the likelihood of a violent criminal outcome among youth is a function of the interaction or balancing of certain risk and protective factors.

125.    As to the second part of his testimony, Dr. Cunningham was prepared to testify about the presence or absence of risk and protective factors in Mr. Lighty's life.  Dr. Cunningham determined that there was only one protective factor in Mr. Lighty's life:  social bonding to positive role models (family members).  Dr. Cunningham further concluded that Mr. Lighty had a staggering number of childhood risk factors, including:

- *from conception to age 6*:  perinatal difficulties, family history of criminal behavior and substance abuse, family management problems, and parental attitudes favorable toward, and parental involvement in, crime and substance abuse;

- *from age 6 through adolescence*: community disorganization and low neighborhood attachment, availability of firearms, media portrayals of violence, family management problems, family conflict, parental attitudes favorable toward, and parental involvement

132

in, crime and substance abuse, academic failure, lack of commitment to school, alienation and rebelliousness, association with peers who engage in delinquency and violence, favorable attitudes towards delinquent and violent behaviors, and constitutional factors (e.g., low intelligence, hyperactivity, attention-deficit disorders).

According to Dr. Cunningham, Mr. Lighty also had the following array of "cumulative" risk factors: parental criminality; child maltreatment; poor family management practices; low levels of parental involvement; poor family bonding and family conflict; parental attitudes favorable to substance abuse and violence; parent-child separation; academic failure; low bonding to school; truancy and dropping out of school; delinquent siblings; delinquent peers; community disorganization (crime, drug-selling, gangs, poor housing); availability of drugs and firearms; neighborhood adults involved in crime; exposure to violence and racial prejudice; hyperactivity, concentration problems, restlessness, and risk taking; involvement in other forms of antisocial behavior; and beliefs and attitudes favorable to deviant or antisocial behavior.

126.   Prior to trial, defense counsel failed to provide the Government timely notice that Dr. Cunningham would offer opinions regarding the presence or absence of certain risk and protective factors in Mr. Lighty. Defense counsel did not furnish the Government with Dr. Cunningham's report indicating his intent to offer an opinion particularized to Mr. Lighty until one week prior to the commencement of the penalty phase, well after the Court-ordered deadline to disclose expert mental health testimony.

127.   As a result of defense counsel's unreasonable failure to provide the Government timely notice, the Court severely limited Dr. Cunningham's testimony. The Court permitted Dr. Cunningham to testify only in general terms about risk factors that make it more likely that a juvenile or young adult will commit a crime. The Court precluded Dr. Cunningham altogether

133

from offering any testimony about the risk/protective factors in Mr. Lighty. The Court expressly stated that defense counsel's failure to timely comply with the notice provisions of its Rule 12.2 order was the basis for excluding the testimony.

128. Because of defense counsel's failure to comply with the Court's Rule 12.2 order, Dr. Cunningham's general testimony regarding risk/protective factors was entirely antiseptic and theoretical. Defense counsel noted on the record that three jurors slept through at least part of it.

129. Because of defense counsel's failure to comply with the Court's 12.2 order, the Government was able to argue, and predictably did argue, that Dr. Cunningham's testimony about risk/protective factors was irrelevant because he did not relate it to Mr. Lighty.

130. To ensure the admission of Dr. Cunningham's important testimony regarding the specific risk and protective factors in Mr. Lighty's life, reasonably competent counsel would have timely complied with the notice deadline set forth in the Court's order. The unreasonable and prejudicial failure of Mr. Lighty's counsel to provide such timely notice constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

131. **Failure to Investigate and Present Evidence Implicating Tony Mathis.** Defense counsel's unreasonable failure to investigate, uncover and present available evidence that Anthony Mathis, and not Mr. Lighty, abducted, shot and killed Eric Hayes, *see* Claim II, incorporated by reference as if fully set forth herein, had a separate prejudicial impact at the penalty phase. Arguably, the jury could have convicted Mr. Lighty notwithstanding a degree of uncertainty as to the respective roles played by Mr. Mathis - whom the Government conceded was likely involved - and Mr. Lighty. A finding that Mr. Lighty participated in the kidnapping would have been sufficient to convict and proceed to a penalty phase. At penalty, however, the jury would have returned a life sentence had defense counsel conducted a comprehensive

134

investigation in support of its case theory and shown that, in fact, Mr. Mathis was more culpable than Mr. Lighty.

132.    In addition, had defense counsel conducted a thorough investigation and made a comprehensive presentation in support of its case theory, the jury would not have found that the Government proved beyond a reasonable doubt at least one of the mandatory death-eligibility factors set forth in 18 U.S.C. § 3591(a)(1)(2).

133.    The Government was required to prove beyond a reasonable doubt one of the four mental states specified by 18 U.S.C. § 3591(a)(1)(2).  This inquiry is necessarily informed by the particular roles played by the parties during the course of an incident and, in this case, whether it was Mr. Lighty or Mr. Mathis who shot and killed Mr. Hayes.

134.    Mr. Lighty's jury found at the penalty phase that the mental state set forth in 18 U.S.C. § 3591(a)(1)(2)(a) was satisfied, i.e., that Mr. Lighty "intentionally killed the victim." Thus, the jury found that it was Mr. Lighty, and not Mr. Mathis, who fired the fired the fatal shots.  This decision was founded on an incomplete evidentiary picture of Mr. Mathis' role in the incident, resulting from defense counsel's failure to present relevant and credible evidence of Mathis' role as the shooter.

135.    The additional *mens rea* determination that the Government was required to make at penalty mandated that defense counsel find and present the evidence of Mathis' particular role in the incident.  Defense counsel's failure to do so left the jury without readily available and necessary evidence to support the defense theory that Mr. Mathis, not Mr. Lighty, shot and killed the decedent.  The jury's acceptance of the defense theory would have precluded a finding that 18 U.S.C.§ 3591(a)(1)(2)(a) was satisfied beyond a reasonable doubt.  Further, there is a reasonable probability that acceptance of the defense theory would have caused the jury to

conclude that the Government also failed to establish beyond a reasonable doubt any of the remaining three alternative *mens rea* requirements (18 U.S.C.§ 3591(a)(1)(2)(b),(c) and (d)).

136.    **Failure to Call Bobby Arnold to Corroborate Lorenzo Wilson's Statement.** Defense counsel was constitutionally ineffective for failing to call Bobby Arnold as a penalty phase witness.  Mr. Arnold was a close friend of Mr. Wilson.  In 2002, just after the Hayes murder, Mr. Arnold and Mr. Wilson were incarcerated together in the Prince George's County Detention Center.  During the period of their incarceration, Mr. Wilson and Mr. Arnold discussed the Hayes murder several times.  Mr. Wilson told Mr. Arnold that Mr. Lighty did not shoot Mr. Hayes.  Rather, he told him that Mr. Hayes was kidnapped in the District of Columbia, taken by car into Maryland, shot in the head by Tony Mathis, returned to the car, and taken near a wooded area where Mr. Flood shot him and left his body.  Mr. Wilson had no reason to lie to Mr. Arnold, with whom he was close.

137.    Given the Government's theory that Mr. Lighty shot Mr. Hayes, defense counsel's failure to fully investigate what Mr. Wilson told Mr. Arnold, and its corresponding failure to call Mr. Arnold as a witness during the penalty phase, was unreasonable and prejudicial to Mr. Lighty.  Had defense counsel called Mr. Arnold, Mr. Arnold's testimony would have corroborated the statement Mr. Wilson gave to Special Agent Bradley on June 11, 2003, which the jury heard during the penalty phase.  Specifically, his testimony would have corroborated Mr. Wilson's statement to Special Agent Bradley that Mr. Mathis shot Mr. Hayes first, that Mr. Hayes was put in the trunk of Mr. Flood's car and driven to a wooded area, and that Mr. Flood shot Mr. Hayes again.  By demonstrating that Mr. Lighty did not shoot Mr. Hayes, Mr. Arnold's testimony would have undermined the Government's justification for

136

seeking the death penalty against Mr. Lighty and would have furnished the jury with important evidence in mitigation.

138.    Reasonably competent counsel would have called Mr. Arnold as a witness to contradict the Government's theory that Mr. Lighty was the shooter.  Defense counsel's unreasonable failure to call Mr. Arnold as a witness during the penalty phase resulted in prejudice to Mr. Lighty, constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

139.    **Failure to Object to Irrelevant, Prejudicial Testimony from Mr. Hayes' Father.**  Defense counsel unreasonably failed to object to the irrelevant and prejudicial testimony of E. Larry Hayes, the victim's father, regarding his service as a police officer and his own experience as a shooting victim.

140.    In addition to stating his occupation, Larry Hayes gave certain details about his job.  For instance, he testified that his assignment to "patrol service area" was a type of "community policing" intended to bring citizens and police together to resolve community problems.  He further informed the jury that his son's death affected his feelings toward his job in that it "fortified [his] conviction" as a police officer, and made him consider going back to school to finish a master's degree in counseling to become a youth counselor.  Larry Hayes also testified that, while on duty, he was himself the victim of a shooting.  He recounted that he was shot four times, spent a week and a half in the hospital, and received numerous visits during that time from his family, including his son.

141.    This inflammatory, prejudicial testimony was irrelevant to the jury's consideration of Mr. Lighty's sentence.  It also constituted unconstitional victim impact evidence

because it effectively asked the jury to sentence Mr. Lighty to death on account of Mr. Hayes' father's stature and career. Defense counsel nevertheless failed to object to its admission.

142. Defense counsel's unreasonable and prejudicial failure to object to the testimony of Larry Hayes regarding his service as a police officer and his own experience as a shooting victim constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

143. **Failure to Object to Prosecutorial Misconduct.** Counsel unreasonably and prejudicially failed to object to prosecutorial misconduct in closing argument at the penalty phase, including commenting on the strain on the decedent's family of sitting through the trial; suggesting that mitigating evidence must have a nexus to the crime in order to be considered by the jury; implicitly arguing for the death penalty based on Mr. Hayes' father's position as a respected police officer; arguing facts not in evidence; and disparaging Mr. Lighty, his defense team, or both. *See* Claim IV.

144. **Failure to Locate and Produce Mr. Lighty's Baby Book During Discovery**. Defense counsel unreasonably failed to locate and produce Mr. Lighty's baby book during discovery. Defense counsel's failure resulted in the prejudicial exclusion of the baby book from evidence.

145. Mr. Lighty's mother, Denise Lighty, kept a baby book in which she described her drug use while she was pregnant with Mr. Lighty. The baby book contained handwritten statements from Ms. Lighty, including the following: "Lil' Kenny had to stay in the hospital for 10 days. The doctor wanted to observe him because I was on that 'boat' all during my pregnancy." The book records that Mr. Lighty was born on September 14, 1982, and that he did not come home until September 24, 1982. Denise Lighty also recorded her sadness that Mr.

Lighty's father had passed away and was not there to see his son, noting the first anniversary of his funeral and writing that she still keeps crying because she misses him so much.

146.   The baby book was retained by Mr. Lighty's grandmother, Nancy Westfield. Although defense counsel had extensive access to Mrs. Westfield prior to trial, defense counsel only inquired and learned of the existence of the baby book during trial.  The Court excluded such evidence because defense counsel had not included the baby book on Mr. Lighty's exhibit list and did not produce it to the Government pursuant to the district court's presentencing order. As a result, the jury never heard Mr. Lighty's mother's admission that she used drugs extensively while pregnant with him.

147.   Reasonably competent counsel would have conducted an investigation sufficient to uncover the existence of Ms. Lighty's baby book – and Ms. Lighty's own admission that she used PCP during her pregnancy – prior to the sentencing phase of Mr. Lighty's trial.  There is no conceivable strategic or tactical reason for defense counsel not to have investigated, discovered and identified the baby book prior to the sentencing phase of Mr. Lighty's trial.

148.   In light of the untimely investigation and disclosure of the baby book, reasonably competent counsel also would have secured its admission on the grounds that, regardless when it was discovered, it constituted evidence that properly rebutted the Government's suggestion on cross-examination of Mr. Lighty's social historian that there was scant evidence of Ms. Lighty's PCP usage while pregnant.

149.   Had defense counsel conducted a reasonably competent, timely investigation, or had defense counsel argued the proper grounds for otherwise admitting the baby book as rebuttal evidence, the jury would have learned important information:  that Ms. Lighty admitted using PCP throughout her pregnancy with Mr. Lighty.  The unreasonable and prejudicial failure of Mr.

Lighty's trial counsel to investigate, timely notify the Government of, and present Mr. Lighty's mother's baby book constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

150.   **Failure to Object to Constitutionally Inadmissible Hearsay Statements from Mr. Lighty's Co-Defendant, Lorenzo Wilson, and from Informant Charles Whitley.** Defense counsel unreasonably failed to object to the admission of unfairly prejudicial, constitutionally inadmissible hearsay testimony about statements that Mr. Lighty's co-defendant, Lorenzo Wilson, allegedly made regarding Mr. Lighty, as well as constitutionally inadmissible hearsay testimony about a statement given by Charles Whitley.

151.   Defense counsel was constitutionally ineffective for failing to object to the admission of the inadmissible testimony of Detective Shawn Chaney regarding statements that Mr. Lighty's co-defendant, Lorenzo Wilson, allegedly made to his then-girlfriend, Krystal Phauls.  Detective Chaney's double hearsay account of Mr. Wilson's statements to Ms. Phauls violated Mr. Lighty's Sixth Amendment rights and was highly prejudicial to Mr. Lighty.

Defense counsel failed to object to the following, constitutionally inadmissible hearsay and double hearsay statements offered by Detective Chaney:

- Ms. Phauls told Detective Chaney that Mr. Wilson told Ms. Phauls that "he [(Mr. Wilson)] was present when Mr. Hayes was abducted on Eighth Street Southeast and that Kenneth Lighty shot and killed Eric Hayes";

- Ms. Phauls told Detective Chaney that Mr. Wilson had Mr. Hayes' pager in his possession at the time he made statements to her regarding the Hayes murder;

- Ms. Phauls told Detective Chaney that Mr. Wilson told Ms. Phauls "that the car, the Lincoln, was being stored at a crackhead's house that Kenny knew".

152.    Defense counsel's failure to object to this inflammatory hearsay, which was introduced in violation of Mr. Lighty's Sixth Amendment rights, constituted ineffective assistance of counsel.  Defense counsel had no sound strategic reason for failing to object to it.

153.    Defense counsel was further constitutionally ineffective for failing to object to inadmissible hearsay testimony from Detective Straughan regarding statements Mr. Wilson allegedly made to Charles Whitley, who was not only available to testify but did testify during the guilt phase.   Like Detective Chaney's testimony, Detective Straughan's testimony violated Mr. Lighty's Sixth Amendment right to confrontation.

154.    Detective Straughan testified that yet *another* detective, Detective Butler, took a statement from Mr. Whitley in which Mr. Whitley said that, *inter alia*, Mr. Wilson told him that "Kenny was dumb as shit for getting locked up for the same gun" and that "the gun had two bodies on it."  Furthermore, the Government introduced, without objection, the full statement that Mr. Whitley made to Detective Butler.

155.    Detective Staughan's constitutionally inadmissible, multiple level hearsay account of Mr. Wilson's statements to Mr. Whitley, as well as the hearsay statement that Mr. Whitley provided to Detective Butler, were unfairly prejudicial to Mr. Lighty as they implicated Mr. Lighty in both the Hayes and Newbill homicides in a way that the Government had not done before.  Defense counsel had no sound strategic reason for failing to object to the admission of either Detective Straughan's testimony or the statement to Detective Butler.  Defense counsel's failure to object to the admission of this evidence constituted ineffective assistance of counsel.

156.    Defense counsel also rendered ineffective assistance by failing to object to constitutionally inadmissible hearsay testimony from Detective Straughan reciting a statement Mr. Whitley made to him on May 2, 2002.  The statement that Detective Straughan read into the

141

record recounted how Mr. Lighty allegedly confessed to abducting and shooting Mr. Hayes. Detective Straughan's inadmissible, double hearsay testimony violated Mr. Lighty's Sixth Amendment rights. Defense counsel had no sound strategic reason for failing to object to the admission of Detective Straughan's testimony.  Defense counsel's failure to object to its admission constituted ineffective assistance of counsel.   Defense counsel had no sound strategic reason for failing to object to the admission of Detective Straughan's testimony.  Defense counsel's failure to object to its admission constituted ineffective assistance of counsel.

157.   **Failure to Object to Constitutionally Inadmissible Hearsay Account of a Prior, Unrelated Crime.**   Defense counsel unreasonably failed to object to the unconstitutional admission of a highly prejudicial hearsay account of a prior, unrelated crime.

158.   The Government asked Special Agent Joseph Bradley to "read just for the record the application for statement of charges against Mr. Lighty" in connection with a prior conviction for armed robbery.  Agent Bradley read the following to the jury:

> Application for statement of charges, the above named defendant and co-defendant, Franco Jefferson Rawlings approached the victim, Alvin Mundell, as he was walking home.  The co-defendant stated to the victim, Do you have my money?  The victim stated, I don't owe you any money. The above defendant stated, Yeah, he does.
> At that time the co-defendant struck the victim in the head with an unknown object.  When the victim fell to the ground, the defendant and co-defendant began kicking him in the head and body.  The co-defendant then went into the victim's pocket and removed $6 in U.S. currency, a set of keys, valued at $5, and one Visa card in the name of Alvin Mundell, valued at $5.

159.   Agent Bradley's testimony regarding the Mundell robbery was inflammatory and unfairly prejudicial to Mr. Lighty.  It was also unreliable, constitutionally inadmissible double or triple hearsay.  Inexplicably, and without any reasonable strategic basis for doing so, defense counsel failed to object to the admission of Agent Bradley's hearsay testimony.  The

142

unreasonable and prejudicial failure of Mr. Lighty's trial counsel to object to the admission of this hearsay constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights

160.    **Failure to Object to Testimony Regarding a Disciplinary Report Involving Mr. Lighty.**  Defense counsel unreasonably failed to object properly to the constitutionally inadmissible hearsay testimony of Special Agent Joseph Bradley regarding a Department of Corrections infraction report (the "Infraction Report") pertaining to Mr. Lighty.  The Infraction Report recounted a situation in which corrections officers removed Mr. Lighty from his cell because he refused to move his belongings to accommodate a new roommate whom he did not know.  The Infraction Report was prejudicial to Mr. Lighty because it indicated that Mr. Lighty experienced difficulty adjusting to life in prison.  Although defense counsel raised an objection to Special Agent Bradley's recitation of the Infraction Report on the grounds that Mr. Lighty had not receive proper notice of the Government's intent to admit it, counsel unreasonably and prejudicially failed to object to the admission of this testimony on the grounds that it constituted inadmissible hearsay whose admission violated Mr. Lighty's Sixth Amendment right to confrontation.

161.    Reasonably competent counsel would have timely objected to the admission of Special Agent Bradley's testimony on hearsay and Sixth Amendment grounds.  The unreasonable and prejudicial failure of defense counsel to properly object to such testimony constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

162.    **Failure to Rebut the Government's Misleading Suggestion that Mr. Lighty Did Not Take Advantage of Institutional Programming.**  Defense counsel conducted an inadequate, unreasonable and prejudicial penalty phase cross-examination of Special Agent

143

Joseph Bradley by neglecting to elicit testimony showing that the Government was inaccurately suggesting that Mr. Lighty did not take advantage of programs offered to him as a pre-trial detainee.

163.    In an effort to demonstrate Mr. Lighty's inability to adjust to institutional life, the Government elicited testimony from Special Agent Bradley that Mr. Lighty's "primary activity" in prison was boxing, and that Mr. Lighty had not availed himself of any other of a multitude of programs purportedly offered to him at the Prince George's County Detention Center.  To demonstrate that Mr. Lighty supposedly had numerous programs available to him, Special Agent Bradley testified about a two-page program list he said he had received from the Department of Corrections.

164.    Defense counsel failed to elicit testimony on cross-examination to establish that many of the programs on the list Special Agent Bradley received were not, in fact, available to Mr. Lighty.  Defense counsel's failure to properly examine Special Agent Bradley left the jury with the inaccurate and unfairly prejudicial impression that Mr. Lighty had not enrolled in a single one of numerous available programs and, therefore, had done nothing productive with his time in jail.

165.    Had defense counsel properly cross examined Special Agent Bradley, the jury would have learned that very few Department of Corrections programs were available to a non-sentenced inmate like Mr. Lighty.  Defense counsel's failure to properly cross examine Special Agent Bradley constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

166.    Defense counsel compounded their error by failing to object to the Government's inaccurate and misleading suggestion that substance abuse treatment programs and mental health

services and other similar services were programs Mr. Lighty could "take." These services were not programs Mr. Lighty could simply sign up for, particularly if he was deemed to be not in need of treatment. Defense counsel had no strategic reason for failing to object to the Government's mischaracterization of these programs. Reasonably competent counsel would have objected to the Government's mischaracterization.

167.    Defense counsel's unreasonable failure to object to the Government's mischaracterization of the services available to Mr. Lighty in prison constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

168.    **Failure to Present Evidence of Witnesses' Losses to Homicide**. Trial counsel unreasonably and prejudicially failed to investigate and present evidence regarding the personal losses to homicide that their mitigation witnesses suffered which would have enhanced the credibility and authority of their testimony and rebutted negative inferences that the Government urged the jury to draw. The trial court erroneously excluded a great deal of such evidence. *See* Claim V (Jacqueline Simons) (Montoria Freeland), incorporated by reference as if fully set forth herein. To the extent that Mr. Lighty's counsel failed to properly investigate, present, proffer or argue the legal significance of any of that evidence, counsel rendered constitutionally ineffective assistance. Counsel additionally failed to investigate and present evidence that penalty phase witness Reverend Leon Lipscombe had lost his own son to murder. Rev. Lipscombe's testimony would have included, but not been limited to, that his son was shot in the head while he was sitting in his car, two or three blocks away from the church at which his father was pastor. Rev. Lipscombe received a call in the early hours of the morning informing him that his son was dead. He was 19 years old. The perpetrator was never identified.

169.    Counsel additionally failed to present testimony from penalty phase witness Jacqueline Ruth that, in addition to her brother, Mr. Lighty's father, she had also lost her own first husband to murder.  Ms. Ruth would have testified that her first husband was a man named Rudy Yelverton. Rudy was addicted to crack cocaine and often used marijuana. Rudy was shot to death by his own brother, Donald, who was under the influence of PCP.

170.    **Failure to Correct Misleading Information Placed Before the Jury Regarding the Possibility of Release.**  Counsel unreasonably and prejudicially failed to request an instruction to the jury to cure the misleading and highly prejudicial effect of the Government's cross examination of defense witness Randy Lighty, Sr. regarding his expectation of release from prison despite having received a sentence of life without parole.  In response to the Government's questions, Randy Lighty, Sr. testified that he was convicted of armed robbery in 1994, that he got a sentence of life with no parole because he has other convictions for crimes of violence, but that he "gave that [sentence] back" by securing its reversal on appeal and so he no longer had a life without parole sentence, and that he hoped to be released from incarceration altogether the following year.

171.    This testimony misled the jury to believe that, if it imposed a life without parole sentence on Mr. Lighty, he, too, could win an appeal and secure his freedom.  It therefore created a false choice for the jury between sentencing him to death and sentencing him to what could be a very limited period of incarceration, in violation of Mr. Lighty's constitutional rights.

172.    This misimpression was reinforced, and the prejudice it caused was compounded, by an exchange that occurred moments earlier during the testimony of the same witness. Preparing to elicit testimony regarding Mr. Lighty's ability to contribute positively in prison if his life was spared, Mr. Lighty's counsel asked: "You understand, do you, that because of this

146

jury's verdict [Mr. Lighty] will be in prison every day for the rest of his life?"  When the Government objected the Court stated, in front of the jury: "Sustained.  It's not necessarily true."  Although unintentional, against the backdrop of the testimony that followed the clear implication of the Court's statement was that death and life without parole were not necessarily the only two options for Mr. Lighty and that he could be released from prison if not sentenced to death.

173.   Mr. Lighty's counsel recognized the problem caused by the testimony regarding the appeal and the urgent need for remedial measures.  However, he suggested only that he be permitted to ask the witness if he understood that the jury's two options in this case were death and life without parole, a solution that the Court rejected and that would in no way have ameliorated the problem in any event.  Reasonably competent counsel would have moved the Court to instruct the jury that, while under some circumstances a criminal defendant can win a lesser sentence on appeal, in a case involving the particular charges that Mr. Lighty had been convicted of, the only possible penalties that may stand are death and life without parole and so there is no possibility that an appellate court could decide to reduce the sentence to anything less than life without possibility of parole.  Mr. Lighty's counsel's failure to request such an instruction constituted ineffective assistance.

174.   **Failure to Properly Argue for Mercy Instruction.**  Defense counsel unreasonably failed to advance a proper argument in support of a valid penalty phase jury instruction concerning the consideration of mercy when imposing punishment.

175.   At trial, defense counsel proposed a jury instruction that included the following language: "Regardless of your findings with regard to aggravating and mitigating factors, you are never required to impose a sentence of death."  The Court refused to give this instruction, explaining that, under relevant case law, a jury may not determine that a sentence of death is

147

justified under the federal death penalty statute and then decide to show mercy by imposing a sentence of life imprisonment.

176.    If defense counsel had provided constitutionally adequate representation, they would have responded to the Court's ruling by proposing an alternative, viable mercy instruction (or they would have proposed such an instruction in the first instance).  Specifically, defense counsel should have requested an instruction permitting the jury to consider mercy *when* weighing – rather than after weighing – aggravating and mitigating factors.  Such an instruction would have been proper and would have served the crucial function of validating and legitimizing the defense's key argument that the jury should consider mercy in its weighing of aggravators and mitigators.

177.    Defense counsel's unreasonable and prejudicial failure to secure a proper instruction about the jury's ability to consider mercy in its penalty phase deliberations constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

178.    **Failure to Object to Improper Jury Instructions.**  The Court improperly instructed the jury at the penalty phase regarding the consequences of their failure to find a proportionality factor and a statutory aggravator; regarding the individual weighing process that the jury should perform; regarding the necessity for a unanimous verdict as to penalty; and regarding the necessity of finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt before imposing a death sentence.  *See* Claim VII, incorporated by reference as if fully set forth herein.  Counsel's unreasonable and prejudicial failure to object to those instructions constituted ineffective assistance of counsel.

1798.   Trial counsel had no reasonable strategic basis for any of the errors and omissions identified above.  Separately, and cumulatively, those errors and omissions prejudiced Mr.

Lighty. It is more than reasonably likely that the jury would not have returned a death sentence if counsel had performed as the reasonably competent counsel guaranteed by the Constitution. Mr. Lighty's sentence must be vacated.

## VII.    IMPROPER INSTRUCTIONS TO THE JURY AT THE PENALTY PHASE VIOLATED MR. LIGHTY'S CONSTITUTIONAL RIGHTS

Mr. Lighty's sentence of death was imposed in violation of his rights to due process, a fair trial, a fair and impartial jury and to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth and Eighth Amendments to the Constitution, because the jury was instructed at the penalty phase that: (1) if it did not find a proportionality factor and a statutory aggravating factor, Mr. Lighty would receive a sentence "other than death as authorized by law," which suggested a sentence less than life in prison without the possibility of parole; (2) a unanimity requirement applies to the weighing of mitigating factors; and (3) a unanimous verdict *must* be obtained, thereby suggesting that the proceeding would not be concluded unless and until each and every jury agreed on the same verdict.

Additionally, Mr. Lighty's sentence of death was imposed in violation of his rights to due process, a fair trial, a fair and impartial jury and to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth and Eighth Amendments to the Constitution, because the Court failed to instruct the jury that the reasonable doubt standard governed the ultimate penalty determination in this case.

In support of this claim, Mr. Lighty alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record and an evidentiary hearing:

1.    **Instruction Regarding the Effect of Proportionality and Statutory Aggravating Factor Not Being Found.**  Mr. Lighty was convicted of the federal offense of

149

kidnapping, resulting in the death of Mr. Hayes. *See* 18 U.S.C. § 1201(a)(1). 18 U.S.C. § 1201(a) provides that, upon conviction of this offense, a defendant must be sentenced to life imprisonment or death. There is no possibility of parole eligibility if a life sentence is imposed. Therefore, following his conviction, the most lenient sentence that Mr. Lighty could have received was life imprisonment without the possibility of parole, even if the jury found no proportionality factor or statutory aggravating factor.

2.     Yet the Court instructed the jury that, in the event it did not find a proportionality factor or a statutory aggravating factor, it would "impose a sentence other than death as authorized by law." The instruction conveyed two unmistakable points: First, correctly, that if the jury did not find either factor, Mr. Lighty would not receive a death sentence; and second, inaccurately, the sentence he would receive would not necessarily be a sentence of life without the possibility of parole.

3.     The language "as authorized by law" misleadingly implied that the Court had discretion in sentencing, because the failure to specify a particular sentence suggested that there was an acceptable range within the "authorization." This left the jury to speculate on how much discretion the Court could, or would, exercise. Additionally, the starkly different language between "life without the possibility of parole" and "a sentence . . . as authorized by law" implies that the alternative to death available to the Court is necessarily different than the alternative to death offered the jury. Since the only punishment greater than life without the possibility of parole is death, the instruction created too great a risk that the jury would believe that the Court had the authority to sentence Mr. Lighty to a term of years.

4.     Juror speculation and concern as to how Mr. Lighty would be punished if they did not find both factors was avoidable. If the Court was obliged to inform the jury the

150

consequences of not finding both factors it should have simply told the jury the truth: that Mr. Lighty would be sentenced to life in prison and, under the law, would not be parole eligible.  By its instruction the Court affirmatively misrepresented those consequences, and inadvertently suggested the possibility, if not the likelihood, that Mr. Lighty would receive a sentence that would allow him to be released from prison at some point in the future.

5.      After having just convicted Mr. Lighty of kidnapping resulting in death, the specter of Mr. Lighty's release was surely unacceptable to the jury.  The instruction therefore likely played a coercive role in their consideration of the proportionality and statutory aggravating factors, causing them to find both factors based not on the evidence, but rather their fear that Mr. Lighty would be released.  The instruction therefore violated Mr. Lighty's constitutional rights.

6.      *Mills* **Error.**  The Court instructed the jury that:

> After you have decided upon the aggravating and mitigating factors that are present as to this defendant, the law requires you to weigh these factors and decide whether you are unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors to justify imposing a sentence of death.

7.      The only fair reading  of  "to *weigh* these factors and decide whether you are *unanimously* persuaded that the aggravating factors outweigh any mitigating factors . . .," is to read "unanimously" as applying to the earlier term "weigh."  Thus, the effect of the instruction was to convey to the jury that the weighing determination requires unanimity.

8.      Any doubt was resolved by the subsequent use of the phrase "outweigh," which unambiguously applies to the phrase "unanimously persuaded," again imputing a unanimity requirement into the weighing process.

9.      The instruction directly violates the commands of *Mills v. Maryland,* 486 U.S. 367 (1988)*.* One juror alone may find a mitigating factor.  Therefore, the weighing process is an

individual one, not requiring unanimity.  If it did require unanimity, *Mills* would have no meaning and the finding of a mitigating circumstance would be a non-event.

10.     Of course, unanimity is required for a death sentence, and a jury should be so instructed.   The concept of unanimity, however, is relevant only to the finding of aggravation, and the ultimate jury vote, not the finding of mitigation nor the individual juror's weighing of aggravation and mitigation.  Notwithstanding the imperatives of an open exchange between jurors and willingness to re-examine one's positions, the finding of mitigation, and the weighing of aggravating and mitigating factors, is an individual decision for each juror, and one that does not require, nor even involve unanimity.

11.     The Court's constitutionally infirm instruction was given in the greater context of penalty phase instructions that gave no guidance whatsoever to the individual weighing process for a juror who found a mitigating factor which all of other jurors did not find.  There was no instruction that, irrespective of other jurors' findings, the individual juror must weigh that factor against aggravation, that the weighing process need not be unanimous and that each juror must individually decide whether to vote for life or death.  In short, the jury was given no explanation whatsoever as to what "weigh" might possibly mean in the context of his deliberations, after which the jury was given an instruction suggesting that in weighing mitigation unanimity *was* required. The instruction therefore violated Mr. Lighty's constitutional rights.

12.     **Instruction Coercing a Unanimous Verdict.**  In its final instructions , given just before sending the jury out to deliberate as to penalty, the Court stated:

> After considering the aggravating and mitigating factors, you must
> unanimously determine whether the defendant should be sentenced to
> death or life imprisonment without the possibility of release . . . .

152

13. The instruction communicated an absolute necessity of returning a unanimous verdict. There is little ambiguity to the word "must." The American Heritage Dictionary defines "must" as "to be obliged or required by morality, law or custom." Alternatively it is used "to express a command or admonition." "Must" followed by a command conveys no choice. The directive must be obeyed, especially where, as here, it comes from a figure of authority.

14. While a Court is not necessarily obliged to inform a jury that the jury is permitted to hang, such a result is permissible. Unanimity is not required by law, nor could it be. A defendant's rights to due process, a fair trial, a fair and impartial jury and to be free from cruel and unusual punishment requires that a juror who has fairly considered all of the evidence and the positions of his fellow jurors be permitted to vote in accordance with his findings and conscience, even if it prevents a unanimous verdict. Although in other parts of its instruction this Court encouraged jurors not to change their opinions "solely because others may think differently or simply to get the case over with," the Court did nothing to cure its unambiguous command that, ultimately, the jury must return a unanimous verdict.

15. That the instruction directing unanimity was presented as a greater imperative than even the jurors' individual moral decision, is supported by comparing the numerous other uses of the word "must" in the Court's instructions. In each of those instances (well over forty), the directive followed by the word "must" is compelled by statute or by the United States Constitution. A representative sampling includes the following:

- the jurors *must* follow and apply the rules of law the court give

- the Government *must* prove beyond a reasonable doubt that the defendant was 18 at the time of the crime

- the Government *must* prove one of the proportionality factors beyond a reasonable doubt

- the Government *must* prove aggravation beyond a reasonable doubt

- the defense *must* prove mitigation by a preponderance

- the jury *must* weigh aggravating and mitigating circumstances

- the verdict form *must* be signed as to sentence and as to non-discrimination

16.     The instruction was not only incorrect as a matter of law, but carried too great a likelihood that a juror, or jurors, believing unanimity was absolutely required, would be coerced into changing his position to satisfy what he perceived to be required.  The harm inherent in such an instruction is particularly prejudicial to a defendant in the penalty phase, in which the Eighth Amendment to the United States Constitution requires that the juror be free to vote in accordance with his individual moral response to the evidence.  The instruction violated Mr. Lighty's constitutional rights.

17.     **The Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt.**  Although the Court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the Court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors.

18.     The Court's instruction mirrored the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors. *See* 18 U.S.C. § 3593(e).  However, this instruction falls short of the requirement of the United States Constitution that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded

154

beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison to the mitigating circumstances that the death penalty is justified and that death is the appropriate penalty.

19.     The Government may not impose a sentence greater than that authorized by the jury's verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi v. New Jersey,* 530 U.S. 466 (2000).  The *Apprendi* principle applies to factfindings necessary to put a capital defendant to death. *Ring v. Arizona*, 536 U.S. 584, 609 (2002).

20.     Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. These findings include a finding that the aggravating factors outweigh any mitigating factors.  Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, Mr. Lighty was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.

21.     Just as the finding of an aggravating factor is a "fact" that must be proved beyond a reasonable doubt under *Ring, supra*, the finding that one or more aggravating factors outweigh mitigating factors is a factual one. Indeed, under the federal death penalty statutes applicable to Mr. Lighty's trial, the weighing process leads to the ultimate factual finding without which the death penalty may not be imposed. Therefore, the "fact" that the aggravating factors outweigh the evidence in mitigation is the indispensable factual finding that "increases

155

the penalty for a crime beyond the prescribed statutory maximum." *Apprendi,* 530 U.S. at 490. In other words, while the finding of one or more aggravating factors is a necessary precondition to the imposition of the death penalty, it is not sufficient for the death penalty to be imposed.

22.     Before a death sentence can be returned, the jury must find, as a matter of fact, that the aggravating factors outweigh the mitigating factors. Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Lighty's sentence was constitutionally invalid.

23.     By not requiring a standard for the certainty necessary to impose a death verdict, a defendant might be sentenced to death by jurors who believe it is simply more likely than not the defendant should be sentenced to death, rather than by a unanimous finding that death is appropriate beyond a reasonable doubt. This plainly violates the Supreme Court's *Apprendi* line of cases. Moreover, because a death penalty is qualitatively different from any other criminal punishment, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. The requirement of heightened reliability compels the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before the death penalty may be imposed.

24.     This Court's failure to provide such an instruction to the jury renders Mr.Lighty's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

25.     The failure to properly instruct on the burden of proof is a structural error which requires automatic reversal of Mr. Lighty's sentence of death.  Additionally these violations of

156

Mr. Lighty's rights had a substantial and injurious effect or influence on the penalty judgment, and the death sentence must be vacated.

## VII.   ERRORS AND OMISSIONS BY APPELLATE COUNSEL DEPRIVED MR. LIGHTY OF HIS CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE ON DIRECT APPEAL

Mr. Lighty's convictions and sentence are unlawful and in violation of his constitutional rights to counsel, the effective assistance thereof, the presumption of innocence, present a defense, confrontation, compulsory process, due process, freedom from cruel and unusual punishment and a fair, reliable, accurate determination of guilt and penalty as guaranteed by the Fifth, Sixth and Eighth Amendments because his representation by appellate counsel and was unreasonably and prejudicially deficient in multiple respects.  But for those deficiencies in the investigation, preparation and presentation of the direct appeal, there is a reasonable probability that, separately and cumulatively, Mr. Lighty would have been granted appellate relief on the claims set forth below.

All omissions by Mr. Lighty's direct appeal counsel that may be noted by this Court, such as the failure to advance available legal objections and claims, the failure to marshal all available facts in support of legal claims, or the failure to advance all available legal bases for claims that were advanced, were the result of counsel's negligence and not the product of any reasonable strategic decision.  Those omissions include, but are not limited to:

**Exclusion of Women From Mr. Lighty's Petit Jury**

1.      The Government committed prosecutorial misconduct in violation of Mr. Lighty's constitutional rights by intentionally excluding women from his petit jury.  See Claim I, incorporated by reference as if fully set forth herein.

157

2.      Appellate counsel unreasonably and prejudicially failed to challenge the Government's exclusion of women from Mr. Lighty's petit jury.  Reasonably competent appellate counsel would have recognized that the Government exercised its peremptory challenges to exclude women from the jury and would have challenged the Government's conduct on appeal.

**Failure to Argue the Proper Standard of Review as to the Government's Unconstitutional Penalty Phase Closing Argument.**

3.      Appellate counsel unreasonably and prejudicially failed to cite and argue for the proper standard of review for Mr. Lighty's meritorious claim that the Government violated Mr. Lighty's Eighth Amendment rights by improperly arguing in its penalty phase closing that it was asking for the death penalty on behalf of the victim's family.

4.      Before the Court of Appeals, Mr. Lighty's appellate counsel incorrectly presumed that the standard for determining whether  the Government's unconstitutional penalty phase argument required reversal was set forth in *Donnelly v. DeChristoforo*, 416 U.S. 437 (1974), as articulated in circuit precedent.  *Donnelly* established the standard for determining whether general prosecutorial misconduct amounts to a violation of a defendant's due process rights. Under *Donnelly*, the defendant must show that the government's misconduct so infected the trial as to rise to the level of a due process violation.

5.      However, the Government's improper penalty phase argument in this case invoking the purported wishes of the victim's family was based on inadmissible – and never-admitted – victim impact evidence.  As the Fourth Circuit expressly held, it constituted a violation of Mr. Lighty's Eighth Amendment rights.  Whether the violation of a specific constitutional right, like the admission of impermissible victim impact evidence and argument, requires reversal is not subject to review under the *Donnelly* standard.  Rather, it is subject to

158

review under the far more demanding standard set forth in *Chapman v. California*, 386 U.S. 18 (1967). Under *Chapman*, it is the government's burden to show that a constitutional error was harmless beyond a reasonable doubt. Unlike *Donnelly,* which is designed to determine whether a reversible due process violation occurred, *Chapman* is designed to determine whether the *proven* violation of a specific constitutional right requires reversal.

6.      Appellate counsel incorrectly informed the Court of Appeals that it should apply the *Donnelly* standard to determine whether the Government's argument violated Mr. Lighty's constitutional rights. They failed to recognize that, because the Government's argument specifically violated Mr. Lighty's Eighth Amendment rights, *Donnelly* and its circuit progeny were inapplicable. Correspondingly, they failed to make the correct argument that the Court of Appeals should apply only the *Chapman* standard to determine whether the government's improper penalty phase argument required reversal.

7.      Because of appellate counsel's unreasonable failure before the Court of Appeals -- namely framing the issue in terms of a wholly inapplicable legal standard - the Court of Appeals was impelled to apply the *Donnelly* standard, as articulated in circuit precedent. Specifically, upon the request of appellate counsel, it sought to determine "whether Lighty's substantial rights were prejudiced to the point of denying him a fair trial."

8.      Appellate counsel should have known the applicable standard, and accordingly should have argued that the Government bore the burden of proof, and that the government was required to show that its misconduct was harmless beyond a reasonable doubt – *i.e.*, that it would not have affected a single juror's sentencing decision.

9.      Had appellate counsel performed as the reasonably effective advocates guaranteed by the Constitution, they would have informed the Court of Appeals that *Chapman* established

the correct standard of review.  Had the issue been properly raised and framed, the Court of Appeals would have concluded that the Government's unconstitutional penalty phase argument required reversal of Mr. Lighty's death sentence.

10.     Appellate counsel's unreasonable failure to inform the Court of Appeals of the correct standard of review for the Government's unconstitutional penalty phase argument constituted ineffective assistance of counsel and violated Mr. Lighty's constitutional rights.

**Mr. Lighty's Right to a Fair and Impartial Jury was Violated in Multiple Respects**

11.     Mr. Lighty was denied his constitutional right to a fair and impartial jury.  See Claim III, incorporated by reference as if fully set forth herein.  Appellate counsel failed to act as the reasonably competent advocate guaranteed by the United States Constitution in failing to raise on appeal the Court's erroneous denial of defense counsel's motions to strike for cause Jurors No. 9, 21, 44, 114, 120, 124, 178, 210 and 254, and the Court's erroneous decisions to grant the Government's motions to strike for cause against Jurors No. 72, 134, 136 and 305.

**The Court's Erroneous Exclusion of Mitigating Evidence.**

12.     The Court erroneously excluded relevant mitigating evidence at the penalty phase of Mr. Lighty's trial.  See Claim V, incorporated by reference as if fully set forth herein. Appellate counsel unreasonably and prejudicially failed to raise on appeal the Court's erroneous exclusion of items of that evidence, including Jaqueline Simons' plea to the jury to spare Mr. Lighty's life; the loss that Ms. Simons herself had suffered; the losses that Montoria Freeland had suffered; and the impact of Mr. Lighty's situation and the threat of his execution on his grandmother, Nancy Westfield, who raised him.

**Improper Penalty Phase Jury Instructions.**

13.      The Court erroneously instructed the jury at the penalty phase regarding the

consequences of their failure to find a proportionality factor and a statutory aggravator; regarding the individual weighing process that the jury should perform; regarding the necessity for a unanimous verdict as to penalty; and regarding the necessity of finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt before imposing a death sentence. *See* Claim VII, incorporated by reference as if fully set forth herein. Appellate counsel unreasonably and prejudicially failed to raise these claims on appeal.

14.     Appellate counsel had no reasonable strategic reason for failing to raise the claims that they failed to raise. It is more than reasonably likely that, had the claims been properly raised, Mr. Lighty's convictions and sentences would have been reversed by the Fourth Circuit. Those convictions and sentences must therefore now be vacated.

## VIII.   MR. LIGHTY'S CONVICTIONS AND SENTENCES MUST BE VACATED BECAUSE OF THE CUMULATIVE EFFECT OF THE PREJUDICIAL ERRORS MADE IN THIS CASE.

Mr. Lighty's convictions and sentences were imposed in violation of his rights to a fair trial, trial by jury, due process, the effective assistance of counsel, present a defense, confront the witnesses against him, a reliable determination of guilt and penalty and freedom from cruel and unusual punishment, as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, because of the cumulative effect of all of the errors that plagued both the guilt and penalty phases of Mr. Lighty's trial.

Mr. Lighty incorporates into this claim by reference as if fully set forth herein all of the facts, allegations and arguments made in this Motion, as well as all objections, arguments and claims of error made at trial and on appeal, including the erroneous and prejudicial admission of the evidence regarding the Afton Street homicide.

161

## PRAYER FOR RELIEF

For the foregoing reasons, Defendant, Kenneth Jamal Lighty, respectfully requests that the Court grant the following relief:

1.      That discovery be granted as is necessary for full and fair resolution of the claims in this Motion;

2.      That leave to amend this Motion be granted, as appropriate;

3.      That an evidentiary hearing be conducted on all disputed issues of fact;

4.      That the parties be afforded an opportunity to submit full briefing on the proper resolution of the claims in this Motion;

5.      That the Court vacate Mr. Lighty's convictions and sentence of death; and

6.      That all other appropriate relief be granted.

Respectfully submitted,

Dated:  October 16, 2012


_/s/ Julie Brain_____
Julie Brain
Julie_Brain@fd.org
Karl Schwartz
Karl_Schwartz@fd.org
Capital Habeas Unit
Delaware Federal Defender Office
800 King Street, Suite 200
Wilmington, DE 19801
(302) 573-6010

_/s/ Seth A. Rosenthal_____
Seth A. Rosenthal
sarosenthal@venable.com
Bar No. 17080
Gilead I. Light
gilight@venable.com
Molly T. Geissenhainer
mtgeissenhainer@venable.com

162

VENABLE LLP
575 7th Street, NW
Washington, DC  20004-1601
202-344-4000

*Counsel for Kenneth Jamal Lighty*

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Julie Brain. I am an attorney licensed to practice law by the State of California, Arkansas and the District of Columbia. I am an assistant federal public defender in the Office of the Federal Defender for the District of Delaware. In 2010, I was appointed post-conviction counsel for Kenneth Jamal Lighty along with Seth A. Rosenthal of Venable, LLC.

I am authorized by Kenneth Jamal Lighty to file the foregoing Motion to Vacate, Set Aside, or Correct Sentence, and for a New Trial Pursuant to 28 U.S.C. § 2255. I am filing the amended motion on Mr. Lighty's behalf. Mr. Lighty is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing Motion to Vacate, Set Aside, or Correct Sentence, and for a New Trial Pursuant to 28 U.S.C. § 2255. I declare that the contents of the foregoing Motion are true except for those matters based upon information and belief, and I believe the latter matters to be true. The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this amended motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this amended motion. I make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings because these matters are more within my knowledge than Mr. Lighty's knowledge.

I declare, under penalty of perjury, that the foregoing verification is true and correct.

Executed by me this 16th day of October, 2012, in New Castle County, Delaware.

/s/ Julie Brain
Julie Brain

164